790 So.2d 267 (1999)
Louis GRIFFIN
v.
STATE.
CR-97-1026.
Court of Criminal Appeals of Alabama.
December 10, 1999.
Opinion on Return to Remand February 4, 2000.
Rehearing Denied March 31, 2000.
*278 J.T. Simonetti, Jr., Birmingham, for appellant.
Bill Pryor, atty. gen.; and Jeremy W. Armstrong and James R. Houts, asst. attys. gen., for appellee.
FRY, Judge.
On April 12, 1996, the appellant, Louis Griffin, pleaded guilty in the United States District Court for the Southern District of New York to violations of the federal Racketeer Influenced and Corrupt Organizations Act (RICO). During Griffin's plea, he admitted to participating in the murder of Christopher Lynn Davis in Birmingham, Alabama, on September 24, 1992. (C.R. 250.) During the March 1997 term, a Jefferson County grand jury returned an indictment charging Griffin with the capital offense of murder for "pecuniary or other valuable consideration." See § 13A-5-40(a)(7), Ala.Code 1975. Griffin was tried and the jury returned a verdict finding Griffin guilty of capital murder, as charged in the indictment. The jury, by a vote of 10-2, recommended that Griffin be sentenced to death. A sentencing hearing was held on January 29, 1998, and the trial court sentenced Griffin to death. On January 30, 1998, Griffin filed a motion for a new trial. On March 24, 1998, the trial court denied Griffin's motion for a new trial. This appeal followed.
The evidence established the following: Jesse Straiton, a crime scene technician for the Birmingham Police Department, *279 testified that he was called to the Avondale pool game room on September 24, 1992, to investigate the scene of the murder of Davis. Straiton stated, in his opinion, that because he was unable to find any empty shell casings at the scene, he believed that revolver(s) were used during the incident.
Dr. Robert Brissie, chief coroner and medical examiner for Jefferson County, testified that he performed an autopsy on Davis on September 28, 1992. Dr. Brissie stated that Davis had suffered "at least seven" gunshot injuries. (R. 427.) According to Dr. Brissie, at least three of the wounds would have been fatal, and that many of the shots were fired at close rangefrom 12 inches to 20 inches.
David Higgins, a forensic scientist for the Birmingham lab of the Department of Forensic Sciences, testified that he analyzed the bullets and fragments found in Davis's body and determined that the bullets were from either a .357 Magnum or a.38 caliber revolver. Higgins stated that regardless of whether the revolver was a.357 Magnum or a .38, the weapon was capable of holding a maximum of six bullets. Higgins said based on his analysis, he was "ninety-nine point ninety-nine percent sure these [bullets] were fired out of a revolver." (R. 440.)
Johnny Spragg, Jr., testified that he had lived in Birmingham most of his life. Spragg stated that he and Rapheal Bimbo[1] sold drugs. According to Spragg, he and Bimbo received their drug supply from Carlton "K" Henry, who, in turn, purchased the drugs from the 142nd Street Lynch Mob Crew (hereinafter "the Crew"), a gang in New York City. Spragg testified that during September 1992, while he and Bimbo were outside in the Avondale projects, a policeman drove up and asked Bimbo to walk over to his car. Because Bimbo was in possession of drugs, he ran from the officer. During the pursuit, Bimbo threw the drugs on the roof of a shed. A short time later, Spragg met Bimbo at Bimbo's grandmother's house. Bimbo was talking on the phone with Henry. Bimbo told Henry about being chased by a police officer, throwing the drugs on the shed's roof, and learning that Davis had retrieved the drugs and refused to return them. After Bimbo ended his telephone conversation with Henry, he told Spragg that Davis had taken possession of some of the drugs and was refusing to return them. Bimbo told Spragg that Henry indicated he "was going to have his man and them to come down here ... [and] take care of the situation." (R. 467.)
Spragg further testified that Griffin was the "security man" for the Crew. According to Spragg, approximately one week after Davis refused to return the drugs, Henry came to his apartment with Griffin. Later that night at a motel near the Birmingham Airport, Spragg met Griffin, Henry, and Jonathan Ferrell (hereinafter "Johnny O."). Spragg testified that he, Griffin, Henry, and Johnny O. rode around in the Avondale area that night and Henry pointed Davis out in a group of people at a playground. Spragg testified that Griffin wanted to kill Davis at that time, but that Henry told him to wait until later.
The next day, Spragg, Griffin, Henry, Johnny O., and Bimbo met at a church in Avondale. Spragg testified that Bimbo gave Henry $4000, and that Henry then gave Griffin and Johnny O. each $2000. Spragg testified that Henry gave the money to Griffin and Johnny O. as payment for the "hit" on Davis.
*280 The next day Griffin called Spragg and asked him to help find Davis. Spragg went to the motel and picked up Griffin and Johnny O., who were dressed in black clothing and had two six-shot .357 Magnum revolvers. That same night, Spragg drove Griffin and Johnny O. around the Avondale area in search of Davis. Spragg stated that they stopped outside the Avondale pool game room, and that he found Davis inside the game room. Spragg returned to the vehicle where Griffin and Johnny O. were waiting, got into the driver's side, and told them where Davis was standing and what Davis was wearing. According to Spragg, he stayed in the vehicle while Griffin and Johnny O. entered the game room; Spragg heard several gunshots come from the game room. Griffin and Johnny O. then ran out of the game room and got into the vehicle. Spragg testified that, as he drove away, someone fired two shots at them and that his vehicle was hit by buckshot. Additionally, Spragg testified that, after the shooting, Griffin's demeanor was "nonchalant... cool ... like it was ... business as usual." (R. 495.)
Spragg stated that he drove Griffin and Johnny O. to the motel. At the motel, Spragg put Griffin and Johnny O.'s guns in the trunk of his vehicle along with the empty shell casings. According to Spragg, Henry drove Griffin and Johnny O. to the Hartsfield International Airport in Atlanta so that there would not be a record of their leaving Alabama.
Later that day, Spragg and Bimbo threw the guns and the shell casings into East Lake. Spragg testified that, when he returned to the game room and looked through a window, Davis's body was lying in the same area where Davis was standing before the shooting occurred.
Spragg testified against Griffin pursuant to the terms of a plea agreement he entered in New York District Court. According to Spragg, he believed that, if he cooperated and testified for the government against Griffin, the United States Attorney General would request that the sentencing judge be lenient when determining his sentence.
Derek Razor testified that he and Griffin grew up together in the Harlem neighborhood of New York City. Razor indicated that he and Griffin were involved in the Crew in New York City. Razor stated that Henry told him that Bimbo had thrown some drugs on top of a shed while he was running from the police and that the person who recovered the drugs would not give them back. According to Razor, Henry requested that Griffin and Johnny O. "take care of business." Razor testified that, a few days later, Henry told him that Griffin and Johnny O. had "taken care of business." Razor stated that he had pleaded guilty in federal court to conspiracy to commit murder and that he was testifying because he hoped to reduce his sentence on federal charges.
Bimbo testified that he had met Griffin only twiceonce briefly during a visit in New York City and again at the "bullpen" at the Jefferson County jail. Bimbo stated that he admitted to federal agents that he and Spragg had disposed of the weapons used to murder Davis by throwing them in a lake.
Chiquita Norman testified that she and Felicia Crenshaw were standing outside approximately 10 feet fromthe Avondale pool game room at the time of the shooting. Norman stated that two men walked into the game room and that she then heard gunshots. According to Norman, someone fired shots at the two men as they exited the game room and ran away. Norman further stated that she did not recognize either of the men and did not recognize Griffin.
*281 Joseph Walsh, an agent for the Federal Bureau of Investigation (hereinafter F.B.I.), testified that one of his assignments was an investigation of the Crew. He stated that Griffin had pleaded guilty in federal court to conspiracy to commit the murder of Davis.
Officer Andre Pressley of the Birmingham Police Department testified that Crenshaw, who was outside the game room when the incident occurred, identified two people as the alleged shooters, neither of whom was Griffin.
Sabrina Smith testified that she gave birth to Griffin's son on September 10, 1992, at Harlem Hospital in New York City. According to Smith, their baby had to stay in the hospital 14 days because of an infection. Smith stated that her baby was released from the hospital on the afternoon of September 24, 1992the day Davis was killed, and that Griffin was with her on the day their baby was released. According to Smith, Griffin was also in New York City on September 25 and 26.
Jamilah Shabazz testified that she was living with Henry around the time the murder occurred. Testimony indicated that a room at the Holiday Inn motel near the Birmingham airport was registered to a person named Henry on the day that the murder occurred. Shabazz identified the handwriting on the motel registration receipt as Henry's. Additionally, Shabazz stated that, on September 25, 1992, she accompanied Henry and two other men to Atlanta, Georgia, because Henry told her that he was going to drive the men to the airport. Shabazz indicated the two men wore black clothing and that they both had New York accents. Shabazz stated she was unsure whether Griffin was one of the men in the vehicle with her and Henry.
Initially, we note that because Griffin was sentenced to death, our review is conducted pursuant to Rule 45A, Ala.R.App.P. which provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
While Griffin's failure to object at trial does not bar our review of an issue, it does weigh against any claim of prejudice he now raises on appeal. Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). Additionally, in Ex parte Land, 678 So.2d 224 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996), our Supreme Court held:
"Plain error is error that `has or probably has adversely affected the substantial rights of the petitioner.' Rule 39(k)[Ala.R.App.P]. `In other words, the plain error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."` United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985), quoting United States v. Frady, 456 U.S. 152, 163, n. 14, 102 S.Ct. 1584, 1592, n. 14, 71 L.Ed.2d 816 (1982)."
678 So.2d at 232. See Freeman v. State, 776 So.2d 160 (Ala.Cr.App.1999). Accordingly, we will review the errors raised on appeal.

I.
Griffin contends that "[t]he trial court reversibly erred when it prevented the defense from showing that the state had *282 previously prosecuted two other individuals for Davis's death, and that one of the individuals admitted responsibility for the offense." (Griffin's brief to this Court at p. 1.) Griffin further argues that "since [the guilty plea conviction] was evidence derived from in-court proceedings, it was by very definition not hearsay" and, therefore, admissible. (Griffin's brief to this Court at p. 2-3.)
In either the fall of 1992 or the spring of 1993, a Jefferson County grand jury indicted Falanda Miles and Anthony Embry for the murder of Davis. In May 1993, Embry pleaded guilty to Davis's murder and was sentenced to 20 years' imprisonment. In April 1994, Miles was tried and acquitted of the murder of Davis.
Griffin argues that the trial court should have admitted the prosecutions of Embry and Miles into evidence because, he says, "the plea of Mr. Embry, and the prosecution of Mr. Miles, was a critical component of the defense case, for it would show that there was ample reason to believe that [he] had not committed the offense: namely, that others had been prosecuted and admitted to responsibility for the offense." (Griffin's brief to this Court at p. 3.)
"A careful analysis of all the pertinent decisions will reveal that the true test of whether evidence of another's guilt is admissible lies within the sound discretion of the trial judge. A particular collection of facts indicating guilt of one other than the accused is admissible if, but only if, the deciding authority, ... feels that the whole of the offered evidence tending to show another's guilt is worth considering or, ... has any tendency to make such other person's guilt more probable than it would without the evidence."
C. Gamble, McElroy's Alabama Evidence, § 48.01(1) (5th ed. 1996).
"`As a general rule, an accused may introduce any legal evidence that tends to show that someone else committed the crime for which he is charged. Green v. State, 258 Ala. 471, 64 So.2d 84 (1953). See generally C. Gamble, McElroy's Alabama Evidence, § 48.01(1) (3d ed. 1977); Schroeder, Hoffman and Thigpen, Alabama Evidence, § 4-4(a)(c) (1987).'"
Travis v. State, 776 So.2d 819, 851 (Ala.Cr. App.1997), quoting Thomas v. State, 539 So.2d 375, 395 (Ala.Cr.App.), aff'd, 539 So.2d 399 (1988), cert. denied, 491 U.S. 910, 109 S.Ct. 3201, 105 L.Ed.2d 709 (1989)(Emphasis added).
The mere fact that another individual has confessed to the offense for which the accused is being tried or that another individual has been prosecuted for that offense is not legal evidence admissible in the trial of the accused. "It is, of course, permissible for the defendant to show that another than himself committed the crime with which he is charged, but such proof is confined to substantive facts, and cannot include conduct or admissions, nor even confessions, unless they are part of the res gestae." Ward v. State, 15 Ala.App. 174, 175, 72 So. 754 (1916)(emphasis added). See Erskine v. State, 21 Ala.App. 307, 107 So. 720 (1926).
"`[T]he outcome of another's prosecution is simply irrelevant to the guilt or innocence of the defendant and may not be received as substantive evidence at defendant's trial. See, e.g., Hill v. State, 210 Ala. 221, 97 So. 639 (1923).'"
Whitt v. State, 733 So.2d 463, 483 (Ala.Cr. App.1998), quoting Stokes v. State, 462 So.2d 964, 967 (Ala.Cr.App.1984).
"Traditional authority has held that the admission or confession of another that such person committed the crime for which the accused is being tried is *283 generally not admissible. This is customarily grounded upon the premise that the admission or confession is violative of the hearsay rule."
C. Gamble, McElroy's Alabama Evidence § 48.01(4) (5th ed. 1996). See Glass v. State, 19 Ala.App. 530, 98 So. 702 (1923). Furthermore,
"Alabama law historically has embraced the position that the declaration of an unavailable person, that such person committed the crime for which the accused is being tried, is not admissible under the hearsay exception for declarations against interest."
Id. at § 249.02.
As the trial court correctly determined, the admission of evidence of the two prior prosecutions and the outcome of those prosecutions, was not material, that is "of consequence," in the determination of Griffin's guilt or innocence. The trial court stated in the case action summary with regard to this issue,
"It is noted that [the trial court] does not believe that this evidence [the conviction of Embry and the acquittal of Miles] is relative to others being tried or that acquittal or arrest bears on a genuine issue in the case before the Griffin jury and indeed would be confusing and irrelevant."
(Supp.R.7.) We agree; the evidence did not make Griffin's guilt more probable or less probable. As we stated in a similar situation in Hill v. State, 210 Ala. 221, 97 So. 639, 641 (1923), "Such an acquittal is no more competent to show the defendant's innocence than that other's conviction would have been to show the defendant's guilt."
Griffin cites in support of his argument the United States Supreme Court's holding in Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), that the trial court had erred in preventing Chambers from introducing hearsay evidence at trial that pointed to the guilt of another man, Gable McDonald, and to Chambers's innocence.
In Thomas v. State, 539 So.2d at 395-96, we provided a complete discussion of the facts and holding in Chambers. We noted that the United States Supreme Court in reversing Chambers's conviction relied heavily upon the fact that McDonald was available to testify at trial and to be cross-examined by the state, that there were strong assurances of the reliability of evidence, and that the hearsay statements, which pointed to the guilt of McDonald, also pointed to Chambers's innocence.
We conclude, however, that Chambers is distinguishable from the present case. Here, Griffin did not subpoena or call either of the persons previously prosecuted for Davis's murder. Therefore, Griffin offered no substantive facts tending to prove that Miles or Embry killed Davis. Griffin requested to present the evidence through court records showing the previous arrests, indictments, and prosecutions of the other individuals. As we stated in Pool v. State, 19 Ala.App. 406, 406, 98 So. 309 (1923), when we reviewed the admissibility of Pool's evidence to prove that T. McNeal had been convicted of the offense that Pool was charged with:
"The indictment against T. McNeal and the verdict of the jury finding him guilty of the crime for which [Pool] has been convicted, and the judgment of the circuit court showing his conviction, were not original evidence tending to show that T. McNeal had committed the offense for which [Pool] has here been convicted. Both the indictment and conviction may have been based on evidence entirely insufficient to sustain them. The evidence offered was inadmissible." *284 As in Pool, the trial court here properly denied Griffin's motion to admit the court records to show the previous arrests, indictments, and prosecutions of Miles and Embry because they did not tend to establish, as Griffin argues, his innocence. See Glass v. State, 19 Ala.App. at 530, 98 So. at 702 (stating "the record of the conviction of another is not original evidence tending to show his guilt, and was not admissible for the purpose of showing his guilt and incidentally the defendant's innocence").
Based on the above analysis, we conclude the trial court did not err in refusing to admit the evidence regarding Miles and Embry.

II.
Griffin contends that the trial court erred in requiring him to call two defense witnesses "out of order" during the state's case-in-chief. We find no objection in the record by Griffin to calling these witnesses out of order. Because Griffin failed to object at trial, our review is limited to plain error. Ala.R.App.P., Rule 45A.
This Court has held:
"The appellant bears the burden of bringing the record before the appellate court. Montgomery v. State, 504 So.2d 370 (Ala.Cr.App.1987). An appellate court may only consider the facts contained in the record on appeal, and it may not presume any facts not shown by that record and make them a ground for reversal. Williams v. State, 412 So.2d 1274 (Ala.Cr.App.1982)."
Carden v. State, 621 So.2d 342, 346-347 (Ala.Cr.App.1992). "The trial court has discretion in scheduling and in determining courtroom procedure; however, when the exercise of that discretion results in the denial of a basic constitutional right, we must find that that discretion has been abused." Ephraim v. State, 627 So.2d 1102, 1105 (Ala.Cr.App.1993). "The mode of conducting the examination of witnesses and the order of introducing evidence are matters within the discretion of the trial court." Alford v. State Farm Fire & Cas. Co., 496 So.2d 19, 21 (Ala.1986), quoting Drs. Lane, Bryant, Eubanks & Dulaney v. Otts, 412 So.2d 254, 259 (Ala.1982).
In the sentencing order, the trial court indicated that it permitted defense witness Bimbo to testify during the state's case-in-chief to allow Bimbo's attorney an opportunity to be present. (Supp.R.30.) The record shows Bimbo's attorney, who had in fact advised Bimbo not to testify, was present in the courtroom. (R. 588-589.) Norman was called by the defense during the state's case-in-chief because the trial court questioned her availability at a later time. (Supp.R.30.)
Although Griffin claims that the testimony of these two defense witnesses before the state rested its case "was grossly prejudicial," he has failed to establish how this procedure denied him a fair trial. Griffin offers only speculation to support any alleged prejudice; therefore, he has failed to show how the trial court abused its discretion and violated his constitutional rights. No plain error occurred in the trial court's allowing Bimbo and Norman to testify out of order that would result in a miscarriage of justice.

III.
Griffin contends the state, during its first closing argument, improperly commented on his failure to testify at trial. According to Griffin, reversible error occurred when the prosecutor stated:
"And the real issue in this case, as I see the evidence presented, is he's trying to say through his attorneys and through his witnesses that it was somebody else that did this murder, but it wasn't him."
(R. 815-16.)
Because Griffin failed to object at trial, our review is limited to a plain-error review. Ala.R.App.P., Rule 45A.
*285 In Ex parte Brooks, 695 So.2d 184, 188-189 (Ala.1997), cert. denied, 522 U.S. 893, 118 S.Ct. 233, 139 L.Ed.2d 164 (1997), our Supreme Court held:
"Alabama law distinguishes direct comments from indirect comments and establishes that a direct comment on the defendant's failure to testify mandates the reversal of the defendant's conviction, if the trial court failed to promptly cure that comment.... On the other hand, `covert,' or indirect, comments are construed against the defendant, based upon the literal construction of Ala.Code 1975, § 12-21-220, which created the `virtual identification doctrine.' Ex parte Yarber, 375 So.2d [1231] at 1234 [(Ala.1979) ]. Thus, in a case in which there has been only an indirect reference to a defendant's failure to testify, in order for the comment to constitute reversible error, there must have been a virtual identification of the defendant as the person who did not become a witness. Ex parte Yarber, 375 So.2d at 1234."
(Some citations omitted.)
At trial, Griffin's defense theory was that he did not murder Davis; that he was in New York City and not in Birmingham at the time of the murder. The alleged improper comment made by the prosecutor, when read in conjunction with the testimony at trial, is simply a restatement of Griffin's defense. We conclude that the prosecutor's statement "`rather than emphasizing the defendant's silence, merely point[s] out his defense and inferentially called on the jury not to believe it.'" Kimble v. State, 545 So.2d 228, 230 (Ala. Cr.App.1989), quoting Brinks v. State, 500 So.2d 1311, 1315 (Ala.Cr.App.1986). We find no plain error in the prosecutor's comment.

IV.
Griffin contends that the trial court's finding that the defense failed to present a prima facie case of racial discrimination in the exercise of the state's peremptory challenges of prospective jurors was erroneous. See Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The record indicates that, after the jury was struck and before it was seated, the following transpired:
"[Defense counsel]: Judge, out of 13 strikes the state struck eight blacks.
"THE COURT: That's right. That's what I show.
"[Defense counsel]: Which would leave us with how many?
"THE COURT: Four according to my
"[Defense counsel]: The defendant is black.
"THE COURT: Yes. That's true.
"[Defense counsel]: We make a motion of prima facie evidence of racial discrimination in the selection of the jury.
"THE COURT: Denied. Did I cut you off?
"[Defense counsel]: No, sir.
"THE COURT: Denied, based upon everything I've seen and heard and in camera discussions we had with a number of the jurors that were struck."
(R. 262-63.)
Griffin did not provide any further argument to establish a prima facie case of racial discrimination. Essentially, the only assertion made by Griffin's counsel in support of his motion was that the state had used 8 of its 13 strikes to remove black potential jurors. The trial court stated the following in the case action summary with regard to Griffin's motion:
"[B]ased on trial court's observation of the voir dire process, including extensive individual voir direre death penalty court holds no prima facie case for *286 discriminatory striking is made by the defense. `Problems' with the death penalty and negative contact with law enforcement are observed as relative [reasons] for state's peremptory strikes."
(Supp.R.8-9.)
In Price v. State, 725 So.2d 1003, (Ala. Cr.App.1997), aff'd, 725 So.2d 1063 (Ala. 1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999), we addressed a similar situation and stated:
"`"A defendant claiming a Batson violation must make a prima facie showing that the prosecution used its peremptory strikes in a discriminatory manner. Jackson v. State, 594 So.2d 1289 (Ala.Cr.App. 1991). Only when the defendant establishes facts and circumstances that raise an inference of discrimination must the state give its reasons for its peremptory strikes. Carter v. State, 603 So.2d 1137 (Ala. Cr.App.1992)."
"`Stokes v. State, 648 So.2d 1179, 1180 (Ala.Cr.App.1994). We will reverse a trial court's ruling on a Batson motion only when that ruling is clearly erroneous. Ex parte Branch, 526 So.2d 609 (Ala.1987).'

"Clemons v. State, 720 So.2d 961, 974 (Ala.Cr.App.1996).
". . . .

"`Batson, Ex parte Branch, 526 So.2d 609 (Ala.1987), and their progeny make it very clear that "`[t]he burden of persuasion is initially on the party alleging discriminatory use of peremptory challenges to establish a prima facie case of discrimination.'" Ex parte Bird, 594 So.2d 676, 679 (Ala.1991) (quoting Ex parte Branch, 526 So.2d at 622). Until this burden is met, the challenged party "is under no obligation to offer explanations for its peremptory strikes." Jackson v. State, 594 So.2d 1289, 1292 (Ala.Cr. App.1991). See also Huntley v. State, 627 So.2d 1013 (Ala.1992). Merely showing that the challenged party struck one more members of a particular race is not sufficient to establish a prima facie case. Harrell v. State, 571 So.2d 1270, 1271 (Ala.1990), cert. denied, 499 U.S. 984, 111 S.Ct. 1641, 113 L.Ed.2d 736 (1991); Ashley v. State, 606 So.2d 187, 192 (Ala.Cr.App. 1992); Jones v. State, 603 So.2d 419, 420-21 (Ala.Cr.App.1992). See also Hood v. State, 598 So.2d 1022, 1023 (Ala.Cr.App.1991)....
"Edwards v. State, [628 So.2d 1021] at 1024 [ (Ala.Cr.App.1993) ].
"`"In Ashley v. State, 606 So.2d 187 (Ala.Cr.App.1992), the prosecution used three of its seven strikes to remove blacks from the pool of potential jurors. This court held that the `appellant failed to establish a prima facie case under Batson and Ex parte Branch [526 So.2d 609 (Ala.1987) ] because the appellant failed to show any evidence of discrimination other than the number of blacks struck.' Ashley, 606 So.2d at 192. Similarly in the present case, the only evidence presented to the trial court by the appellant was the fact that three out of the seven potential black jurors were struck by the prosecution. There was no evidence presented that any of the factors set out in Ex parte Branch, 526 So.2d 609 (Ala.1987), which may be used to establish a prima facie case, existed. The evidence presented at trial was not sufficient to prove a prima facie case of a Batson violation. The trial court did not err in denying the appellant's Batson motion."

*287 "`Moore v. State, 677 So.2d 828, 829 (Ala.Cr.App.1996).
"`"When determining whether a challenging party has shown a prima facie case of racial discrimination in the use of peremptory strikes, `the court is to consider "all relevant circumstances" which could lead to an inference of [such] discrimination.' Ex parte Branch, 526 So.2d 609, 622 (Ala.1987). The challenging party `may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial.' Batson, 476 U.S. at 96, 106 S.Ct. at 1723 (emphasis added). Normally, the challenging party has not shown that the prosecution used its peremptory strikes in a racially discriminatory manner where the only evidence presented in support of a prima facie case of discrimination is the fact that blacks were struck by the prosecution. Ex parte Branch, 526 So.2d 609, 622-23 (Ala.1987), contains a nonexclusive list of factors that a challenging party might use to establish a prima facie case of discrimination. This list includes, `[a] pattern of strikes against [jurors of a certain gender or race] on a particular venire; e.g., 4 of 6 peremptory challenges were used to strike black jurors.' Branch, 526 So.2d at 623 (emphasis added). A pattern `"implies that the decision-maker... selected ... a particular course of action at least in part `because of,' not merely `in spite of,' its adverse effects upon an identifiable group," Hernandez [v. New York], 500 U.S. 352, 360, 111 S.Ct. [1859] at 1866, [114 L.Ed.2d 395 (1991) ] (quoting Personnel Administrator of Massachusetts v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979)) (footnote and citation omitted in Hernandez).' Freeman v. State, 651 So.2d 576, 583 (Ala.Cr.App.1994). When determining whether peremptory strikes were used in a manner to suggest a discriminatory `pattern of strikes,' `[m]erely showing that the challenged party struck one or more members of a particular race is not sufficient to establish a prima facie case [of discrimination].' Edwards v. State, 628 So.2d 1021, 1024 (Ala.Cr.App.1993)."
"`Bell v. State, 676 So.2d 1349, 1350 (Ala.Cr.App.1995)....'
"Clemons v. State, 720 So.2d at 975."
725 So.2d at 1059-60. See Pressley v. State, 770 So.2d 115 (Ala.Cr.App.1999); and Farrior v. State, 728 So.2d 691 (Ala. Cr.App.1998).
Here, Griffin relied solely on the number of strikes made by the State against blacks, without any supporting evidence indicating a discriminatory intent or purpose, to support his Batson motion. Consequently, we concur with the trial court that Griffin failed to make a prima facie showing of racial discrimination by the state. He has not shown that the trial court's denial of his Batson motion was clearly erroneous.

V.
Griffin contends the testimony of his alleged accomplices, Spragg and Bimbo,[2] was insufficiently corroborated as a matter *288 of law; therefore, he says, his conviction must be reversed. Specifically, he argues that the "state failed to meet its burden of proof, and offered no other evidence that [he] committed the capital offense of murder for pecuniary gain besides the unreliable and unverified testimony offered by [his] accomplices." (Griffin's brief to this Court at p. 25.)
Section 12-21-222, Ala.Code 1975, provides that:
"A conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense of the circumstances thereof, is not sufficient."
In Arthur v. State, 711 So.2d 1031 (Ala. Cr.App.1996), aff'd, 711 So.2d 1097 (Ala. 1997), this Court stated:
"`"Corroboration need only be slight to suffice." Ingle v. State 400 So.2d 938, 940 (Ala.Cr.App.1981). "While corroborating evidence need not be strong, it `... must be of substantive character, must be inconsistent with the innocence of a defendant and must do more than raise a suspicion of guilt.' McCoy v. State, 397 So.2d 577 (Ala.Cr.App.), cert. denied, 397 So.2d 589 (Ala.1981)." Booker v. State, 477 So.2d 1388, 1390 (Ala.Cr. App.1985). "However, the corroboration need not be sufficiently strong by itself to warrant a conviction." Miles v. State, 476 So.2d 1228, 1234 (Ala.Cr. App.1985). The requisite corroborative evidence is determined by a process of elimination or subtraction. Caldwell v. State, 418 So.2d 168, 170 (Ala.Cr.App.1981). "The means for analyzing the evidence to determine if there is sufficient evidence to corroborate testimony of an accomplice is to set aside the accomplice's testimony and determine whether or not the remaining evidence tends to connect the defendant with the commission of the offense." Leonard v. State, 459 So.2d 970, 971 (Ala.Cr.App.1984). "Whether such corroborative evidence exists is a question of law to be resolved by the trial court, its probative force and sufficiency being questions for the jury." Caldwell v. State, supra, at 170. Circumstantial evidence is sufficient to show corroboration. Jackson v. State, 451 So.2d 435, 437 (Ala.Cr.App.1984). See also McConnell v. State, 429 So.2d 662 (Ala.Cr.App.1983).'

"Hodges v. State, 500 So.2d [1273] at 1275-76 [ (Ala.Cr.App.1986) ].
"In Ware v. State, 409 So.2d 886 (Ala. Cr.App.1981), writ quashed, 409 So.2d 893 (Ala.1982), this court quoted Andrews v. State, 370 So.2d 320, 322 (Ala. Cr.App.), cert. denied, 370 So.2d 323 (Ala.1979), stating:
"`"The corroboration of an accomplice must tend to connect the accused with the commission of the crime but need not refer to any statement or fact testified to by the accomplice. `Corroborate means to strengthen, to make stronger; to strengthen, not the proof of any particular fact to which the witness has testified, but to strengthen the probative, criminating force of his testimony.' Malachi v. State, 89 Ala. 134, 140-141, 8 So. 104, 106 (1889); Smith v. State, 230 Ala. 413, 416, 161 So. 538 (1935); Brown v. State, 31 Ala.App. 529, 19 So.2d 88 (1944). The corroborative evidence need not to be strong, nor sufficient of itself to support a conviction, the criterion being that it legitimately tend to connect the accused with the offense. Miller v. State, 290 Ala. 248, 275 So.2d 675 (1973). Corroborative *289 evidence need not directly confirm any particular fact nor go to every material fact stated by the accomplice. Bridges v. State, 52 Ala.App. 546, 295 So.2d 266 (1974); Dykes v. State, 30 Ala.App. 129, 1 So.2d 754 (1941). Corroborative evidence need not directly connect the accused with the offense but need only tend to do so. State v. Canada, 107 Ariz. 66, 481 P.2d 859, cert. denied, 404 U.S. 848, 92 S.Ct. 154, 30 L.Ed.2d 87 (1971). See Pearce v. State, 26 Ala.App. 492, 495, 164 So. 114, cert. denied, 231 Ala. 150, 164 So. 118 (1935) (`(B)ut, as we read the cases, the corroboratory evidence, if it meets the test of "tending to connect the defendant with the commission of the offense," need not be, in and of itself alone, that tending in any wise to fasten guilt upon the defendant'); 23 C.J.S. Criminal Law § 812(3) (1961). The sufficiency of corroborating evidence is established if its probative value tends to connect the defendant with the commission of the crime. Lowe v. State, 32 Ala.App. 176, 22 So.2d 618 (1945). The corroboration of an accomplice may be shown by circumstantial evidence. Blevins v. State, 56 Ala.App. 115, 319 So.2d 734, cert. denied, 294 Ala. 753, 319 So.2d 739 (1975); Tidwell v. State, 23 Ala.App. 409, 126 So. 186 (1930).
"`. . . .
"409 So.2d at 891."
711 So.2d at 1059-60 (emphasis in original). In addition, "[i]t has been held that nonaccomplice evidence of an admission or confession by the accused is sufficient corroboration of an accomplice's testimony to sustain a conviction of the accused." C. Gamble, McElroy's Alabama Evidence, § 300.01(9) (5th ed. 1996). See White v. State, 352 So.2d 29 (Ala.Cr.App.1977); Williams v. State, 52 Ala.App. 406, 293 So.2d 324 (1974); Floks v. State, 49 Ala. App. 101, 268 So.2d 881 (1972); and Knowles v. State, 44 Ala.App. 545, 215 So.2d 727 (1968).
The trial court determined that Spragg was an accomplice in the murder of Davis. Spragg testified that Griffin and Johnny O. each received $2,000 from Henry to kill Davis.
We conclude that Spragg's testimony was sufficiently corroborated by the following evidence. Bimbo, a defense witness, testified during cross-examination by the state that he had previously informed the government that Griffin had killed Davis for pecuniary gain. (R. 614-15.)
"While the general rule is that the testimony of an accomplice cannot be corroborated by the testimony of another accomplice, the necessary corroboration of the state's accomplice may be supplied by the testimony of an accomplice witness who is called by and testifies for the defendant."
Ward v. State, 376 So.2d 1112, 1116 (Ala. Cr.App.1979). Moreover, Griffin in his guilty plea in federal court admitted killing Davis. Because we conclude in Part VI of this opinion that Griffin's admission in the guilty plea proceeding in federal court was properly admitted into evidence, Griffin's admission provided a connection to the offense sufficient to corroborate Spragg's testimony. Furthermore, testimony indicated that Henry had a motel room in Birmingham registered in his name on the day Davis was killed and that a telephone call was made from that room to Griffin's girlfriend in New York City. This testimony suggests that Griffin was in Birmingham and had an opportunity to participate in the offense. "If ... the accused is in close proximity to the crime and there is other evidence indicating guilt, such a combination of evidence is sufficient to corroborate *290 the testimony of an accomplice." C. Gamble, McElroy's Alabama Evidence, § 300.01(14) (5th ed. 1996). Although Shabazz could not identify Griffin, her testimony corroborated Spragg's testimony that Henry took Griffin and Johnny O. to Atlanta for their return flight to New York City. The evidence presented by the state, independent of Spragg's testimony, sufficiently connected Griffin with the killing of Davis.

VI.
Griffin contends that the trial court erred when it admitted in evidence his admission that he had killed Davis, which occurred during his guilty plea in federal court to RICO violations. Specifically, he argues that the federal plea allocution was inadmissible because, he says, he "was not fully informed of the consequences of the plea: namely, that he would be prosecuted for capital murder upon entering the plea agreement." (Griffin's brief to this Court at p. 31).
"Judicial confessions ... consist of guilty pleas, or statements in support of such pleas, made in judicial proceedings. These confessions may have been made in other actions.... Alabama has long held that an accused's plea of guilty in another court to a charge of doing a criminal act for which the accused is not being tried is admissible on the present trial even in the absence of a warning to the accused in such other court as to the effect of, or the subsequent usability as incriminating evidence of, the entry of a plea of guilty. Such a guilty plea, or a statement made in support of it, is admissible in the later litigation as an admission. A voluntary plea of guilty at a preliminary hearing before a committing magistrate by one charged with a crime, for example, is admissible in evidence as a confession in the subsequent trial of the accused."
C. Gamble, McElroy's Alabama Evidence, § 200.09(1) (5th ed. 1996).
An admission by a defendant constitutes the strongest possible evidence of his guilt. Rule 801(d)(2)(A), Ala.R.Evid., includes among the statements defined as "not hearsay," a statement "offered against a party" that is "his own statement." A plea of guilty by a defendant to a felony and his allocution on that plea are admissions under Rule 801(d)(2)(A).
Our determination of the admissibility of Griffin's plea of guilty in federal court rests upon a determination of whether Griffin entered his plea voluntarily. We analyze the allegation under the standard provided by Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), Twyman v. State, 293 Ala. 75, 300 So.2d 124 (1974), and Ireland v. State, 47 Ala. App. 65, 250 So.2d 602 (Ala.Cr.App.1971).
During the guilty plea hearing the federal trial court, after determining that Griffin was represented by counsel, engaged in a lengthy colloquy with Griffin, in which the court explained Griffin's rights and ensured that Griffin was waiving those rights knowingly and voluntarily. The court advised Griffin of the range of punishment that could be imposed upon conviction, and Griffin stated that he understood the possible punishment. Because Griffin was represented by counsel, had ample time for reflection before entering his plea, was provided with an opportunity to consider the weight of the evidence against him, and was fully informed of his rights, we conclude that Griffin's plea of guilty to RICO charges, in which he admitted participating in the murder of Davis, was made voluntarily.
We reject Griffin's argument that his plea was not voluntary because, he says, he was not informed that "he would be prosecuted for capital murder upon entering *291 the plea agreement." (Griffin's brief to this Court at p. 31.) According to Griffin, his prosecution in the State of Alabama for the capital murder of Davis is a direct consequence of his guilty plea to the RICO charges; therefore, he concludes his plea was involuntary.
Initially, we note that before entering his guilty plea to the RICO charges, Griffin executed a plea agreement with the United States Attorney for the Southern District of New York, approved by his defense counsel, which included the following statement:
"It is further understood that this Agreement does not bind any federal, state, or local prosecuting authority other than this Office."
(C.R.272.) Therefore, Griffin was informed that other jurisdictions were not bound by the agreement.
"`"`[A]n accused is entitled to information concerning the direct consequences of his plea. He is not entitled to information concerning all collateral effects, or future contingencies that might arise.'" Fearson v. State, 662 So.2d 1225, 1226 (Ala.Cr.App.1995)(quoting Minnifield v. State, 439 So.2d 190, 192 (Ala.Cr.App.1983)).'"
Robinson v. State, 730 So.2d 252, 254 (Ala. Cr.App.1998). Griffin's prosecution for capital murder in the State of Alabama was not a direct consequence of his plea of guilty to RICO violations in federal court. The federal prosecutor was not required to inform Griffin of the possibility that he might be charged in the State of Alabama for the murder of Davis. The State of Alabama is a different, independent sovereign from the federal government; therefore, prosecution in the State of Alabama was totally independent of the federal prosecution.
"`"[E]ach government in determining what shall be an offense against its peace and dignity is exercising its own sovereignty, not that of the other.
"`. . . .
"`Thus, "[e]ach has the power, inherent in any sovereign, independently to determine what shall be an offense against its authority and to punish such offenses, and in doing so each `is exercising its own sovereignty, not that of the other.'" [United States v.] Wheeler, 435 U.S. [313] at 320, 98 S.Ct. [1079] at 1084[, 55 L.Ed.2d 303 (1978) ] (quoting [United States v.] Lanza, 260 U.S. [377] at 382, 43 S.Ct. [141] at 142[, 67 L.Ed. 306 (1922)) ]."
Clemons v. State, 720 So.2d 961, 967 (Ala. Cr.App.1996), aff'd, 720 So.2d 985 (Ala. 1998), cert. denied, 525 U.S. 1124, 119 S.Ct. 907, 142 L.Ed.2d 906 (1999), quoting Heath v. Alabama, 474 U.S. 82, 88-90, 106 S.Ct. 433, 437-38, 88 L.Ed.2d 387, 392-93 (1985).
Griffin's prosecution in the State of Alabama was conducted by an independent sovereign and involved an entirely distinct legal offense from the offense underlying the guilty plea conviction in federal court. The prosecution in Alabama was not an "automatic" or "definite" consequence of Griffin's federal plea of guilty to RICO violations. While the admission in his plea of guilty that he killed Davis may have been the impetus to start his prosecution in Alabama, the prosecution for capital murder was not a direct consequence, as a matter of law, from his plea. United States v. Persico, 621 F.Supp. 842 (S.D.N.Y.1985)(holding that a defendant need only be advised concerning the direct consequence of the guilty plea; thus, the defendant did not have to be advised that the "conduct underlying the plea may become a predicate act for criminal offenses committed by the defendant after the date of such conduct"establishing a RICO violation); *292 United States v. Andreadis, 366 F.2d 423 (2d Cir.1966), cert. denied, 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967)(defendant's plea in state court to a charge of false advertising was admissible later in a federal prosecution for mail fraud arising from the advertising); and Myers v. United States, 49 F.2d 230 (4th Cir.), cert. denied, 283 U.S. 866, 51 S.Ct. 657, 75 L.Ed. 1470 (1931)(state court guilty plea to charge of possession of illegal liquor was admissible in subsequent federal prosecution for unlawfully selling liquor).
We conclude that no error occurred when the trial court admitted into evidence Griffin's voluntary plea of guilty to RICO violations.

VII.
Griffin contends the state lost or destroyed exculpatory evidence before his trial. Approximately four years before Griffin's trial, the state prosecuted two other men, Miles and Embry, for the murder of Davis. Griffin requested during pretrial discovery that the state produce the original police file that led to the prosecutions of Miles and Embry. The state, however, was unable to produce the file because the file was missing. Griffin claims the loss or destruction of the original case file "establishes an unacceptable likelihood of prejudice to [him] that requires reversal." (Griffin's brief to this Court at p. 38.) We disagree.
In May v. State, 710 So.2d 1362, 1369 (Ala.Cr.App.1997), this Court stated:
"The Alabama Supreme Court, in Ex parte Gingo, 605 So.2d 1237 (Ala.1992), adopted the United States Supreme Court's position in Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), regarding the allegations that the state failed to preserve evidence potentially useful to the defense:
"`"[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Youngblood, 488 U.S. at 58, 109 S.Ct. at 337. "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." ...'
"605 So.2d at 1240-41. Gingo additionally recognized that a defendant's right to due process can be violated when the loss or destruction is of evidence so critical to the defense that its loss or destruction makes the trial fundamentally unfair. Id. (citing Youngblood, 488 U.S. at 67, 109 S.Ct. at 342)."
(Some citations omitted.)
The record indicates that the state made a diligent effort to locate the missing case file. Nothing in the record indicates the loss of the original case file was the result of bad faith on the part of the police or the state. Therefore, we conclude Griffin was not denied due process in this regard.
Moreover, Griffin has failed to demonstrate that the evidence that was lost was critical to the defense's case. In his brief to this Court, Griffin claims that the following inferences can be drawn regarding the evidence in the lost case file:
(1) At least two eyewitnesses identified someone other than Griffin as the shooter;
(2) There were many people in the game room at the time of the shooting and without the case file Griffin had no way to learn their identities; and
(3) Presumably, there was forensic evidence of the two individuals arrested and prosecuted for the Davis murder. *293 (Griffin's brief to this Court at p. 39-40.) Griffin, however, offers no more than speculation and conjecture in support of his argument. Griffin presented testimony that two eyewitnesses had identified other men as the shooters of Davis. Additionally, Norman and Shabazz, Henry's girlfriend, were unable to identify Griffin at trial. Griffin presented evidence in his defense that he was not in Birmingham at the time of the murder. Furthermore, the police never recovered the murder weapon. Consequently, we fail to see how Griffin was incapable of presenting his defense and unfairly prejudiced by the state's inability to produce the missing file. Any evidence obtained from the file would have been cumulative and not so critical as to make Griffin's trial fundamentally unfair.

VIII.
Griffin claims that the presentence investigation report (hereinafter "PSI"), required by § 13A-5-47(b), Ala. Code 1975, was inadequate and "[did] not provide adequate guidance to the trial court." (Griffin's brief to this Court at p. 43.) Specifically, Griffin claims that the PSI is deficient because, he says, no effort was made to secure personal information regarding his children, to discover why he left school, or to contact other members of his family. Because Griffin did not object to the PSI report at his sentencing hearing, our review is limited to a plain-error review. Rule 45A, Ala.R.App.P.
Griffin cites Guthrie v. State, 689 So.2d 935 (Ala.Cr.App.1996), in support of his claim that his PSI report was inadequate. However, we find the PSI report in Guthrie is easily distinguished from Griffin's PSI report. The personal and social history included in Guthrie's PSI report was taken from an interview with Guthrie that occurred at least five years before Guthrie's sentencing hearing and did not contain psychological information that was known to exist. 689 So.2d at 947-948. We remanded the case in Guthrie because the report "implie[d] little, if any, attempt [was made] to subjectively evaluate Guthrie." 689 So.2d at 947.
By contrast, the record before us indicates that Griffin's presentence investigation occurred during the month between his conviction and sentence. The PSI report contains Griffin's personal and social history, indicating that he is single and has fathered four children; provides his work history; and states that Griffin "did not want to name any references or give any additional information" other than the information he provided. (C.R.192.) The PSI report also indicates that the court was in possession of Griffin's prior criminal record. Although Griffin claims that information regarding the case status of codefendants, victim notification information, victim impact, and financial status were insufficient, we conclude that a remand is not required. Griffin merely states that these categories were left blank; he offers no evidence that this information was available. He does not proffer the evidence or indicate how it would assist the trial court in its evaluation. Furthermore, the PSI report directly refutes Griffin's argument on appeal because it states that Griffin did not want to provide further information. The same trial judge who presided over and imposed sentence on Griffin also conducted the trial and sentenced Griffin's codefendant, Bimbo; therefore, the trial court was familiar with the evidence. Additionally, Griffin's counsel argued the existence of mitigating circumstances. Evidence of Griffin's character was presented implicitly throughout the guilt and sentencing proceedings. Based on the foregoing, we conclude that the PSI report adequately presented evidence from which the trial court could *294 evaluate Griffin and meets the requirements of § 13A-5-47(b), Ala.Code 1975.

IX.
Griffin argues that "[h]earsay infected the entire trial" and "violated [his] rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, [and] the equivalent portions of the Alabama Constitution, and Alabama law." (Griffin's brief to this Court at p. 44.) Griffin lists from the record several instances where, he says, inadmissible hearsay was allowed into evidence.[3] Specifically, Griffin claims that improper hearsay was admitted during the state's opening statement and during the direct testimony of Spragg and Razor. We will address each of these claims in turn.

1. Alleged instances of improper hearsay admitted during the state's guilt-phase opening statement.
Griffin claims the prosecutor relied on "anticipated hearsay" during his opening statement on at least four occasions. (Griffin's brief to this Court at p. 45.) All of these claimed errors occurred during the state's guilt-phase opening statement and involved statements made by either Davis or Henry.
"The purpose of opening statements is for each party to give the jury an overview of what the evidence will show."
McKinney v. State, 654 So.2d 95, 98 (Ala. Cr.App.1995). In addition, "the scope of an opening statement rests within the sound discretion of the trial judge." Shelton v. State, [Ms. CR-97-1313, May 28, 1999] ___ So.2d ___, ___ (Ala.Cr.App. 1999). The prosecutor "`"is to be allowed considerable latitude in presenting to the jury in his opening statement what he expects the evidence to show."'" Kinder v. State, 515 So.2d 55, 66 (Ala.Cr.App. 1986), quoting Ex parte Baldwin, 456 So.2d 129, 136 (Ala.1984)(emphasis in original.) We have reviewed the portions of the record Griffin cites. Because we conclude in subsection 2 of this part of our opinion that the alleged improper hearsay was properly admitted into evidence and in light of the wide latitude in presenting expected evidence during opening argument, we conclude no error occurred.

2. Alleged instances of improper hearsay admitted during the direct examinations of Spragg and Razor.
Griffin lists four instances of the admission of alleged hearsay that occurred during the state's direct examination of Spragg. Three of these instances involved statements about a telephone conversation between Bimbo and Henry. Spragg testified that Bimbo had a telephone conversation with Henry. During the conversation, Bimbo informed Henry that Davis had recovered the drugs and was refusing to return them. In addition Spragg indicated that Bimbo told him that Henry was going to have someone "come down here" and "take care of the situation." Spragg also testified that Bimbo told him he gave Henry $4000. The final instance cited by Griffin occurred when Spragg testified that a telephone number listed on the motel receipt was Bimbo's pager number.
Griffin also claims that improper hearsay was admitted four times during the direct examination of Razor. Three of these claimed instances concern Razor's testimony regarding statements made by Henry to Razor about Bimbo's throwing *295 the drugs on a roof and Davis's refusing to return them. According to Razor, Henry asked him whether he thought Griffin and Johnny O. "would come down here and take care of some business." (R. 548.) Additionally, Razor testified that Henry informed him that Griffin and Johnny O. had taken "care of business." (R. 551.) The last instance concerned a conversation between Razor and Johnny O. in which Johnny O. stated that Henry owed him money.
The trial court concluded that the alleged hearsay evidence offered by Spragg and Razor was admissible because the instances involved a statement or act by one coconspirator against another coconspirator. We agree.
Rule 801(c), Ala.R.Evid., states:
"`Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."
Rule 801, Ala.R.Evid., lists many types of statements that are by definition not hearsay. Included in that list are admissions by party opponents. Rule 801(d)(2)(E) declares a statement is not hearsay if:
"The statement is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."
In addition, this Court has held:
"`"Where proof of a conspiracy exists, any act or statement by an accused's co-conspirator in the commission of the crime, done or made before the commission of the crime, during the existence of the conspiracy and in the furtherance of a plan or design, is admissible against the accused."' Deutcsh v. State, 610 So.2d 1212, 1222 (Ala.Cr.App. 1992), quoting Charles W. Gamble, McElroy's Alabama Evidence, § 195.03(1)(4th ed. 1991).
"`[T]he principle is that by conspiring together, the conspirators have jointly assumed to themselves, as a body, the attributes of individuality, so far as necessary to pursue a common design; thus, rendering whatever is done or said in furtherance of that design a part of the res gestae and, therefore, the act of all.'
Charles W. Gamble, McElroy's Alabama Evidence, § 195.03(1)(4th ed. 1991)(citing Stokley v. State, 254 Ala. 534, 49 So.2d 284 (1950))."
Nettles v. State, 683 So.2d 9, 12 (Ala.Cr. App.1996).
"`While it is preferable that a co-conspirator testify after the prima facie showing of the existence of a conspiracy, such order of proof is not mandatory. The order of proof requirement is for the purpose of expediting the trial and saving the valuable time of the trial court, rather than protecting or securing any supposed right a defendant might have. Morton v. State 338 So.2d 423, 425 (Ala.Cr.App.), cert. denied, 338 So.2d 428 (Ala.1976); Conley [v. State, 354 So.2d 1172 (Ala.Cr.App.1977) ]'"
Harris v. State, 632 So.2d 503, 524 (Ala.Cr. App.1992), aff'd, 632 So.2d 543 (Ala.1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995), quoting Nance v. State, 424 So.2d 1358, 1365 (Ala.Cr.App. 1982).
"The fact of a party's participation in a conspiracy may be proven by that party's own express admission. It has been held, for example, that proof both of the accused's and another's membership in the alleged conspiracy may consist solely of accused's own admission or confession of such membership."
*296 C. Gamble, McElroy's Alabama Evidence, § 195.03(2)(5th ed. 1996).
"In determining whether the State presented a prima facie case, this court will consider the evidence in the light most favorable to the State. Hutcherson v. State, 441 So.2d 1048 (Ala.Cr.App.1983); Smelcher v. State, 385 So.2d 653 (Ala.Cr. App.1980)."
Salter v. State, 578 So.2d 1092, 1094 (Ala. Cr.App.1990).
Reviewing the evidence in the light most favorable to the state, we find that the testimony of Spragg and Razor was not hearsay and that it was properly admitted. Before Spragg and Razor testified, the evidence at trial established that Davis was shot seven times with either .38 caliber or .357 Magnum bullets that came from one or more revolvers. The testimony also established that at the time of Davis's murder, those caliber revolvers held only six rounds. While these facts alone are insufficient to establish a conspiracy before the testimony of Spragg and Razor, any deficiency was cured by the admission of further evidence.
In his federal plea allocution, Griffin admitted to participating with Razor, Henry, and others in Davis's murder. This admission, in and of itself, established Griffin's participation in the conspiracy sufficient to admit Spragg and Razor's testimony. In addition to Griffin's federal allocution, Norman testified that while she was outside of the game room on the night of the murder, she saw two men enter the game room. After hearing gunshots, she saw two men run from the building. Shabazz testified the day after the murder that Henry drove two men with New York accents to the Hartsfield International Airport in Atlanta. The testimony of both Norman and Shabazz was consistent with that of Spragg and Razor. Clearly, the admission by Griffin and the supporting evidence by Norman and Shabazz sufficiently established a conspiracy and, thus, the testimony of Spragg and Razor was properly admitted.
Likewise, Spragg's testimony concerning Bimbo's beeper number being listed on the motel registration was properly admitted. Rule 602, Ala.R.Evid., states, in pertinent part:
"A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness's own testimony."
In reviewing the record, we find the state laid the proper foundation for Spragg's testimony by establishing that Spragg had personal knowledge of Bimbo's beeper number.
Upon a careful review of the record, we conclude that the objectedto portions of Spragg and Razor's testimony were not hearsay. Consequently, the prosecutor's argument was permissible because it was supported by the evidence. No error occurred.

X.
Griffin contends that the state violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, (1963), when it did not provide a gun that law enforcement officers located in the lake where the guns used to kill Davis were allegedly thrown. Griffin argues that this gun was critical to his defense because "it was not the type of gun that was purportedly used by [him] to kill Mr. Davis." (Griffin's brief to this Court at p. 53.) Additionally, he appears to argue that the state suppressed a forensics report conducted on the gun.
In 1995, three years after the murder of Davis, Spragg informed law enforcement *297 officers that he had thrown the guns used by Griffin and Johnny O. to kill Davis into East Lake. When law enforcement officers searched the lake and the surrounding area, they found a .38 revolver. The state was unable to turn the revolver over to Griffin because the F.B.I. laboratory had destroyed it. Although Griffin alleges that the state had the revolver examined by a forensics expert and a written report was compiled, the prosecutor represented to the trial court that there was no written report.
In order to establish a Brady violation, Griffin "must establish 1) that the state suppressed evidence, 2) that the evidence was favorable to the defense, and 3) that the evidence was material." Ellis v. State, 641 So.2d 333, 337 (Ala.Cr.App. 1994).
"Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different. A `reasonable probability' is a probability to undermine confidence in the outcome."
United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3379-3380, 87 L.Ed.2d 481 (1985).
We conclude that Griffin has failed to establish a Brady violation. Although the revolver had been destroyed, the jury was informed that a revolver had been found in the lake at Spragg's direction. Additionally, the revolver and any examination conducted upon it were not material or exculpatory. Walsh testified that the revolver was examined by the F.B.I. firearms laboratory and that it was damaged. The testimony indicated that the recovered gun was so deteriorated from water damage that any attempt to perform a projectile analysis would have been futile. Thus, contrary to Griffin's assertion, his defense was not limited by the state's inability to produce the weapon for analysis. Therefore, the recovered weapon was not material to the determination of whether Griffin killed Davis.
Griffin has failed to establish that the result of his trial would have been different had the gun been provided; we conclude that the state did not commit a Brady violation with regard to the destroyed weapon.

XI.
Griffin contends the trial court erred when it denied his motion in limine and allowed the state to comment on his alleged affiliation with the Crew because, he says, those comments were "extremely prejudicial and generally inadmissible by the Alabama courts." (Griffin's brief to this Court at p. 59.)
Griffin relies on Ex parte Thomas, 625 So.2d 1156 (Ala.1993), in which the Alabama Supreme Court stated that allowing the state to comment on any possible gang affiliation is equal to allowing the state to introduce evidence of collateral criminal acts.
Rule 404(b), Ala.R.Evid., states, in pertinent part:
"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive. ..."
(Emphasis added.) This Court has previously held that a defendant's involvement in gang activity may be relevant to prove motive in a particular case. Siler v. State, 705 So.2d 552 (Ala.Cr.App.1997); see also Knotts v. State, 686 So.2d 431, 469 (Ala.Cr. App.1995), aff'd, 686 So.2d 486 (Ala.1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1559, 137 L.Ed.2d 706 (1997)(holding that "the appellant's possible membership in an organization *298 that espouses racial hatred is relevant to a possible motive for the homicide").
The theory of the state's case was that Griffin, a member of the Crew, was paid to come to Birmingham to kill Davis because Davis had refused to return the drugs to Bimbo, a drug dealer affiliated with the Crew. Griffin's defense was that he was not in Alabama when Davis was murdered and that he was not involved in Davis's murder. Clearly, Griffin's motive was at issuemotive for a homicide is always a proper inquiry. Chambliss v. State, 373 So.2d 1185 (Ala.Cr.App.), cert. denied, 373 So.2d 1211 (Ala.1979). Because "[evidence] tending to show motive is always admissible," we find no error in the trial court's ruling. Benefield v. State, 726 So.2d 286 (Ala.Cr.App.1997).
Moreover, Rule 403, Ala.R.Evid., states:
"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."
We note that the trial court was acutely aware of the provisions of the Rule 403, Ala.R.Evid., balancing test with regard to evidence of Griffin's affiliation with the Crew. In a pretrial hearing on Griffin's motion in limine, the trial court indicated that it would be "very circumspect" about allowing the state to mention Griffin's bad acts during its opening statement. In addition, the trial court indicated to the state that he felt certain testimony concerning "hit gang stuff" was prejudicial and that he was unsure of its probative value. (R. 66.)
In R.D.H. v. State, 775 So.2d 248, 252-53 (Ala.Cr.App.1997), we stated:
"`Evidence of any offense other than that specifically charged is prima facie inadmissible. Nicks v. State, 521 So.2d 1018 (Ala.Cr.App.1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988). However, evidence of collateral crimes or bad acts is admissible as part of the prosecutor's case if the defendant's collateral misconduct is relevant to show his guilt other than by suggesting that he is more likely to be guilty of the charged offense because of his past misdeeds. Nicks v. State; Brewer v. State, 440 So.2d 1155 (Ala.Cr.App.1983).
"`. . . .
"... All of the exceptions relate to the relevancy of the evidence, which means that evidence of separate and distinct crimes is admissible only when the evidence is relevant to the crime charged. Mason v. State, 259 Ala. 438, 66 So.2d 557 (1953); Nicks v. State. If the evidence is not so remote as to lose its relevancy, the decision to allow or to not allow evidence of collateral crimes or acts as part of the state's case rests in the sound discretion of the trial court. McGhee v. State, 333 So.2d 865 (Ala.Cr. App.1976).
". . . .
"That being said, we are, however, also mindful of the well-settled principle that even where the proffered evidence of collateral bad acts is relevant, its probative value must not be substantially outweighed by the danger of undue and unfair prejudice for the evidence to be admissible. Ex parte Smith, 581 So.2d 531, 535 (Ala.1991); Hargress v. City of Montgomery, 479 So.2d 1137 (Ala.1985); Thomas [v. State] 625 So.2d [1149] at 1153 [ (Ala.Cr.App.1992) ]; Jones v. State, 473 So.2d 1197 (Ala.Cr. App.1985). See McElroy's Alabama Evidence, §§ 20.01 and 21.01(4). `Prejudicial' in this context means `"an undue tendency to move the tribunal to decide *299 on an improper basis, commonly, though not always, an emotional one."` Averette v. State, 469 So.2d 1371, 1374 (Ala. Cr.App.1985), quoting State v. Forbes, 445 A.2d 8, 12 (Me.1982). Before the probative value of evidence of collateral bad acts may be held to outweigh its potential prejudicial effect, the evidence must be `reasonably necessary' to the state's case. Bush [v. State, 695 So.2d 70] at 85 [ (Ala.Cr.App.1995), aff'd, 695 So.2d 138 (Ala.1997) ]; Averette, 469 So.2d at 1374."
According to the state's theory, this homicide centered around Davis's alleged refusal to return drugs to Bimbo, a distributor for the Crew. Griffin's membership in the Crew played a key role in his participation in Davis's murder. It was alleged that Griffin, because he was a "security" man for the Crew, was paid to come to Alabama to kill Davis. To omit this crucial affiliation would have fragmented the presentation of the evidence and confused the jury. Griffin's membership in the Crew and the Crew's stake in selling drugs in Birmingham established the motive for Davis's murder. There was no less prejudicial means of presenting this evidence of motive. Therefore, based on the state's theory of the case and the above analysis, we find the trial court's admission of Griffin's association with the Crew was not error.
Griffin further contends that the trial court erred in admitting into evidence his "complete federal plea allocution" during the penalty phase of his trial. Specifically, Griffin claims the allocution "was enormously prejudicial, and was simply not relevant to any of the mitigating or aggravating circumstances legitimately argued by the defense or the state." (Griffin's brief to this Court at p. 62.) We disagree.
Section 13A-5-45(c) and (d) state:
"(c) At the sentence hearing evidence may be presented as to any matter that the court deems relevant to sentence and shall include any matters relating to the aggravating and mitigating circumstances referred to in Sections 13A-5-49, 13A-5-51 and 13A-5-52. Evidence presented at the trial of the case may be considered insofar as it is relevant to the aggravating and mitigating circumstances without the necessity of re-introducing that evidence at the sentencing hearing, unless the sentence hearing is conducted before a jury other than the one before which the defendant was tried.
"(d) Any evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements. This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the State of Alabama."
In Siebert v. State, 562 So.2d 586, aff'd, 562 So.2d 600 (Ala.1990), cert. denied, 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 408 (1990), the prosecutor argued as an aggravating circumstance that Siebert had previously been convicted of another capital felony or a felony involving the use or threat of violence toward the person. In support of his argument, he introduced into evidence "a prior conviction of manslaughter and introduced evidence concerning the circumstances of the manslaughter in order to prove the violence." 562 So.2d at 597. In affirming the trial court's admission of the evidence, we found "that the testimony regarding the violence of the appellant's prior manslaughter offense was relevant and of probative value in the sentencing aspect of the trial." 562 *300 So.2d at 598. See also Hallford v. State, 548 So.2d 526 (Ala.Cr.App.1988), aff'd, 548 So.2d 547 (Ala.1989), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989)(holding that testimony during the sentencing phase regarding the defendant's incestuous relationship with his daughter was admissible to negate the defendant's claims that he had no significant criminal record and that he was a good father and a person of good character).
Moreover, "`[a] party has "the right to rebut evidence offered against him, be it relevant or irrelevant." Smothers v. State, 39 Ala.App. 292, 295, 98 So.2d 66, 68 (1957).'" Smith v. State, 756 So.2d 892, 929 (Ala.Cr.App.1998), quoting Childers v. State, 607 So.2d 350, 352 (Ala.Cr. App.1992), rev'd on other grounds, 640 So.2d 16 (Ala.1994).
"`The State may properly rebut evidence of mitigating circumstances. See McWilliams v. State, 640 So.2d 982, 988-991 (Ala.Cr.App.1991), aff'd. in part, remanded in part, 640 So.2d 1015 (Ala. 1993). In fact, once the defendant presents mitigation evidence, the burden shifts to the State to disprove the factual existence of the defendant's mitigating circumstances by a preponderance of the evidence. § 13A-5-45(g), Ala.Code 1975.'"
George v. State, 717 So.2d 844, 846 (Ala. 1996), aff'd, 717 So.2d 858 (Ala.1998), cert. denied, 525 U.S. 1024, 119 S.Ct. 556, 142 L.Ed.2d 462 (1998).
First, we note that the state did not introduce, and the trial court did not admit, Griffin's "complete federal plea allocution." At the sentencing hearing, the prosecutor argued the existence of the following aggravating circumstances:
1. That the murder was committed for pecuniary gain, see § 13A-5-49(6), Ala. Code 1975;
2. That the murder was committed by a person under sentence of imprisonment, see § 13A-5-49(1), Ala.Code 1975; and
3. That Griffin had been previously convicted of a capital offense or a felony involving the use or threat of violence to the person, see § 13A-5-49(2), Ala.Code 1975.
To prove the existence of these aggravating circumstances, the state introduced, and the trial court admitted into evidence, the following:
1. A certified copy of a letter from Vincent DeFilippis, the assistant chief of the State of New York Executive Department Parole Division, which stated that at the time of Davis's murder Griffin was on parole for robbery in the first degree;
2. A certified copy of the federal indictment charging Griffin with two counts of RICO violations;[4]
3. A certified copy of the federal docket sheet indicating the disposition of his federal plea; and
4. A certified copy of the certificate of disposition of Griffin's guilty plea conviction for robbery in the first degree.
(C.R.401-33.) The above evidence constitutes the evidence admitted by the state during the penalty phase. Therefore, Griffin's claim that his "complete federal plea allocution" was admitted into evidence is directly refuted by the record.
*301 Griffin's argument, however, implies a need to determine whether evidence of his conviction in federal court was correctly admitted to establish the aggravating circumstance that Griffin was previously convicted of a felony involving the use or threat of use of violence to the person, see § 13A-5-49(2), Ala.Code 1975.
To guide us in our determination of whether Griffin's conviction for RICO violations constitutes a felony in the State of Alabama, we look to our determinations as to whether out-of-state felony convictions may be used to enhance a defendant's sentence pursuant to the Habitual Felony Offender Act, see § 13A-5-9, Ala.Code 1975.
In order to determine whether a defendant's conviction in federal court was correctly used to enhance his punishment with regard to the Habitual Felony Offender Act we must decide whether
"the conduct made the basis of that conviction constitutes a felony under Act 607, § 130(4), Acts of Alabama 1977, p. 812 (§ 13A-1-2(4), Alabama Criminal Code), or would have constituted a felony under that section had the conduct taken place in Alabama on or after January 1, 1980; and further, a conviction of a crime against the United States shall be considered to be a felony conviction if that crime is punishable by imprisonment in excess of one (1) year under federal law, and was so punishable at the time of its commission, even if the conduct made the basis of that conviction would not be punishable under Alabama law."
Rule 26.6(b)(3)(iv), Ala.R.Crim.P. See Elston v. State, 687 So.2d 1239 (Ala.Cr.App. 1996). We have stated that "[t]he obvious intent of the legislature in enacting the Habitual Felony Offender Act was to authorize the infliction of a more severe penalty on one who is a persistent offender, regardless of when and where the prior convictions occurred." Esters v. State, 480 So.2d 615, 618 (Ala.Cr.App.1985). We conclude that the same principles apply with regard to the Legislature's enumeration of aggravating circumstances.
With these principles in mind, the first question to be answered in deciding whether a federal offense constitutes a felony for purposes of establishing the aggravating circumstance is whether there is a state counterpart for the federal crime. Although Alabama does not have a criminal statute analogous to the federal RICO violations, see 18 U.S.C. §§ 1961(1) and (5), this State does proscribe that murder, attempted murder, robberies, and narcotics traffickingthe conduct made the basis of the federal RICO violationsare felonies. See §§ 13A-6-1 to 13A-6-4, 13A-4-2, 13A-8-40 to 13A-8-44, and 13A-12-230 to 13A-12-233, Ala.Code 1975. We, therefore, conclude as did the trial court that Griffin's federal conviction rests on felonious conduct as defined by Alabama law at the time of the federal conviction. Cf. Carter v. State, 420 So.2d 292 (Ala.Cr.App. 1982). Moreover, Griffin's federal conviction can be classified as a felony because the punishment for the violation is in excess of one year under federal law. Thus, there was no error in admitting the evidence to establish the aggravating circumstance that Griffin was previously convicted of a felony involving the use or threat of use of violence to the person.
Additionally, we find no error in the trial court's admission of Griffin's RICO indictment and the federal docket sheet indicating his conviction because their admission is consistent with the principle that in the penalty phase the jury is entitled to receive as much information as possible in order to make an informed decision as to punishment. See Gregg v. Georgia, 428 U.S. 153, 204, 96 S.Ct. 2909, *302 2939, 49 L.Ed.2d 859 (1976); and Lockett v. Ohio, 438 U.S. 586, 602-03, 98 S.Ct. 2954, 2963-64, 57 L.Ed.2d 973 (1978).
With regard to Griffin's argument that the prosecutor's displaying on a blackboard the various offenses constituting the conduct in the RICO indictment was error, we conclude in light of the liberal admission of evidence in the sentencing hearing and our holding in Siebert, the evidence was necessary to present a complete picture of Griffin and his conduct. Griffin's defense counsel argued that Griffin's age and immaturity constituted mitigating circumstances. Also, in an attempt to negate or deemphasize Griffin's role in the murder, defense counsel argued extensively about the participation of Griffin's accomplices and the fact that some of his accomplices had been granted immunity against prosecution for Davis's murder or in the case of codefendant Bimbo, the fact that Bimbo would be eligible for parole at some time in the future. The prosecutor's presentation on the blackboard and his emphasis on the conduct of Griffin rebutted Griffin's argument that his age and immaturity were mitigating circumstances. In support of his rejection of these mitigating circumstances and his establishment of the existence of the proposed aggravating circumstances, the prosecutor mentioned various murders, attempted murders, and conspiracies to commit murder that Griffin had admitted participating in. He argued that Griffin was the "director of security" for a prosperous narcotics enterprise. These factors were relevant because they tended to prove that Griffin, despite his age and his claim of immaturity, was in fact a responsible, mature adult who actively engaged in the coordinating, planning, and murdering a number of individuals.
Therefore, in light of the policy of liberal admission of evidence during a sentencing hearing and of the argument of defense counsel, we conclude that the admission of the evidence concerning the various offenses committed by Griffin was relevant to establish the aggravating circumstance that he had been previously convicted of a crime of violence. Additionally, the prosecutor's argument was permissible to disprove the factual existence of Griffin's mitigating circumstances by a preponderance of the evidence.

XII.
Griffin next claims the trial court erred when it failed to consider as a mitigating factor the sentences of his accomplices. Griffin's codefendant, Bimbo, was tried for capital murder for his involvement in Davis's murder before the same trial court as Griffin. The jury found Bimbo guilty of the lesser included offense of murder, and Bimbo was sentenced to life imprisonment. Spragg and Razor, coconspirators, testified for the state in exchange for not being indicted and prosecuted for the murder of Davis. Testimony at trial indicated that Henry, another coconspirator, was deceased at the time of Griffin's trial.
Griffin argues that the Alabama Supreme Court has "found that disparate sentences and punishment must be evaluated as a mitigating circumstance." (Griffin's brief to this Court at p. 64.) Griffin cites Ex parte Henderson, 616 So.2d 348 (Ala.1992), in support of his position. In Henderson, Cleveland Turner, Jr., and Curtis Lee Henderson were tried for the capital murder of Willie Perkins. Turner had paid Henderson to kill Perkins because Turner had been having an affair with Perkins's wife. After Perkins was killed, Turner intended to relocate to Springfield, Ohio, with Perkins's wife. Turner and Henderson were tried before different judges and different juries. Despite the jury's recommendation of death *303 in Turner's case, the trial court sentenced him to life imprisonment without parole. The trial court, in its determination, found two mitigating factors: 1) that Turner had no significant prior criminal history and 2) that Turner had a low IQ. At Henderson's sentencing, the trial court considered only one mitigating factorHenderson's lack of a prior criminal recordand sentenced Henderson to death. On appeal, the Supreme Court reversed Henderson's death sentence and ordered the trial court to consider Henderson's age and his low IQ as two additional mitigating factors.[5]
Griffin's reliance on Henderson is misplaced. Henderson's case was remanded, not because his sentence was harsher than that of his codefendant, but because the trial court failed to consider certain mitigating factors. While the trial court may consider the different treatment of codefendants as a mitigating circumstance, it is not required to do so. We have recently held:
"while Parker [v. Dugger, 498 U.S. 308, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991) ] and Ex parte Henderson may suggest that the differential treatment of an accomplice may be a proper subject for consideration as mitigating evidence in a capital case, neither case remotely holds that a trial court is obligated to so find, and neither case lends support to Burgess's claim that the trial court erred in his case. `"Although the trial court is required to consider all mitigating circumstances, the decision whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer."` Boyd v. State, 715 So.2d 825, 840 (Ala.Cr.App.1997), aff'd, 715 So.2d 852 (Ala.1998), quoting Williams v. State, 710 So.2d 1276, 1347 (Ala.Cr.App.1996), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998)."
Roy Burgess v. State, [Ms. CR-94-0475, Dec. 18, 1998] ___ So.2d ___, ___ (Ala. Cr.App.1998).
In Griffin's sentencing order the trial court noted that trial counsel argued as a nonstatutory mitigating circumstance that "Johnny Spragg and Derek Razor were never charged in the murder and that codefendant Bimbo was convicted of the lesser included offense of felony murder and sentenced to a life term with parole eligibility." (Supp.R.33.) The trial court, however, concluded that "[n]o [nonstatutory] mitigating circumstance [See § 13A-5-52, Ala.Code 1975] can be gleaned from any source or material that suggests mitigation of punishment in this case." (Supp.R.35.) Clearly, the trial court considered the argument presented by Griffin's defense counsel with regard to the treatment of his accomplices and within its authority rejected it as a non-statutory mitigating circumstance.
Accordingly, we find no error in the trial court's consideration of the treatment of Griffin's accomplices. In addition, it should be noted that Griffin and Bimbo were not convicted of the same offense. Bimbo was convicted of the lesser offense of intentional murder. The trial court sentenced him to life imprisonment, the maximum sentence under the law for that offense. Therefore, no disparate treatment in punishment resulted between Griffin and his accomplices. See Hamm v. State, 564 So.2d 453 (Ala.Cr.App.1989), aff'd, Ex parte Hamm, 564 So.2d 469 (Ala.1990), cert. denied, 498 U.S. 1008, 111 S.Ct. 572, 112 L.Ed.2d 579 (1990).

*304 XIII.
Griffin claims the trial court erred by not providing funds for his counsel, Lawrence Gerzog, who represented him during his federal guilty plea conviction, to travel to Alabama to testify regarding the voluntariness of his federal plea allocution. In his written motion, Griffin offered the conclusory statement that Gerzog's testimony was exculpatory and material to his defense. At the hearing, when the trial court requested a proffer as to why Gerzog's presence was necessary, his counsel indicated that his testimony would assist in establishing Griffin's claim of a violation of double jeopardy. The trial court denied the request, stating:
"If your client is convicted, we can reach it post conviction, because I have not seen anything in all of the files that suggests to me that the State is precluded from trying this capital murder case based on what happened in New York."
(R. 280.) On appeal Griffin claims that the trial court should have approved his request for funds for Gerzog's transportation because Gerzog's testimony could establish that his plea of guilty in federal court was not knowingly and voluntarily made.[6] Because the ground raised on appeal is different from the ground raised at trial, this claim was not properly preserved for appellate review; therefore, our review is limited to one for plain error. Rule 45A, Ala.R.App.P. See Hyde v. State, 778 So.2d 199 (Ala.Cr.App.1998).
"Initially, we note that no Alabama case law requires the state to pay the expenses of nonexpert defense witnesses." Zumbado v. State, 615 So.2d 1223, 1235 (Ala.Cr.App.1993). Moreover, our review of the record leads us to conclude that the trial court was open to provide funds for transportation for out-of-state witnesses, provided the defense presented a reasonable need.[7] Griffin's offer of proof with regard for the need for Gerzog's presence at trial was limited to generalities and did not indicate that Gerzog's presence was critical. Therefore, we cannot say that the trial court's refusal to provide transportation funds for Gerzog based on the reasons presented was plain error.
We reject Griffin's argument on appeal that he was entitled to funds to secure Gerzog because Gerzog was an expert witness. At no time at trial or on appeal does Griffin claim or attempt to prove that Gerzog is an expert in any particular field. Griffin correctly argues that Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), establishes that a defendant is entitled to funds to pay for an expert. However, the defendant must also show "a reasonable probability that an expert would aid in his defense and that the denial of an expert to assist at trial would result in a fundamentally unfair trial." Dubose v. State, 662 So.2d 1189, 1192 (Ala. 1995). This Court has previously held that "[i]t is only where such an expert is necessary for an adequate defense that an accused may be allowed to procure expert testimony at the State's expense." Davis v. State, 549 So.2d 577, 579 (Ala.Cr.App. 1989). Because Griffin did not request an expert and, consequently, did not present any evidence that indicated that he required an expert, there is no plain error.
Griffin further claims that the trial court erred by not granting his motion to proceed *305 ex parte in his applications for funds. (Issue XXII of Griffin's brief to this Court at p. 91.) Before trial, Griffin filed a motion to proceed ex parte in his applications for funds. The motion correctly states the law, but provides no indication, as the state asserts, as to what expert assistance he required. On appeal, Griffin offers no indication as to what expert assistance was not provided or how he was prejudiced by the trial court's failure to allow him to proceed ex parte. Consequently, we cannot find any error.

XIV.
Griffin contends that the trial court erred when it allowed the state to admit into evidence a redacted copy of his federal plea allocution during the guilt-phase of his trial. Specifically, he argues that "by informing the jury that the plea agreement was redacted, the jury was effectively informedat the guilty stage that Mr. Griffin had admitted to other offenses." (Griffin's brief to this Court at p. 68.) According to Griffin, the redacted allocution caused the jury to infer, speculate, and/or conclude that the information withheld was prejudicial to him.
"The prosecution is precluded generally from offering evidence as to the accused's commission of collateral crimes when offered to prove bad character and conformity therewith on the occasion of the now-charged crime. [See Rule 404(b), Ala.R.Evid.] Consequently, if a confession includes an assertion of accused's commission of another crime which itself is not provable in the present prosecution, such assertion should be excluded if, but only if, it can possibly be done without rendering unintelligible the part of the confession pertaining to the crime for which the accused is being tried."
C. Gamble, McElroy's Alabama Evidence, § 200.15 (5th ed. 1996). Therefore, the redaction of Griffin's plea allocution to remove references to Griffin's other bad acts was the proper procedure to eliminate evidence regarding Griffin's collateral crimes from the document and present the admissible, relevant evidence to the jury.
Griffin seems to argue that the physical appearance of the redacted document was prejudicial. Griffin cites Gray v. Maryland, 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998), as authority. Gray, however, is easily distinguishable from this case. In Gray, two defendants, Kevin Gray and Anthony Bell, were tried jointly for murder. At trial, the state was allowed to introduce and admit into evidence a redacted version of Bell's confession to the police implicating himself and Gray. Blank spaces, set off by commas, indicated where Gray's name had been included in the confession. The Supreme Court determined that merely replacing Gray's name with a blank space, or other similar alteration, improperly linked Gray to the confession in the minds of the jury.[7] The Supreme Court concluded that the redacted statement in Gray was directly accusatory because:
1. A jury would react similarly to an unredacted confession or a confession redacted as it had been in Gray;

2. The obvious deletion called the attention of the jury to the removed name and encouraged speculation by the jurors; and
3. Blanks and similar alterations functioned grammatically the same as if the defendant's name had been inserted.
*306 Gray, 523 U.S. at 192, 118 S.Ct. at 1155-56.
Unlike the facts in Gray, Griffin was the only defendant at his trial.[8] Additionally, the redacted allocution was Griffin's own statement in federal court. Here, the redacted portions of Griffin's allocution related other criminal acts committed by Griffin, which were not relevant to the offense charged. We recognize that it definitely was to Griffin's benefit that the allocution be redacted to prevent prejudice. While the appearance of Griffin's allocution was modified by the redaction, we conclude that a jury would not have reacted similarly to an unredacted version of Griffin's allocution as to the redacted version. As previously noted, the complete allocution indicated numerous offenses that if admitted would have been extremely prejudicial to Griffin. Moreover, while the deletions may have called to the attention of the jury that information had been removed, we do not believe that it encouraged the kind of prejudicial speculation that Griffin asserts it does. We reject Griffin's argument that the redaction may have overemphasized the importance of his confession. The jurors were aware that Griffin had pleaded guilty to RICO violations in federal court. The trial court repeatedly instructed the jury that it was to consider only the evidence presented at trial in making its determination. Finally, it does not appear to us that the blanks and omitted portions functioned grammatically the same as if Griffin's name or the prejudicial information had been inserted. Because the statements were made by Griffin, himself, it is obvious that the information that was included, as well as excluded, pertained to him. We have reviewed the transcript of the redacted allocution introduced at trial and find nothing so egregious in its appearance or in its content to allow a conclusion that the trial court abused its discretion in admitting it into evidence.
Griffin further contends that the trial court erred when it "allowed the prosecution to present Griffin's federal guilty plea as a roleplay." (Issue XVII in Griffin's brief to this Court at p. 116.) Essentially, he argues that the in-court presentation of the guilty plea with individuals in the courtroom reading different roles was improper.
There was nothing improper with the state, in addition to admitting the redacted plea allocution into evidence, also reading it aloud for the jury. See Hyde v. State, supra. Neither the record before us nor Griffin's general assertions in his brief to this Court establish a sufficient basis for us to conclude that the trial court abused its discretion in allowing the "roleplay." We cannot presume error based on a silent record and on the speculation of appellate counsel. Pressley v. State, supra; Magwood v. State, 689 So.2d 959 (Ala.Cr.App. 1996), cert. denied, 522 U.S. 836, 118 S.Ct. 108, 139 L.Ed.2d 61 (1997); George v. State, 717 So.2d 827, 834 (Ala.Cr.App.), rev'd on other grounds, 717 So.2d 844 (Ala. 1996), on remand, 717 So.2d 849 (1997), aff'd, 717 So.2d 858 (Ala.1998), cert. denied, 525 U.S. 1024, 119 S.Ct. 556, 142 L.Ed.2d 462 (1998).; Arthur v. State, supra; and Gaddy v. State, 698 So.2d 1100 (Ala.Cr.App.1995), aff'd, 698 So.2d 1150 (Ala.), cert. denied, 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613 (1997). In light of the broad discretion granted the trial court in determining the procedure and presentation of evidence in the courtroom, we conclude no error occurred here.

*307 XV.
Griffin contends the trial court erred by not granting his motion for a continuance because, he says, the trial court's refusal to continue his trial "effectively foreclosed [his] counsel from investigating, preparing, and presenting a defense, and therefore [the trial court] far exceeded its range of discretion." (Griffin's brief to this Court at p. 71.)
"`The guidelines for determining whether a trial court has abused its discretion in denying a continuance are set out in Ex parte Saranthus, 501 So.2d 1256, 1257 (Ala.1986):
"`"A motion for a continuance is addressed to the discretion of the court and the court's ruling on it will not be disturbed unless there is an abuse of discretion. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973). If the following principles are satisfied, a trial court should grant a motion for continuance on the ground that a witness or evidence is absent: (1) the expected evidence must be material and competent; (2) there must be a probability that the evidence will be forthcoming if the case is continued; and (3) the moving party must have exercised due diligence to secure the evidence. Knowles v. Blue, 209 Ala. 27, 32, 95 So. 481, 485-86 (1923).'"

"Fortenberry v. State, 545 So.2d 129, 138 (Ala.Cr.App.1988)."
Ex parte Clark, 728 So.2d 1126, 1134 (Ala. 1998). See also Hyde v. State, supra.
"`[N]ormally, a reviewing court determines the correctness of a trial court's ruling "as of the time when it was made and according to what the record shows was before the lower court at that time."'" Henry v. State, 468 So.2d 896, 899 (Ala.Cr.App.1984), cert. denied, 468 So.2d 902 (Ala.1985).
Dozier v. State, 630 So.2d 137, 140 (Ala.Cr. App.1993).
Griffin argues in his brief to this Court that "several critical witnesses for the defense" were not located and that "additional time was necessary to locate the missing police [file] and investigation records from the original 1992 investigation of the case." (Griffin's brief to this Court at p. 73.)
With regard to Griffin's claim that he needed more time to locate witnesses, we note the following. The record, as a whole, supports a finding that the trial court carefully monitored the activities of counsel and diligently endeavored to ensure that Griffin's rights to a fair trial, especially to present a defense, were protected. Unrelenting efforts were made by the trial court to secure the presence of the witnesses Griffin requested. The record further indicates that two eyewitnesses, Norman and Crenshaw, were, in fact, located. The defense presented Norman as a witness. She testified that she was outside the Avondale pool game room the night Davis was shot. She unequivocally stated that she did not see Griffin there that night. In addition, Crenshaw was also located by law enforcement before the close of the defense's case-in-chief. Although she appeared at court, defense counsel, with Griffin's permission, excused her from testifying. Additionally, the defense presented the testimony of Pressley, who testified that he participated in the murder investigation of Davis in 1992. Pressley stated that he interviewed Crenshaw as part of his investigation. According to Pressley, Crenshaw identified two individuals, neither of whom was Griffin, in a photographic lineup as one of the men who shot Davis. He further testified that *308 Norman also identified the same individuals as Crenshaw as the shooters.
Based on the testimony of Norman and Pressley and the defense's release of Crenshaw as a witness, it appears that the defense was able to adequately present witnesses from the scene of the murder to negate the state's evidence that Griffin was there. Therefore, from the record before us, we conclude that the trial court did not abuse its discretion in denying Griffin's motion for a continuance on this ground.
Although Griffin claims in his brief to this Court that a "large number of witnesses" were located in New York City and needed to be interviewed, he fails to name those witnesses or make any proffer as to the content of their testimony or how such testimony would be material. We note that Smith, a resident of New York City, did testify on Griffin's behalf. Therefore, we find no merit in this argument.
In addition to the need to determine and to locate additional witnesses, Griffin argues more time was needed to locate the original police case file. The state indicated on numerous occasions before trial that the original case file was missing and that all efforts to locate it had been fruitless. Pressley even testified that he had gone to the homicide division "where it [the case file] was housed" and that the case file was missing. (R. 726.)
Although we find no lack of diligence to secure witnesses or evidence on Griffin's behalf, Griffin has not established how the missing witnesses's testimony would be material or that the missing file would be forthcoming had the trial court granted a continuance. Additionally, Griffin does not offer any evidence as to how the trial court's refusal of his request prejudiced his defense. Based on the record before us, the trial court did not abuse its discretion in denying Griffin's motion for a continuance. See Connor v. State, 447 So.2d 860, 863 (Ala.Cr.App.1984) ("The speculative allegations of defense counsel regarding the possible existence of potential witnesses or evidence are insufficient to show that the trial judge abused his discretion.").

XVI.
Griffin claims that the trial court erred by failing to grant his request for funds "to send an investigator to New York to gather evidence necessary both for the guilt phase of [his] trial, and to prepare evidence for the potential penalty phase." (Griffin's brief to this Court at p. 75.) Griffin claims this evidence included "birth records, health records, ... and, more critically, documentary evidence that would have established that [he] was in New York at the time Mr. Davis was killed." (Griffin's brief to this Court at p. 76.)
In Pace v. State, 714 So.2d 320, 331 (Ala.Cr.App.1996), rev'd in part on other grounds, 714 So.2d 332 (Ala.1997), we addressed a similar claim, stating:
"However, in Dubose v. State, 662 So.2d 1189 (Ala.1995), this Court held that the Ake principles relating to assistance of experts are not limited to psychiatrists. The Ake principles, which are grounded in the due process guarantee of fundamental fairness, apply to assistance by nonpsychiatric experts when an indigent defendant makes a proper showing that the requested assistance is needed in order for the defendant to have `a fair opportunity to present his defense.' Dubose, 662 So.2d at 1194. Specifically, a defendant, in order to be entitled to funds to pay for an expert, must show more than a mere possibility that he or she will receive useful assistance from the expert. *309 Rather, the defendant must show a reasonable probability that the expert would aid in the defense and that the denial of an expert to assist at trial would result in a fundamentally unfair trial. In the past, Alabama decisions have been based upon whether the defendant made an adequate showing of a need for the requested expert. Dubose, 662 So.2d at 1192."
714 So.2d at 331.
In his claim of error, Griffin fails to identify whose birth or health records or what other "documentary evidence" could be produced by sending an investigator to New York City. Consequently, Griffin's argument is based merely on an "expectation" that an investigator would have been beneficial to his defense. Assuming, for the sake of argument, that the subject records concerned the birth of his son at Harlem Hospital, then his claim would be without merit. The trial court provided funds to transport Smith from New York City to Alabama to testify on Griffin's behalf. (R. 763-774.) As previously indicated, Smith testified she gave birth to Griffin's son on September 10, 1992, and that Griffin was with her when their infant left the hospital on September 24, 1992. Other documentation of Griffin's son's birth would be cumulative. Therefore, Griffin has failed to demonstrate the trial court abused its discretion by failing to provide additional funds or that he was deprived of his right to a fair trial.

XVII.
Griffin next claims that the trial court was biased against him and had a preconceived notion of his guilt. (Issue XVIII in Griffin's brief to this Court at p. 80.) Specifically, Griffin argues in his brief to this Court that the following notation in the case action summary by the trial court indicates the trial court's bias:
"Presided over Alabama v. Bimbo, tried in October, 1997 and have heard testimony of Johnny Sprague [sic] and Derek Razor concerning the ongoing criminal activities conducted by defendant Griffin, Johnny O., Carlton Henry, and others in September, 1992same testimony is anticipated in this case."
(C.R.6.) Griffin did not file a pretrial motion requesting the trial court to recuse itself; therefore, our review is limited to one for plain error. Rule 45A, Ala. R.App.P.
In Woodall v. State, 730 So.2d 627, 638 (Ala.Cr.App.1997), aff'd. in part and rev'd on other grounds, 730 So.2d 652 (Ala.1998), we held that:
"To disqualify a judge because of bias, the bias must be personal bias. Ex parte Large, 501 So.2d 1208, 1210-11 (Ala.1986).
"`The bias or prejudice which has to be shown before a judge is disqualified must be `personal' bias, and not `judicial' bias. Personal bias, as contrasted with judicial, is an attitude of extra-judicial origin, or one derived non coram judice. In re White, 53 Ala.App. 377, 300 So.2d 420 (1974). The fact that one of the parties before the court is known to and thought well of by the judge is not sufficient to show bias. Duncan v. Sherrill, 341 So.2d 946 (Ala.1977). Neither is the fact that the judge had previously sentenced the defendant's partner in crime to the maximum sentence and bemoaned the fact that he could not impose a longer sentence sufficient to constitute proof of bias. Coleman v. State, 57 Ala.App. 75, 326 So.2d 140 (1976). Nor is bias proved simply because the trial judge who presided at the second trial of defendant had also presided *310 at his first trial and heard evidence later found to be inadmissible by an appellate court. Walker v. State, 38 Ala.App. 204, 84 So.2d 383 (1955).'

"McMurphy v. State, 455 So.2d 924, 929 (Ala.Cr.App.)."
Griffin and Bimbo were both charged with capital murder in the contract killing of Davis. As previously indicated, the same circuit judge presided over the trials of Griffin and his codefendant, Bimbo. We conclude that the above-mentioned comment written in the case action summary by the trial court was simply a statement on what the trial court expected the evidence to be, based on the prior trial. Nothing in the trial court's comments indicates personal bias or prejudice against Griffin. We refuse to follow Griffin's suggestion and give the comment such a strained interpretation. See Grayson v. State, 675 So.2d 516 (Ala.Cr.App.1995), cert. denied, 519 U.S. 934, 117 S.Ct. 309, 136 L.Ed.2d 225 (1996). No plain error occurred in this regard.
Griffin further contends that the trial court erred because, he says, the trial court ordered two state witnesses transported sua sponte. (Issue XXX in Griffin's brief to this Court at p. 133.) Specifically, he claims that because the trial court's orders to transport Spragg and Razor from federal custody appear to precede the state's petitions requesting their transportation, the following improprieties may have occurred:
1. The trial court dictated what witnesses the state should call;
2. The state had ex parte contact with the trial court; or
3. A hearing between the parties was held but not transcribed.
Griffin failed to present this claim at trial; therefore, our review is limited to plain error. Rule 45A, Ala.R.App.P.
"The determination of the prejudicial character of improper conduct and comments of a trial judge in most cases depends on the issues, parties, and general circumstances of each case. While a particular remark [or action] by the trial judge may be open to question, in order for it to amount to grossly improper error requiring reversal, it must have influenced the result of the trial."
Thompson v. State, 503 So.2d 871, 879 (Ala.Cr.App.1986), aff'd, 503 So.2d 887 (Ala.), cert. denied, 484 U.S. 872, 108 S.Ct. 204, 98 L.Ed.2d 155 (1987).
Griffin's claim relates back to when he was originally scheduled to be tried jointly with codefendant Bimbo and does not refer to the trial that resulted in his conviction. The record indicates that the trial court signed the order to transport Spragg on August 14, 1997, for the October 20, 1997, trial date. The order securing Spragg's presence for the October 20, 1997, trial date was filed the same day as the state's petition, August 33, 1997.[9](C.R.48-49.) The record further indicates that the trial court signed the order to transport Razor for the October 20, 1997, trial date on September 2, 1997. That order was also filed on the same day as the state's petition, September 3, 1997. (C.R.53-54.) Neither of the petitions filed by the state were dated, so the record is silent concerning when the state prepared their requests. Both the petitions and the orders indicate the date of trial was October 20, 1997.[10]
*311 Although the petitions from the state and the orders from the trial court were filed on the same day, we refuse to say that the orders preceded the petitions. The record does not contain the pretrial hearings for the October 20, 1997, trial date and we will not reach such a conclusion based on a silent record and conjecture. Moreover, even if the orders were signed before the petitions were filed, we are unwilling to conclude that that alone is an indication of any ex parte contact between the trial court and the state or an indication that the trial court in some way directed or improperly influenced any part of the state's case. Furthermore, especially in light of the fact that the petitions and orders regard the October 20, 1997, trial date and do not involve the acquisition of the witnesses for the trial that resulted in Griffin's conviction, Griffin has failed to establish any prejudice. Griffin offers no evidence, either direct or circumstantial, that he was in any way prejudiced by the trial court's allegedly improper actions. His conclusions are "based on pure speculation and [are] without foundation in fact or in law." Alonzo Burgess v. State, 723 So.2d 742, 756 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999). Thus, we conclude that no plain error occurred.

XVIII.
Griffin contends numerous errors occurred during the voir dire process that prevented him from receiving a fair trial. (Issue XIX in Griffin's brief to this Court at p. 83.) Specifically, Griffin claims the trial court erred by denying his motion for the discovery of juror information, by failing to grant his motion to allow a juror questionnaire, and by failing to grant his motion for individual voir dire. We will address each of these claims individually.

A. Denial of his motion for access to juror information.
Initially, we question the timeliness of Griffin's motion for discovery of juror information. On the first day of Griffin's trial and just before the voir dire of the jury was to begin, defense counsel put forth the following argument:
"[Defense counsel]: Your Honor, we would like access to, inspection of, and copying of all of the jury system records, directing the Jefferson County officials that have discretion and control over these records to provide us with access to the master list, the source list, and the computer programming and data or any other records in their possession, which would basically go to the issue that we believe that the Jefferson County jury list excludes a large number of citizens who are black and who are female and who otherwise would qualify for service on account of their race, sex, age or employment.
"However, we truly believe that there is a systematicon account of the way that certain members of this race issue, race designation, are actually not eligible for driver's licenses, we would ask the Court to take judicial notice of the fact that there are a higher degree of black citizens who are cited or charged for driving without a license and things of that nature.
"We feel like that the manner in which the jury pool is actually selected violates the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Alabama Constitution.
"And under Test v. United States, [420 U.S. 28, 95 S.Ct. 749, 42 L.Ed.2d 786 (1975) ] the courts have held that there's long been the view that jury commission records must be made available *312 for inspection and copying by criminal defendants who allege that they that the system they operate violates the constitution.
"And it's those records, Your Honor, that we're asking for.
"THE COURT: Well, you have no evidence that what you've said is true, do you?
"[Defense counsel]: Your Honor, other than observations, you know, as far as a practicing attorney in the court system that there is a large degree of black citizens who do not maintain driver's licenses.
"THE COURT: I think it's driver's ID that triggers the jury summons. I may be wrong. I think it's ID as opposed to driver's license.
"[Defense counsel]: Still, Your Honor, we feel like that there's a high degree of those citizens who do not eitherbecause of their inability to read and write and other socioeconomic problems do not even try to obtain an ID or a driver's license.
"THE COURT: Well, in the absence of some evidence that our system pertaining to jurors is constitutionally informed, I will deny your motion, please ma'am.
"I sit in here day in and day out, as you know, and I see plenty of women and black people on jury venires. I have not observed any paucity of women or black people on the jury venires, but ifI'm not familiar with this Test case that you've cited me. I'll read that."
(R. 90-92.) Griffin provided no documentary or statistical evidence in support of his motion.
Our Supreme Court has previously held:
"Selection of a petit jury from a representative cross-section of the community is an essential component of the Sixth Amendment right to a jury trial. Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). Section 12-16-55, Ala.Code 1975, also requires that all persons selected for jury service be selected at random from a fair cross-section of the population of the area served by the court and that all qualified citizens have the opportunity to be considered for jury service in this state and an obligation to serve as jurors when summoned for that purpose.
"In order to establish a prima facie violation of the fair-cross-section requirement, a defendant must show (1) that the persons alleged to have been excluded constitute a distinctive group in the community; (2) that the representation of the group on venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process. Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579. Rayburn v. State, 495 So.2d 733 (Ala.Cr.App.1986)."
Ex parte Dobyne, 672 So.2d 1354, 1356 (Ala.1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996). The Supreme Court further stated in Dobyne that the burden of establishing a prima facia case rests on the defendant. Id. Additionally, we have held that the random selection of jurors from a list of licensed drivers is an acceptable manner by which to select a jury venire. Finch v. State, 715 So.2d 906 (Ala.Cr.App.1997), citing Sistrunk v. State, 630 So.2d 147 (Ala.Cr.App. 1993).
Here, Griffin's argument rests on the "expectation" that the requested discovery would establish that his right to a jury consisting of a fair cross section of the community was violated. Griffin has failed to show that the method of jury selection *313 the use of a list of licensed drivers was unacceptable; therefore, Griffin has failed to establish these groups were underrepresented or that there was systematic exclusion of these groups in the jury selection process.

B. Failure to grant Griffin's request for a juror questionnaire.
On November 17, 1997, a month before trial, Griffin filed a motion requesting to be allowed to use a jury questionnaire to aid in the jury selection process. (C.R. 131-132.) The record further indicates the following took place after voir dire:
"[Defense counsel]: The defense also has a motion for the use of a jury questionnaire, which I guess is moot at this point, but if you wanted to show it as denied.
"THE COURT: I'll just show it as moot. But in all fairness, I generally don't allow them.
"[Defense counsel]: Right. That's what I
"THE COURT: We would have individual voir dire on the death penalty. We would have had it on media, if we had needed it."
(R. 286.)
The general rule is that, in order for this Court to review an issue on appeal, the appellant must have received an adverse ruling by the trial court. See Berryhill v. State, 726 So.2d 297 (Ala.Cr.App.1998)(holding this Court will not review the merits of a motion presented by appellant at trial unless the trial court has issued a ruling adverse to the appellant on the motion). However, because Griffin was sentenced to death, we will review the claim for plain error. Rule 45A, Ala.R.App.P.
This exact issue was before our Supreme Court in Ex parte Land, supra. In Ex parte Land, Justice Butts, writing for the Court, stated:
"A trial court is vested with great discretion in determining how voir dire examination will be conducted, and that court's decision on how extensive a voir dire examination is required will not be overturned except for an abuse of the discretion. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973); Lane v. State, 644 So.2d 1318 (Ala.Cr.App.1994); Harris v. State, 632 So.2d 503 (Ala.Cr.App. 1992), affirmed, 632 So.2d 543 (Ala.1993), affirmed, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995)."
678 So.2d at 242. See Alonzo Burgess v. State, supra. We have reviewed the pertinent portions of the record and find that extensive questioning of the potential jurors was conducted by the state and by the defense. We conclude that no abuse of discretion occurred in this regard. Therefore, we find no plain error. See Maples v. State, 758 So.2d 1 (Ala.Cr.App.1999); and Drinkard v. State, 777 So.2d 225 (Ala. Cr.App.1998), rev'd on other grounds, Ex parte Drinkard, 777 So.2d 295 (Ala.2000).

C. Failure to allow individual voir dire.
Griffin claims on appeal that "[t]he trial court's denial of [his] motion for individual voir dire was an unreasonable restriction on his right to discover possible prejudice or biases of jurors." (Griffin's brief to this Court at p. 86-87.) Although the record indicates that Griffin did file a motion for individual voir dire, there is no indication in the record that the trial court ever ruled on the motion. (See C.R. 60-62) Because Griffin did not receive an adverse ruling, our review is limited to one for plain error. Rule 45A, Ala.R.App.P.
"`"A trial court is vested with great discretion in determining how voir dire examination will be conducted, and that *314 court's decision on how extensive a voir dire examination is required will not be overturned except for an abuse of that discretion. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973); Lane v. State, 644 So.2d 1318 (Ala.Cr.App.1994), affirmed, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995); Harris v. State, 632 So.2d 503 (Ala.Cr.App.1992), affirmed, 632 So.2d 543 (Ala.1993), affirmed, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995)." Ex parte Land, 678 So.2d 224 (Ala.1996), cert. denied, [519] U.S. [933], 117 S.Ct. 308, 136 L.Ed.2d 224 (1996).
"`"As the general rule, the decision whether to voir dire perspective jurors individually or collectively is in the sound discretion of the trial court. Waldrop v. State, 462 So.2d 1021 (Ala. Cr.App.1984), cert. denied, 472 U.S. 1019, 105 S.Ct. 3483, 87 L.Ed.2d 618 (1985). This discretion is limited, however, by the requirements of due process. United States v. Hawkins, 658 F.2d 279 (5th Cir.1981); Waldrop v. State. Individual questioning may be necessary under some circumstances to ensure that all prejudice has been exposed. United States v. Hurley, 746 F.2d 725 (11th Cir. 1984).'"

"Boyd v. State, 715 So.2d [825] at 848-49 [(Ala.Cr.App.1997), aff'd, Ex parte Boyd, 715 So.2d 852 (Ala.1998) ], quoting Haney v. State, 603 So.2d 368, 402 (Ala. Cr.App.1991), aff'd, 603 So.2d 412 (Ala. 1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993).
"`Even in capital cases, there is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination, and it is within the trial court's discretion whether to allow such a request. Bell v. State, 475 So.2d 601 (Ala.Cr.App.1984), aff'd, 475 So.2d 609 (Ala.), cert. denied, 474 U.S. 1038, 106 S.Ct. 607, 88 L.Ed.2d 585 (1985); Raines v. State, 429 So.2d 1104 (Ala.Cr.App.), aff'd, 429 So.2d 1111 (Ala.1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1804, 76 L.Ed.2d 368 (1983).'

"Hallford v. State, 548 So.2d 526, 538 (Ala.Cr.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989). See also Taylor v. State, 666 So.2d 36 (Ala. Cr.App.), aff'd, on return to remand, 666 So.2d 71 (Ala.Cr.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996)."
Minor v. State, 780 So.2d 707, 742 (Ala.Cr. App.1999).
The record indicates that the trial court asked the venire the general qualifying questions, then allowed the state and Griffin to conduct a further, more detailed examination. The trial court informed the venire that individuals could answer questions in private if they desired. (R. 130.) In fact, certain veniremembers, especially members who expressed concerns about imposing the death penalty, were examined individually. At no time before or during voir dire did Griffin ask the trial court to conduct more extensive individual voir dire. We have reviewed the voir dire examination and we conclude that no plain error occurred.

XIX.
Griffin claims the trial court erred when it denied his request for a bench conference subsequent to an objection he made during the state's opening statement at the guilt phase of trial. (Issue XX in Griffin's brief to this Court at p. 87.) Specifically, Griffin argues "the trial court's refusal to permit the defense to mount their objections *315 outside the hearing of the jury fundamentally undermined the reliability of the jury's verdict [and] prevented [him] from fully articulating the harm and impropriety of the state's arguments." (Griffin's brief to this Court at p. 88.)
On the opening day of trial, Griffin filed a motion in limine seeking to prevent the state from mentioning his association with the Crew. (C.R.151-52.) The trial court granted the motion and ordered the state not to refer to Griffin's involvement with the Crew during voir dire. (R. 101.) After the jury was selected, the trial court allowed the parties to further argue the admissibility of Griffin's association with the Crew during trial. The state argued, based on caselaw, that Griffin's membership in the Crew was admissible and relevant to prove the motive for the murder. (R. 289.) The defense argued that any reference to Griffin's gang membership was overly prejudicial. (R. 292-93.) The trial court indicated that it would rule on the matter the next morning prior to opening statements. (R. 303.) The next morning, the trial court did not enter a ruling. During opening statements, the following occurred:
"THE COURT: Thank you very much. [The prosecutor].
"[Prosecutor]: Thank you, Judge Hard. Good morning.
"THE JURORS: Good morning.
"[Prosecutor]: The 142nd Street Lynch Mob Crew was a criminal organization....
"[Defense counsel]: Your Honor, we object.
"THE COURT: Overruled. Some latitude will be given the State in this area.
"[Prosecutor]: The 142nd Street Lynch Mob Crew is an organization that operates out of New York City. Today many of its members are either dead or serving lengthy terms in federal prison. But back in 1992, the Crew was a major player in the business of trafficking in cocaine.
"It was started back in the late 1980s by a person named Charles Leon Brown. It was headquartered up
"[Defense counsel]: Judge, I'm going to object to all of this. It's
"THE COURT: Overruled, sir.
"[Defense counsel]: And we're going to ask for a mistrial.
"THE COURT: No, ma'am. No ma'am, we're not going to do that. Some latitude is given the State in their effort to prove not only an intentional murder of Mr. Davisthat it was done pursuant to a contract or for hire.
"All right. You may proceed.
"[Defense counsel]: Your Honor, respectfully, is the Court then overruling our motion in limine?
"THE COURT: Well, in part I am, apparently, yes. But
"[Defense counsel]: Can we
"THE COURT: Well, you've noted an exception and
"[Defense counsel]: Can we approach the bench?
"THE COURT:that's why Kathy [court reporter] is here.
"[Defense counsel]: Can we approach the bench and have a ruling on the motion?
"THE COURT: No, we're not going to approach the bench. I have overruled your objection, and we will proceed at this time.
"Go ahead."
(R. 313-315.) The state then proceeded with its opening statement.
Whether to hold a bench conference is a matter within the sound discretion of the trial court and its decision on *316 this matter would be reversible only upon a showing of an abuse of discretion. See Alford v. State, 651 So.2d 1109 (Ala.Cr. App.1994). As evidenced by the above testimony and the hearings before and after the selection of the jury, the request for a bench conference came after the trial court had heard arguments by both parties and had articulated why it was overruling Griffin's objection. It is apparent from Griffin's written motion in limine and the arguments before and after voir dire that the trial court was well aware of Griffin's grounds for his objection. Griffin has failed to offer any evidence or argument to show an abuse of discretion by the trial court. Griffin, therefore, has failed to establish any error.

XX.
Griffin contends that the trial court erred when it failed to enforce the rule excluding witnesses from the courtroom during trial. (Issue XXI in Griffin's brief to this Court at p. 88.) Specifically, he argues that "the state, through the use of Agent Walsh,[11] was able to greatly bolster the otherwise incredible testimony of two accomplices who had every reason to lie and deceive." (Griffin's brief to this Court at p. 90.) We have reviewed the record, and we find no request by Griffin or the state to invoke the rule or an objection by Griffin that witnesses were improperly permitted in the courtroom; therefore, our review is limited to one for plain error. Rule 45A, Ala.R.App.P.
"The rule" and its administration are within the sound discretion of the trial court. Ex parte Lawhorn, 581 So.2d 1179, 1181 (Ala.1991), cert. denied, 502 U.S. 970, 112 S.Ct. 445, 116 L.Ed.2d 463 (1991). The trial court's discretionary power in this regard is embraced in Rule 9.3(a), Ala.R.Crim.P., which provides,
"Prior to or during any proceeding, the court, on its own motion or at the request of any party, may exclude witnesses from the courtroom and direct them not to communicate with each other, or with anyone other than the attorneys in the case, concerning any testimony until all witnesses have been released by the court."
Furthermore, in Young v. State, 416 So.2d 1109, 1111 (Ala.Cr.App.1982), this Court held:
"Where the rule for the exclusion of witnesses from the courtroom is invoked, it is within the sound discretion of the trial court to allow any one of the witnesses to remain in the courtroom during the examination of the others and the exercise of this discretion is not reviewable on appeal. Huskey v. State, 129 Ala. 94, 29 So. 838 (1901); Barnes v. State, 88 Ala. 204, 7 So. 38 (1890); Stone v. State, 55 Ala.App. 663, 318 So.2d 359 (Ala.Cr.App.1975). And this principle is applicable in a prosecution for first degree murder. Smarr v. State, 260 Ala. 30, 68 So.2d 6 (1953); Roynica v. State, 54 Ala.App. 436, 309 So.2d 475 (Ala.Cr. App.1974), cert. denied, 293 Ala. 772, 309 So.2d 485, cert. denied, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 85 (1975).'
"The sequestration of witnesses in a criminal prosecution, while rarely withheld upon request, is nevertheless discretionary with the trial court, and even where a witness remains in the courtroom in violation of the rule, the trial court's decision as to his testifying or not is not open to review. Beddow v. State, 39 Ala.App. 29, 96 So.2d 175 *317 (1956), cert. denied, 266 Ala. 694, 96 So.2d 178 (1957), cert. denied, 355 U.S. 930, 78 S.Ct. 412, 2 L.Ed.2d 414 (1958)."
See also Clemons v. State, supra (invocation and enforcement of rule excluding witnesses from courtroom is within the sound discretion of the trial court); Anderson v. State, 542 So.2d 292, 304 (Ala.Cr.App. 1987), 542 So.2d 307 (Ala.1989), cert. denied, 493 U.S. 836, 110 S.Ct. 116, 107 L.Ed.2d 77 (1989); and Hall v. State, 500 So.2d 1282, 1291 (Ala.Cr.App.1986).
First and foremost, as evidenced by the caselaw set forth above, the decision to allow Walsh to remain in the courtroom was within the absolute discretion of the trial court. We do not find an abuse of that discretion. Additionally, we conclude that Griffin's claim that the testimony of Walsh was biased because Walsh was allowed to remain in the courtroom during the entire trial is groundless. The record reveals that the state did question Walsh regarding the in-court testimony of Johnny Spragg. (R. 675-77.) However, we note that this testimony was in response to Griffin's attempts to discredit Spragg by revealing to the jury Spragg's motives for testifying at Griffin's trial. (R. 510-36.) Further, contrary to the Griffin's contention on appeal, our review of the record does not reveal that the state questioned Walsh regarding Razor's in-court testimony. Griffin has failed to show how he was prejudiced by the trial court's decision. We conclude no abuse in the discretion of the trial court in excluding Walsh from "the rule." Accordingly, no error, plain or otherwise, occurred.

XXI.
Griffin contends that "by allowing the jury to begin deliberations at six in the evening, and then by having them continue their deliberations until they reached a verdict or a consensus that they wanted to stop for the night, the trial court created a coercive and intimidating atmosphere likely to lead to an unconsidered guilt verdict." (Issue XXIII in Griffin's brief to this Court at p. 94-5.) We disagree.
Our review of the record reveals that before the jury began its deliberations, the following transpired:
"THE COURT: Do y'all want to deliberate for a period of time tonight, consensus of opinion, or do you want to start fresh tomorrow, or do you want to kind of talk about it in the jury box among yourselves?
"A JUROR: Tonight.
"THE COURT: What do you think? Do you want to stay for a little while?
"THE JURORS: Yes.
". . . .
"THE COURT: Thanks, folks. To the jury room. We'll be attentive to your knock on the door when you have reached a unanimous verdict or on the consensus you may want to go home; all right?"
(R. 895-97.)
"The trial court has discretion in scheduling a trial and in determining courtroom procedure as long as the exercise of that discretion does not result in the denial of a defendant's basic constitutional right. Ephraim v. State, 627 So.2d 1102, 1105 (Ala.Cr.App.1993)."
Hyde v. State, 778 So.2d at 236.
"`The duration of deliberations by the jury is committed to the sound discretion of the trial court. The exercise of that discretion will not be disturbed on appeal except for clear abuse. Martin v. State, 29 Ala.App. 395, 396, 196 So. 753 (Ala.Cr.App.1940).' Hammons v. State, 371 So.2d 986 (Ala.Cr.App.1979)."
Thomas v. State, 399 So.2d 915, 923 (Ala. Cr.App.1981).
*318 Clearly, the colloquy between the trial court and the jurors did not create a "coercive and intimidating atmosphere." The trial court offered the jurors the option of either beginning deliberations immediately or waiting until the following morning. The jurors themselves decided to begin deliberations. Thus, we find no abuse of discretion in the trial court's decision to allow the jury deliberations to last into the night. Griffin has failed to demonstrate that the trial court's procedure adversely affected his rights. Accordingly, we find no error, plain or otherwise.

XXII.
Griffin next claims that his attorney-client relationship was violated when the trial court allowed Walsh to testify as to a comment Walsh overheard between Griffin and his attorney. (Issue XXIV in Griffin's brief to this Court at p. 95.)
Walsh was the state's final rebuttal witness. Walsh testified that when Griffin saw Shabazz enter the courtroom, Griffin turned to his attorney and said "That's Ms. Shabazz." (R. 798.) The trial court admitted the evidence and the next day between the guilt phase and the sentencing phase of the trial, the trial court admitted the following testimony outside the presence of the jury to establish the basis for the admission of Walsh's testimony:
"THE COURT: Okay. Kathy, it's my unfortunate habit, perhaps always thinking about the evidentiary phase of the litigationI think it would be appropriate at this time out of the jury's hearing and presence to have Mr. Walsh, who is present, flesh out in a little more detail about overhearing Mr. Griffin's statement that was made in court relative to the identification of this girl from Atlanta.
"What was her name, Shabazz?
"[Prosecutor]: Jamilah Shabazz.
"THE COURT: Shabazz. Mr. Walsh, you can hear me?
"[Walsh]: Yes, sir.
"THE COURT: You're under oath; is that right?
"[Walsh]: Yes, sir, I am.
"THE COURT: Consider yourself under oath.
"You gave us some testimony yesterday. Where were you standing in the courtroom? We just have a cold record. I don't think the record reflects that you were apparently some distance from the counsel table.
"[Walsh]: I was standing right in front of the third bench, Your Honor, against the wall.
"THE COURT: In the seated section of the audience?
"[Walsh]: Yes, sir.
"THE COURT: Okay. How many feet would you reckon that would be from where the defendant was seated?
"[Walsh]: I guess it was 25 feet.
"THE COURT: Okay. Was it a whisper that you heard or just what? Was it a conversational tone like we're talking now?
"[Walsh]: No, it was not a whisper. It was just a normal tone of conversation.
"THE COURT: Okay. [Defense counsel] has suggested in a written motion that you were eavesdropping. Could you comment on that?
"[Walsh]: I would have to say that borders on the absurd. I wasn't eavesdropping at all.
"THE COURT: All right. Mr. Willis, who works with me and has worked with me for some 8 or 10 years, told something this morning that I want to be on the record. Mr. Willis is one of our bailiffs.
"Is that right, Andy?

*319 "THE BAILIFF: Yes, sir.
"THE COURT: Will you consider yourself under oath?
"THE BAILIFF: Yes, sir.
"THE COURT: What did you say to me this morning relative to this subject?
"THE BAILIFF: Your Honor, after the subject came up yesterday, I related to you that I was back here near where Mr. Culpepper is. I don't remember if I was seated or standing. But I heard the same thing Mr. Walsh did. The defendant leaned over and spoke to Mr. Gomany and says: `That's Shabazz.'
"THE COURT: All right. Now, you were in the furthermost point in the courtroom you
"THE BAILIFF: Yes, sir.
"THE COURT:could be?
"THE BAILIFF: Yes, sir.
"THE COURT: Back at the end of the courtroom; is that right?
"THE BAILIFF: Yes, sir
"THE COURT: All right. Well, in any event, did it strike you that the defendant was making some type of private communication, either of you fellows, or just kind of speaking out to anybody that would have been in the room, or just what?
"[Walsh]: Like I said, Judge
"THE COURT: Was it prodded by a question?
"[Walsh]: It appeared to me that he turned around as soon as Ms. Shabazz walked into the room and spoke in a normal tone of voice.
"THE COURT: Identifying her by name?
"[Walsh]: Yes, sir.
"THE COURT: What do you think, Andy?
"THE BAILIFF: That's what I heard, Judge.
"THE COURT: Okay.
"THE BAILIFF: I didn't take it to be anything private.
"THE COURT: All right. Now, [defense counsel], you filed a written motion yesterday. And I told you that you could supplement that with any kind of comment you would like to make today.
"[Defense counsel]: Judge, I would state, for the record, that the conversation could I ask Mr. Griffin now on the record for this particular motion?
"THE COURT: Okay.
"[Defense counsel]: Mr. Griffin.
"[Griffin]: Yes, sir.
"[Defense counsel]: When there was a comment made about Shabazz yesterday when she came in the courtroomfirst of all, tell the Court what youwho did you make the statement to?
"[Griffin]: Well, when she came in, y'all informed me that we have the Shabazz person. And then when I turned around and looked in the back, I seen a girl sitting back there. I said: `Is this Shabazz?'
"[Defense counsel]: Okay. Was that statementwho was that statement directed to?
"[Griffin]: What do you mean? Was it to
"[Defense counsel]: Who were you saying that to?
"[Griffin]: I was saying that to you. "[Defense counsel]: Okay. And I'm your lawyer?
"[Griffin]: Correct. Yes.
"[Defense counsel]: This statement to me, was it to be a private attorney-client statement in conversation to me, or was it public?
"[Griffin]: Yes. Yes, it was.
"[Defense counsel]: Yes, it was what?
"[Griffin]: It was private.

*320 "[Defense counsel]: Between me and you?
"[Griffin]: Between me and you.
"[Defense counsel]: We're sitting here at the counsel table where we've been for the last week?
"[Griffin]: That's because we don't have nowhere else to go.
"[Defense counsel]: Did you mean for anybody else to hear it?
"[Griffin]: No, I didn't.
"[Defense counsel]: That's it, Judge.
"THE COURT: So your man says it was more in the nature of an inquiry than a declaration?
"[Defense counsel]: Yes, sir.
"THE COURT: All right. Well, thank you very much."
(R. 911-917.)
This Court has previously held:
"`Before the attorney-client privilege attaches, there must be a communication between the attorney and the client that is confidential, Sawyer v. Stanley, 241 Ala. 39, 1 So.2d 21 (1941), and it must have been communicated because of the attorney-client relationship. § 12-21-161, Code 1975.'"
Ex parte Clark, 630 So.2d 493, 496 (Ala.Cr. App.1993), quoting Goza v. Goza, 470 So.2d 1262, 1266 (Ala.Civ.App.1985). The burden of proving facts to establish that a communication falls within the attorney-client privilege falls upon the party asserting the privilege. Ex parte Clark, 630 So.2d at 496. "[T]he known presence of an unnecessary party or an understanding that the information will be communicated to such a person negates the prerequisite confidentiality." C. Gamble, McElroy's Alabama Evidence, § 388.02(4)(5th ed.)(1996).
"If a client fails to take reasonable precautions to prevent others from being made privy to the communication, this may be a factor causing the court to determine that the privilege falls, thus opening the mouth of the eavesdropper because of no intent to create confidentiality."
Id. at § 388.05. In determining whether a communication qualifies, the Alabama Supreme Court has held:
"Whether a communication is privileged is a question of fact to be determined by the trial court from the evidence presented and `[a] witness, be he attorney or client, is not entitled to decide the question for himself.' Harris v. State, 281 Ala. 622 625, 206 So.2d 868, 871 (1968)."
Ex parte DCH Regional Medical Center, 683 So.2d 409, 412 (Ala.1996).
Moreover, it has long been the law that
"[i]f the [attorney and client] choose to hold their conferences in the presence and hearing of third persons, whether they be officers of the law, and as such, charged with the custody of the client, and hence necessarily present, or indifferent bystanders, there is no rule of law which forbids such third persons to depose to facts thus coming to their knowledge."
Cotton v. State, 87 Ala. 75, 6 So. 396, 397-98 (1889).
The testimony reveals that the comment made by Griffin to his attorney was made in open court and was made loudly enough that it could be easily heard by people throughout the courtroom. The bailiff's testimony mirrors Walsh's testimony that the comment was easily overheard. While Griffin maintains that the statement was intended for his counsel alone, the record indicates that Griffin did not take *321 reasonable precautions to prevent others from overhearing. Based on our review of the record, we find no error in the court's determination that Griffin's comment to his attorney was not a confidential communication. Therefore, no error occurred in the admission of the evidence in this regard.
Griffin also claims the trial court engaged in improper ex parte contact with a witness. (Issue XXV of Griffin's brief to this Court at p. 98.) Specifically, Griffin claims the trial court had improper contact with the trial court's bailiff prior to the bailiff's testifying concerning the statement he heard between Griffin to his defense counsel. Griffin did not raise this objection during trial; therefore, our review is limited to one for plain error. Rule 45A, Ala.R.App.P.
Canon 3 A(4), Alabama Canons of Judicial Ethics, states:
"A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider ex parte communications concerning a pending or impending proceeding. A judge, however, may obtain the advice of a disinterested and impartial expert on the law applicable to a proceeding before him; provided however, a judge should use discretion in such cases and, if the judge considers that justice would require it, should give notice to the parties of the person consulted and the substance of the advice, and afford the parties reasonable opportunity to respond."
In order for the trial judge's conduct to warrant a reversal, the complaining party must prove that the judge was materially prejudiced. Mathieson v. Mathieson, 409 So.2d 439 (Ala.Civ.App.1982). See also Stewart v. Stewart, 354 So.2d 816 (Ala.Civ.App.1977).
The testimony indicates that the bailiff approached the trial judge and informed him that he also overheard Griffin's comment to his attorney. The trial court made the information conveyed to him by the bailiff known to the parties. Each party was given an opportunity to question the bailiff. There is no indication in the record that the trial court initiated the contact with the bailiff. In addition, the bailiff's testimony was outside the presence of the jury; therefore, the bailiffs testimony was never heard or considered by the jury.
Based on the above analysis, we find that Griffin has failed to establish that he was materially prejudiced. Therefore, no plain error occurred.

XXIII.
Griffin claims that several instances of alleged prosecutorial misconduct throughout the voir dire, the guilt phase and the sentencing phase of his trial denied him a fair trial and sentencing determination. (Issue XXVI in Griffin's brief to this Court at p. 100.) For simplicity, we will address Griffin's claims as they appear in the order of trialfrom voir dire to closing arguments in the sentencing phase.
In Hunt v. State, 642 So.2d 999 (Ala.Cr. App.1993), aff'd, 642 So.2d 1060 (Ala.1994), this Court stated:
"`In determining whether the accused was prejudiced by prosecutorial misconduct, "we must ordinarily give great deference to the ... judge's handling of the alleged misconduct during the trial. The ... judge is ordinarily in a much better position to understand the circumstances surrounding the alleged misconduct and to evaluate its impact." United States v. Tham, 665 F.2d 855, 860 (9th Cir.1981)" [,cert. denied, 456 U.S. 944, 102 S.Ct. 2010, 72 L.Ed.2d 466 *322 (1982) ]. Wysinger v. State, 448 So.2d 435, 439 (Ala.Cr.App.1983.) The statements of a prosecutor will justify the reversal of a conviction only if they undermined "the fairness of the trial and contributed to a miscarriage of justice." United States v. Obregon, 893 F.2d 1307, 1310 (11th Cir.), cert. denied, 494 U.S. 1090, 110 S.Ct. 1833, 108 L.Ed.2d 961 (1990) (quoting United States v. Sawyer, 799 F.2d 1494, 1507 (11th Cir.1986) (per curiam), cert. denied, 479 U.S. 1069, 107 S.Ct. 961, 93 L.Ed.2d 1009 (1987)).'"
642 So.2d at 1032, quoting, Carroll v. State, 599 So.2d 1253, 1268 (Ala.Cr.App. 1992), aff'd, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1047, 114 S.Ct. 1582, 128 L.Ed.2d 224 (1994). In addition, this Court has held:
"Improper comments by the district attorney will result in reversal only if they `"so infected the trial with unfairness as to make the resulting conviction a denial of due process."' Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144, 157 (1986), quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)."
George v. State, 717 So.2d at 838.
According to these principles of law, we will now review Griffin's allegations.

A. Alleged instances of prosecutorial misconduct during voir dire.
1. Griffin claims that the following questions posed by the prosecutor improperly "assumed" that the jury would find him guilty of capital murder. (Issue XXVI(H) of Griffin's brief to this Court at p. 111.)
"[Prosecutor]: One of the things that Judge Hard has already talked to you about in this case is the death penalty. And he's talked to you in a little bit of an abstract fashion about it.
"But I want to ask you a little bit more specific question. Make no mistake about it, when this case is over, you will considerthe 12 of you seated will consider guilt on the crime of capital murder. And when you return a verdict finding the defendant guilty of capital murder, then you'll come back for a second stage which is the sentencing stage. And at that point the State will be asking in the strongest possible terms for the death penalty for this defendant. So we're not talking about this in the abstract anymore.[12]
"In addition to those of you who have already raised you handand I've already got a list of everybody who raised their handis there anybody else, looking at this defendant in courtand we're not talking about any abstract here. Would anybody have trouble recommending to Judge Hard that the death sentence be imposed on this particular defendant? When I put it in those terms, does that make anybody stop and think that maybe I've got a problem with that?"
(R. 180-181.)(Emphasis added.)
We note that Griffin did not object; therefore, our review is limited to one for plain error. Rule 45A, Ala.R.App.P.
Before the state and the defense questioned the veniremembers, the trial court, as mandated by § 12-16-6, Ala.Code 1975, asked the veniremembers general questions regarding the death penalty and its imposition. (R. 113-14.) The alleged objectionable state's question was simply a continuance of the trial court's questions in an effort to determine any biases or prejudices among the veniremembers. The jury was repeatedly informed that it was *323 its duty to determine the facts of the case and to apply the law as it was instructed on to those facts. The trial court emphasized that the jury's determination was not to be made until the close of all the evidence and until it had been properly instructed. In light of the entire record, we do not find the state's question to be plain error or to mandate reversal.
2. Griffin next claims the prosecutor improperly appealed to the public's fear of crime to obtain a conviction. (Issue XXVI(L) of Griffin's brief to this Court at p. 119.) Specifically, Griffin alleges:
"[T]he district attorney informed them [the venire] that he and his office were responsible `for prosecuting criminal cases like this one and all of the other crimes that you hear about on TV.' (R. 131)(emphasis supplied.) Later, the prosecutor told the jury panel that he `gets a lot of responses' from his question whether people had been a victim of crime. (R. 152.)"
Griffin failed to object when the alleged statements were made; therefore, our review is limited to one for plain error. Rule 45A, Ala.R.App.P.
No plain error occurred when the district attorney explained his role to the veniremembers. See Mason v. State, 768 So.2d 981 (Ala.Cr.App.1998). Moreover, questioning the venire about whether any member had been a victim of a crime has been held to be an important inquiry to determine the impartiality and fairness of a potential juror. See Hurley v. State, 568 So.2d 359 (Ala.Cr.App.1990). We do not believe that informing the potential jurors that this question unfortunately results in a lot of responses improperly appealed to the public's fear of crime or that it rendered Griffin's trial fundamentally unfair. After reviewing the comments in context, we conclude the prosecutor was merely explaining the function of his office and that no plain error occurred.
3. Griffin also claims the prosecutor improperly asked the venire not to consider his prior punishment in federal court. (Issue XXVI(M) in Griffin's brief to this Court at p. 120.)
In the first instance of error alleged by Griffin, the prosecutor informed the trial court he intended to ask the venire if its members felt it was unfair to try Griffin for capital murder after he had entered a plea in federal court. (R. 101-02.) This comment was made to the trial court outside of the presence of the jury; therefore, the prosecutor's statements did not prejudice Griffin and we find no error.
The second instance of error allegedly occurred when the prosecutor asked the veniremembers if anyone on the venire thought it was unfair to use his federal plea allocution against him in a state court. (R. 186.) According to Griffin, the prosecutor improperly used the above information to strike a member of the venire. Griffin failed to object to the question; therefore our review is limited to one for plain error. Rule 45A, Ala.R.App.P.
In Sanders v. State, 641 So.2d 1260, 1263 (Ala.Cr.App.1993), Judge Taylor, writing for this Court stated:
"Rule 18.4(c), Ala.R.Crim.P., states: `The [trial] court shall permit the parties or their attorneys to conduct a reasonable examination of prospective jurors.' Rule 18.4(d), states: `Voir dire examination of prospective jurors shall be limited to inquiries directed to basis for challenge for cause or for obtaining information enabling the parties to knowledgeably exercise their strikes.'
"The trial court has considerable discretion in `insur[ing] an unbiased jury.' Motes v. State, 356 So.2d 712 (Ala.Cr. *324 App.), writ denied, 356 So.2d 720 (Ala. 1978). Counsel questioning the prospective jurors is given the right to question the jurors as to any matter that `might aid him in the intelligent exercise of his right to peremptory challenges. Dyer v. State, 241 Ala. 679, 4 So.2d 311 (1941).' Alabama Power Co. v. Bonner, 459 So.2d 827, 832 (Ala.1984), overruled on other grounds, Cooper v. Bishop Freeman Co., 495 So.2d 559 (Ala.1986). `The scope of the examination is left largely to the discretion of the trial judge.'[Alabama Power v.] Bonner, 459 So.2d [827 (Ala.1984) ] at 832."
We have recently held:
"How far counsel may go in asking questions of the jury on voir dire, and the nature, variety, and extent of those questions are left to the discretion of the trial court."
Ingram v. State, 779 So.2d 1225, 1262 (Ala. Cr.App.1999).
The record indicates the state was concerned that some member of the venire might think it was unfair to prosecute Griffin in Alabama after he had pleaded guilty in federal court. The state's question was directed toward determining whether the potential jurors could be impartial and unbiased. The trial court did not abuse its discretion by allowing the state to explore this area of bias; therefore, we find no plain error.

B. Alleged instances of prosecutorial misconduct during the state's first closing argument in the guilt phase.
1. We addressed Griffin's claim that the state improperly commented on his failure to testify in Part III of this opinion. (Issue XXVI(A) in Griffin's brief to this Court at p. 100.)
2. In addition, Griffin claims the state mischaracterized Dr. Brissie's area of expertise. (Issue XXVI(F) of Griffin's brief to this Court at pp. 109-110.) According to Griffin, the prosecutor wrongly claimed that Dr. Brissie was an expert in ballistics in the following portion of the record:
"[Prosecutor]: Dr. Brissie gives us the best testimony about how he was killed. It was his testimony that shows if you look at the whole thingand, again, that's what Dr. Brissie is an expert witness in, is looking at all of the wounds and all of the other various stippling and the tattoo marks and all of the things he talked to you about. And he's very good at that.[13]"
(R. 816.) Griffin failed to object to the prosecutor's comments during closing arguments; therefore, our review is limited to one for plain error. Rule 45A, Ala. R.App.P.
We reject Griffin's claim that the prosecutor characterized Dr. Brissie as a ballistics expert. The above comment emphasizes that Dr. Brissie examined Davis's wounds and in no way indicated that Dr. Brissie testified regarding ballistics. Additionally, at the beginning of Dr. Brissie's testimony, Griffin stipulated in open court "that Dr. Brissie is qualified as an expert in the case as a medical examiner and to the cause of death." (R. 375.) In reviewing the claimed error in context with the entire record, we conclude the prosecutor did not mislead or mischaracterize Dr. Brissie's role to the jury. We find nothing in the above-quoted text that would lead any member of the jury to believe that Dr. Brissie was anything other than an expert *325 on the cause of death. Therefore, we find no error, plain or otherwise.
3. Griffin further claims that the state improperly vouched for the credibility of Dr. Brissie when the prosecutor stated "[a]nd he is very good at that." (R. 816.)(Issue XXVI(G) of Griffin's brief to this Court at pp. 110.) Despite Griffin's claim to the contrary, "[t]he credibility of witnesses is proper subject matter for arguments to the jury." Price v. State, 725 So.2d at 1029. See also Cross v. State, 536 So.2d 155 (Ala.Cr.App.1988). "[A] prosecutor may express her opinion concerning reasonable inferences, deductions, and conclusions to be drawn from the facts and evidence, as long as she does not express an opinion as to the defendant's guilt." Sams v. State, 506 So.2d 1027, 1029 (Ala. Cr.App.1986). Accordingly, we find no error in the prosecutor's comment.

C. Alleged instances of prosecutorial misconduct during the state's second closing argument in the guilt phase.
Griffin claims the prosecutor repeatedly mischaracterized evidence during its rebuttal argument in the guilt phase of trial. (Issue XXVI(K) of Griffin's brief to this Court at p. 117.) Griffin points to four instances where, he says, the state mischaracterized the evidence presented at trial. We note that Griffin failed to object to any of the now claimed errors at trial; therefore, our review is limited to one for plain error. Rule 45A, Ala.R.App.P.
In reviewing closing statements made by the prosecutor to the jury, the Alabama Supreme Court has stated:
"A challenged comment of a prosecutor made during closing arguments must be viewed in the context of the evidence presented in the case and the entire closing arguments made to the jury both defense counsel's and the prosecutor's."
Ex parte Brooks, 695 So.2d at 189.
1. Griffin cites to two instances where, he claims, the prosecutor improperly argued that Bimbo committed capital murder. Griffin claims this argument was improper because Bimbo was, in fact, convicted of the lesser included offense of intentional murder. The state argues, and we agree, that the prosecutor's statements were a reply-in-kind to Griffin's attack on the credibility of Spragg's testimony. Our review of the record indicates that the prosecutor essentially restated Bimbo's explanation that he had previously admitted to capital murder because he did not want Spragg to be implicated. Clearly, the prosecutor was responding to defense counsel's attack on the credibility of Spragg's testimony and did not mischaracterize the evidence presented by Bimbo. See Chandler v. State, 615 So.2d 100, 110 (Ala.Cr.App.1992)(stating that the prosecutor has a right to comment on statements made by defense counsel in closing argument.) We have reviewed the comments cited by Griffin and find them to contain no error. The trial court did not abuse its discretion.
2. Griffin also claims the state improperly argued that he flew out of the airport in Atlanta after Davis's murder. According to Griffin, the evidence did not support these comments. However, there was testimony from Spragg that Henry intended to drive Griffin and Johnny O. to the airport in Atlanta so there would be no record of their flying out of Birmingham. In addition, Shabazz testified she accompanied Henry and two men dressed in black clothing who had New York accents to a hotel located near the Atlanta airport. Clearly, the evidence presented at the trial supported the prosecutor's argument. We find nothing improper regarding this portion *326 of the state's arguments.[14]
3. Griffin claims the state improperly accused the defense attorneys of lying (Issue XXVI(N) of Griffin's brief to this Court at p. 121.), when the prosecutor stated:
"[Prosecutor]: When you back up and look at what they're really asking you to do, it boils down to this. These attorneys want to talk out of both sides of their mouths, which is something people say attorneys do all of the time, I guess.
"And then sort of the back-up position of that is, well, okay, if you believe it was really him, then he did it, but he didn't get paid any money for it. So, you know, you can only find him guilty of murder.
"I mean, that's really what they're saying. He didn't do it. Well, but if he did do it, he didn't get paid for it, so it's just regular murder. They're not going to come right out and say that, though."
(R. 851-852.)(Emphasis added.)
When reading the state's comments in light of the arguments presented by both defense counsel and the state, it is apparent that the prosecutor was replying to Griffin's closing argument. Griffin's counsel argued that the state failed to prove that he killed Davis. Additionally, counsel attacked Spragg's credibility by arguing that Spragg did not mention the payment of money in his federal plea allocution and thus, that his testimony at Griffin's trial must be questionable. As we previously stated, the defense, as well as the prosecutor, is allowed to reply in kind to each other's arguments. The prosecutor was merely stating his perception of the argument by defense counsel and replying in kind.
4. Additionally, Griffin claims that the prosecutor "denigrated" the severity of the lesser included offenses by "arguing that [the lesser included offenses] were not applicable in this instance." (Issue XXVI(O) of Griffin's brief to this Court at p. 122.) Griffin cites only a page from the record in support of his contention and does not identify what specific portion of the state's argument is offensive; therefore, Griffin has failed to adequately present his claim. However, we note that on the page of the record Griffin cites the prosecutor stated the following:
"[Prosecutor]: What they're hoping is this, that when y'all get back thereand this happens sometimes when you have a lesser included offense. Like, remember I talked to [you] about it, if you don't have that element, you've just got murder. They're hoping you'll get back there and do the easy thing, which is to compromise on murder. Some people think one thing, and some people think the other.
"I'm going to ask you not to do that, because what the State has proven we're going to talk about this in a second, but what we have proven is the whole thing. It was him. And he didn't come down here and do it for nothing."
(R. 852.) Reading the above-quoted portion of the record in the context of the entire record, we are convinced the prosecutor again was simply replying in kind to Griffin's argument that the state failed to prove that Davis was murdered for pecuniary gain. The prosecutor was merely encouraging the jury not to reach a compromise verdict but to evaluate the state's evidence and to conclude that the state had met its burden of proof to convict Griffin *327 of capital murder. We find no plain error in the prosecutor's remarks.
5. Griffin claims that the prosecutor improperly commented on his failure to call witnesses. (Issue XXVI(B) of Griffin's brief to this Court at p. 101.) We disagree.
During Griffin's closing argument, his counsel stated:
"[Defense counsel]: The F.B.I. and Flynn, who is a New York City detective, who sat therethey brought him down here to sit there and read a few words out of a transcriptcertainly could have brought [Griffin's girlfriend] down here if Griffin called her up from the hotel. Couldn't they have? Easy. The F.B.I. can find anybody."
(R. 842.)
During the state's second closing argument, the following occurred:
"[Prosecutor]: [Defense counsel] talked about the State not providing or bringing witnesses down here. The State has the burden of proof. And I think you first heard that from me. I told you that up front. I've never tried to not shoulder that.
"The defendant has no burden to prove anything. But the defendant has the same subpoena power as the State does.
"[Defense counsel]: No, we don't. Judge, I object to that. That's not true.
"THE COURT: I don't want to see you guys start fussing now, please. I don't want to get into a big Sixth Amendment discussion about compulsory attendance of witnesses and all.
"You may proceed.
"[Prosecutor]: Ms. Smith, this witness you heard, the lady who testified about the baby up in New York, was brought down here by them. They had the ability to bring in any other witness they wanted to. They had the ability and the names of every single one of these eyewitnesses that was over there in the game room, because I gave it to them. Chiquita Norman. All of these ladies. The only one they brought in here was Ms. Norman."
(R. 858-59.) "Reference to a particular witness's failure to testify is improper if the witness is equally available to both parties." Pacifico v. Jackson, 562 So.2d 174, 177 (Ala.1990); accord Helton v. State, 433 So.2d 1186, 1189 (Ala.Cr.App.1983); Daniels v. State, 650 So.2d 544, 560 (Ala. Cr.App.1994), cert. denied, 514 U.S. 1024, 115 S.Ct. 1375, 131 L.Ed.2d 230 (1995). However, we conclude that the prosecutor's comment was directed at Griffin's failure to call a particular kind of witness. In that light, and when read in conjunction with the prosecutor's entire closing argument, we conclude the comment was directed to Griffin's failure to establish his alibi witnesses or to develop his defense. See Pacifico v. Jackson. Reading the above comment in light of the entire argument and the evidence presented at trial, we conclude that the state was not commenting on the defense's failure to call witnesses, but was again replying in kind to Griffin's closing argument.
Moreover, we reject Griffin's claims that the prosecutor misled the jury by indicating that a "defendant has the same subpoena power as the State does." (Griffin's brief to this Court at p. 117.) Defense counsel opened the door for the prosecutor's comment by challenging the state's presentation of out-of-state witnesses. The record indicates that the trial court assured Griffin that efforts would be made to secure the witnesses he had requested. The case action summary indicates that Griffin requested five witnesses to testify in his behalf. Smith was the only out-of-state witness he requested. *328 (Supp.R.11.) She was provided with transportation by the trial court. Therefore, in light of the trial court's efforts to secure Griffin's requested witnesses and our conclusion that the prosecutor's comment was reply-in-kind, no error occurred here.

D. Alleged instances of prosecutorial misconduct during the state's second closing argument in the penalty phase.
In evaluating the comments of the state or defense to the jury, this Court has held:
"Statements made by counsel in argument to the jury are considered as having been made in the heat of debate and are usually valued by the jury at their true worth. Harris v. State, 539 So.2d 1117 (Ala.Cr.App.1988.) In order for a prosecutor's comments in closing argument to warrant a new trial, those comments must have so infected the trial with unfairness that the resulting conviction resulted in a denial of due process. Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)."
Poole v. State, 645 So.2d 330, 332 (Ala.Cr. App.1994). In addition, "`[q]uestions of the propriety of argument of counsel are largely within the trial court's discretion.'" Freeman v. State, 776 So.2d at 184, quoting McCullough v. State, 357 So.2d 397, 399 (Ala.Cr.App.1978).
1. Griffin claims the prosecutor committed prosecutorial misconduct by improperly contrasting his rights with those of Davis. (Issue XXVI(C) of Griffin's brief to this Court at p. 102.) Griffin failed to object at trial; therefore our review is limited to one for plain error. Rule 45A, Ala.R.App.P.
Griffin claims reversible error occurred as a result of the following statement by the prosecutor:
"[Prosecutor]: He had an attorney up there in New York. And down here he had two attorneys.
"He had a judge, a federal judge, in New York. Judge Hard here, who made rulings on evidence, orchestrated or sat and watched over the proceedings.
"In a courtroom like this, he had a group of fine jurors like yourselves to listen to all of the evidence and decide if he's guilty or not.
"That's the due process we gave him. Look at the due process he gave Chris Davis and these folks. His due process was a .357 Magnum."
(R. 947.)
In McNair v. State, 653 So.2d 320, 337 (Ala.Cr.App.1992), this Court stated:
"The prosecutor made numerous references to the victim's rights and several times implied that her rights were to be weighed against the appellant's. This was clearly improper. However, we think these references were valued by the jury at their true worth, as having been uttered in the heat of debate and were not expected to become factors in the formation of the verdict."
Likewise, we conclude that these comments by the prosecutor in this case, though questionable, did not rise to the level of plain error.
2. Griffin next claims the prosecutor improperly injected his opinion into the trial. (Issue XXVI(D) of Griffin's brief to this Court at p. 104.) Specifically, he claims that "[b]y arguing that Griffinto the exclusion of all other capital defendants deserves death, the prosecutor improperly informed the jury that he `knows what the truth is and is assuring its revelation.'" (Griffin's brief to this Court at p. 105.) (Citation omitted.) Griffin cites the *329 following portion of the record in support of his argument:
"[Prosecutor]: Ladies and gentleman, when you look at the evidence, there is no other recommendation. When you look at the aggravation, again, it's through the roof. And there's no mitigation. If this isn't a case where aggravation outweighs mitigation, then you'll never see one. If this is not a case where the death penalty is appropriate, then there never will be a case.
"And y'all were very honest on Monday when you said in the appropriate case you could recommend death. Well, if this isn't an appropriate case, what is?
"I'm confidant when you look at this law that Judge Hard gives you and the evidence you've got and you weigh it, you'll reach the only possible conclusion in the case, which is that the appropriate sentence for this defendant is death by electrocution.

"Thank you."
(R. 948.)(Emphasis supplied.)
Griffin correctly argues that it is improper for the prosecutor to express his opinion about the guilt or innocence of the defendant. However, that is not what the prosecutor was doing here. Clearly, the argument put forth by the prosecutor was a plea with the jury to recommend to the trial court that it impose the maximum sentence, death by electrocution. In Bryant v. State, 585 So.2d 259 (Ala.Cr. App.1991), we stated:
"`The prosecutor has the right to present his impressions from the evidence. He may argue every matter of legitimate inference and may examine, collate, sift, and treat the evidence in his own way.' Donahoo v. State, 505 So.2d 1067, 1072 (Ala.Cr.App.1986)."
585 So.2d at 260. A matter of legitimate inference would include the prosecution's arguing to the jury that the death penalty is the appropriate punishment. We find no error in the prosecutor's argument.
3. Griffin also complains that the state mischaracterized the evidence by claiming that he was in charge of the murder of Davis. Griffin claims that the evidence at trial showed that Henry was in charge of the murder.
During his testimony, Spragg testified that Griffin came from New York City to Birmingham for the express purpose of killing Davis. Spragg testified that prior to the actual shooting, Griffin had indicated he was ready to shoot Davis. Spragg further stated that, after Davis was killed, Griffin and Johnny O. argued about who actually shot Davis first.
In Price v. State, supra, we stated:
"`"The prosecutor's comment was a reasonable inference from the evidence. `The test of a legitimate argument is that whatever is based on facts in evidence is within the scope of proper comment and argument to the jury.' Ward v. State, 440 So.2d 1227, 1230 (Ala.Cr. App.1983). `Counsel for both the State and [the] defendant are allowed wide latitude in drawing reasonable inferences from the evidence in their closing arguments. A prosecutor as well as defense counsel has a right to present [her] impression from the evidence, if reasonable, and may argue every legitimate inference.'"
725 So.2d at 1031, quoting Manigan v. State, 402 So.2d 1063, 1072 (Ala.Cr.App. 1981), cert. denied, 402 So.2d 1072 (Ala. 1981).
The prosecutor essentially argued that Griffin was responsible for pulling the trigger and killing Davis. While restating the evidence, the prosecutor noted that Bimbo lost the drugs and that Henry held him accountable for the loss. Although Henry *330 arranged for Griffin to travel to Birmingham to kill Davis, Henry was not "in charge" in that he actually pulled the trigger Griffin was. The evidence indicated that Griffin was paid to kill Davis; therefore, the prosecutor's argument was not improper. After reviewing the record, we find the prosecutor's argument was a reasonable inference from the testimony presented at trial. We, therefore, find no error.

E. Remaining claims of alleged prosecutorial misconduct.
1. Griffin claims the prosecution improperly "appealed to an anti-gang hysteria from the very outset of the case." (Issue XXVI(E) of Griffin's brief to this Court at p. 106.) Griffin also claims the prosecution "[r]elied extensively on inadmissible hearsay during opening and closing arguments." (Issue XXVI(I) of Griffin's brief to this Court at p. 112.) We have previously reviewed these claims in Parts XI and IX, respectively, of this opinion and found no error. No prosecutorial misconduct occurred with regard to these two claims.
2. Griffin claims the state also attempted to mislead the jury regarding a federal judge's discretion at sentencing. (Issue XXVI(J) of Griffin's brief to this Court at p. 115.) During defense counsel's cross-examination of Spragg about his agreement with the government to testify in Griffin's trial, the following occurred:
"[Defense counsel]: And under the federal sentencing guidelines, the judge can depart all of the way down to 0 months, can they not?
"[Spragg]: It's left up to the judge.
"[Defense counsel]: Right.
"[Spragg]: Right.
"[Defense counsel]: And the judge can do whatever the judge wants to do?
"[Spragg]: Right.
"[Defense counsel]: All the way from life
"[Prosecutor]: Judge, I'm going to object to that question. It's an incorrect statement of the law.
"[Defense counsel]: It's not incorrect, Judge. It's correct.
"THE COURT: Well, the question is whether the witness knows the answer.
"So if you don't know the answer, Mr. Spragg, just say you don't know. If you do know, you may answer.
"[Spragg]: Repeat the question.
"[Defense counsel]: Mr. Spragg, under the federal sentencing guidelines, the judge can do what's known as `depart,' in other words, go all of the way down to 0 months; is that correct?
"[Spragg]: I'm not sure. It's left up to him, from my knowledge.
"[Defense counsel]: Right.
"[Spragg]: Right.
"[Defense counsel]: And the judge can depart or move away from a life sentence; is that correct?
"[Spragg]: Right.
"[Defense counsel]: And he can give you 0 months, if the judge wanted to, on your sentence; correct?
"[Spragg]: I'm not sure. I've never heard of any case where, you know, someone just walked, ...."
(R. 534-35.)
According to Griffin, the prosecutor, by objecting, "clearly attempted to mislead the jury and cause them to believe that a federal judge does not have full discretion when deciding whether to grant a downward departure." (Griffin's brief to this Court at p. 116.) Although the prosecutor may have been incorrect in the reason for his objection, the trial court averted any error by focusing the question on Spragg's *331 understanding of the federal trial court's discretion.
As the trial court pointed out, the question of defense counsel was intended to test Spragg's knowledge of the federal guidelinesnot what the guidelines actually are. Spragg testified fully concerning his understanding of the discretion of the federal trial judge. Even if the prosecutor was incorrect, nothing in his objection indicates he was intentionally trying to mislead the jury. We therefore find no error.
3. Griffin claims the prosecutor improperly impeached a defense witness. (Issue XXVI(P) of Griffin's brief to this Court at p. 122-23.) Rule 608(b), Ala.R.Evid., states, in pertinent part:
"Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's credibility, other than conviction of crime as provided in Rule 609, may not be inquired into on cross-examination of the witness nor proved by extrinsic evidence."
However, "the party against whom the witness is called may impeach the witness' credibility by proving that the witness has previously made statements that are inconsistent with the witness' present testimony." C. Gamble, McElroy's Alabama Evidence, § 155.02(1) (5th ed. 1996). During the state's recross-examination of Bimbo, the following occurred:
"[Prosecutor]: Mr. Bimbo, you just testified you didn't do no violent acts here in Birmingham, Alabama?
"[Bimbo]: As far as thismy understanding with the RICO act as far as
"[Prosecutor]: That's not my question. You testified you didn't do any violent acts here in Birmingham?
"[Bimbo]: I testified forI just said that we didn't dothe RICO act stipulates that drugs and violence is
"[Prosecutor]: That's not my question, Mr. Bimbo.
"[Bimbo]: Oh, yes, I did. Yeah, growing up in the project, you're going to do violent acts.
"[Prosecutor]: Johnny Spragg has testified to his involvement in the attempted murder of someone knowna John Doe known as Derrick in the spring of 1992?
"[Bimbo]: Yes.
"[Prosecutor]: You were also involved in the attempted murder of Derrick, weren't you?
"[Bimbo]: No, sir. I was not charged with that.
"[Prosecutor]: That's not my question.
"[Bimbo]: I was not involved in that.
"[Prosecutor]: In the summer of 1992 here in Birmingham, Alabama, you plotted along with Johnny Spragg, which he's admitted to, to murdering a guy named Sam; do you remember that?
"[Bimbo]: Me and Sam had differences from high school, but we never plotted to kill him or nothing, no.
"[Prosecutor]: So you had differences with Sam, but you didn't plot with Spragg to kill him?
"[Bimbo]: No, sir. It was high school. It has nothing to do with this.
"[Prosecutor]: So you and Johnny Spragg and Carlton Henry and three other guys, Mark, Cary, and Derrick, didn't go to the projects in Kingston and open fire on Sam?
"[Bimbo]: No, sir."
(R. 637-38.) Griffin failed to object during trial; therefore, our review is limited to one for plain error. Rule 45A, Ala. R.App.P.
The above testimony was elicited by the state in response to Bimbo's claim that he and Spragg "wasn't doing no violent acts *332 over no drugs." (R. 632-33.) We find no error.

XXIV.
Griffin contends that "[t]he trial court improperly instructed the jury on the law." (Issue XXVII of Griffin's brief to this Court at p. 123.) Griffin lists eight instances where, he says, the "trial court committed several instructional errors that require this Court [to] reverse [his] conviction and sentence of death." (Griffin's brief to this Court at p. 123.) Because Griffin failed to object at trial to any of these allegedly improper instructions, our review is limited to one for plain error. Rule 45A, Ala.R.App.P. We will review each of these claims separately.
A. Griffin first claims the trial court erred in not instructing the jury to consider as a mitigating factor during the penalty phase of trial the fact that his accomplices received lesser sentences.
"A trial court has broad discretion in formulating its jury instructions, providing those instructions accurately reflect the law and the facts of the case. Raper v. State, 584 So.2d 544 (Ala.Cr.App. 1991). We do not review a jury instruction in isolation, but must consider the instruction as a whole, Stewart v. State, 601 So.2d 491 (Ala.Cr.App.1992), aff'd. in relevant part, 659 So.2d 122 (Ala.1993), and we must evaluate instructions like a reasonable juror may have interpreted them. Francis v. Franklin, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985); Stewart v. State."

Ingram v. State, 779 So.2d at 1258.
During the penalty phase, the trial court provided the following instruction:
"THE COURT: In making your determination concerning the existence of aggravating and mitigating circumstances, you should consider the evidence presented at the hearing today and, as well, any evidence that was presented during the guilt phase of the trial earlier in the week that is relevant or pertinent to the existence of any aggravating or mitigating circumstance.
". . . .
"THE COURT: The law of our state provides a list of some of the mitigating circumstances which you may consider. But that list is not a complete list of the mitigating circumstances you may consider.
"So let's go to the list of some of the mitigating circumstances that you may consider. This would include the following:
"That the defendant was an accomplice in the capital offense committed by another person, and his participation was relatively minor.
"Second, the age of the defendant at the time of the crime. I've got the defendant's date of birth at September 14, '65. So in September
"What was it, the 24th
"[Prosecutor]: Yes, Your Honor.
"THE COURT:of '92.
"[Prosecutor]: He was 27.
"THE COURT: He would have been 27 years old, if my arithmetic is correct.
"Moreover, in addition to these mitigating circumstancesas I've said, a mitigating circumstance does not have to be included in this discussion we've had for you to consider a mitigating circumstance to have existed.
"In addition to the mitigating circumstances specified, mitigating circumstances shall include any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death.

*333 "I've got Bimbo's file right here. And it's true that on October 23, right here in front of me, Bimbo was convicted of the lesser offense of murder. On November 14, I sentenced him to a life sentence.
"A mitigating circumstance considered by you should be based on the evidence you've heard. When the factual existence of an offered mitigating circumstance is in dispute, the State shall have the burden of disproving the factual existence of the circumstance by a preponderance of the evidence.
"The burden of disproving it by a preponderance of the evidence means that you're to consider that the mitigating circumstance does exist, unless taking the evidence as a whole it is more likely than not that the mitigating circumstance does not exist.
"Therefore, if there is a factual dispute over the existence of a mitigating circumstance, then you should find and consider that mitigating circumstance, unless you find the evidence is such that it is more likely than not that such mitigating circumstance does not exist."
(R. 951-52, 956-59.)
While Griffin is correct that the trial court did not explicitly instruct the jury that it may consider the treatment of his accomplices as a mitigating circumstance, we conclude, after considering the trial court's instruction in its entirety, that it was adequate. Defense counsel strongly argued during the hearing that the treatment of Griffin's accomplices constituted mitigation. The trial court repeatedly instructed the jury to consider all the evidence evidence presented at the hearing, as well as evidence presented during the guilt phase of the trial. We believe the jury fully understood its responsibilities and its duty to consider all the evidence in its determination of mitigating circumstances. While the trial court's instruction was not as clear as it could have been, we conclude that Griffin's rights were not substantially impacted by the charge and the charge did not render the penalty phase of his trial unfair. No plain error occurred.
B. Griffin next claims the trial court failed to properly admonish the jury each time it separated. Specifically, Griffin lists five instances in the record where, he says, the trial court failed to admonish the jury pursuant to Rule 19.3(b), Ala. R.Crim.P.[15]
Rule 19.3(b), Ala.R.Crim.P., states:
"In all cases, the court shall admonish the jurors that they are not:
"(1) To discuss among themselves any subject connected with the trial until the case is submitted to them for deliberation;
"(2) To converse with anyone else on any subject connected with the trial, until they are discharged as jurors in the case;
"(3) To knowingly expose themselves to outside comments or to news accounts of the proceedings, until they are discharged as jurors in the case; or
"(4) To form or express any opinion on the case until it is submitted to them for deliberation.
"If the jurors are permitted to separate, they may also be admonished not to view the place where the offense was allegedly committed."
Prior to excusing the jury the first day, the trial court gave the following admonition to the jury:
"THE COURT: Thank you, ladies and gentlemen, very much. We're going to let you go in just a moment too; okay?

*334 "Here's the deal. I want you to make an agreement with me. You've already heard about the Avondale pool game room, the game room out there at Airport Highway. You'll hear about other places perhaps depicted in the evidence. You'll hear about words that you might want a little definition of. You might want to ask somebody outside the courthouse, `What do you think such and such means?'
"Don't do that. Don't go to the scene depicted. Don't ask anybody any questions. We want the verdict that springs from this jury to be the work product of this group only, not infected with what the people at home might think.
"If I see a news reporter from the Birmingham Post-Herald or the Birmingham News, I'll ask you not to read the paper that might cover the case. Oftentimes, cases are covered in progress.
"And that's just about it. I just want you to be punctual with us, please. Listen attentively to the evidence. And the lawyers are going to be punctual. And we'll try to get this case to you in short order."
(R. 267-68.)
We conclude the above-quoted admonition sufficiently covered the requirement set forth in Rule 19.3(b), Ala.R.Crim.P. We have reviewed those portions of the record cited by Griffin. In each instance, the trial court made some reference to his initial instruction. Although the better practice would be for the trial court to admonish the jury at each break or recess, there is nothing in Rule 19.3(b), Ala.R.Crim.P., that requires it to do so. The trial court initially instructed the jurors with regard to their actions while not in the courtroom and because it reminded them each time they separated of their duty, we conclude that no plain error occurred when the trial court did not repeat the entire admonition at each recess. Jurors are presumed to follow the instructions of the trial court. Taylor v. State, 666 So.2d 36 (Ala.Cr.App.), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996).
C. Griffin claims the trial court "bungled" its instruction to the jury regarding his failure to testify. Specifically, Griffin claims that the trial court's instruction informed the jury that the prosecutor could not comment on his failure to testify, even if he wanted to; that it informed the jury that it was his decision not to testify, and thus the jury would blame him for his silence at trial; and that the term "failure" used by the trial court had bad connotations. We disagree.
Section 12-21-220, Ala.Code 1975, states, in pertinent part:
"On the trial of all indictments, complaints or other criminal proceedings, the person on trial shall, at his own request, but not otherwise, be a competent witness, and his failure to make such a request shall not create any presumption against him nor be the subject of comment by counsel."
When reviewing comments made by the trial court, this Court has stated:
"`Each case of allegedly improper remarks by a trial judge must be judged on its own peculiar facts. [Citations omitted]. Here, the trial judge merely stated a correct proposition of law. Construing the entire charge as a whole, we find no error to cause a reversal. [Citation omitted]. "The entire charge must be considered and if upon the whole no prejudice to defendant intervened no reversal should be entered." [Citation omitted].'"
*335 Towns v. State, 494 So.2d 798, 800 (Ala.Cr. App.1986), quoting Gamble v. State, 480 So.2d 38, 40 (Ala.Cr.App.1985).
During the guilt-phase charge, the trial court stated the following:
"THE COURT: But what else can I tell you in the witness area? Well, we observed, for example, that Mr. Griffin did not take the stand in the case. And let me tell you about a special statute we have on that derived from the Fifth Amendment to the Bill of Rights. We've talked about the Sixth Amendment. The Fifth Amendment, perhaps you're familiar with. But we have a state statute on this too that provides, in essence, that on the trial of all cases in the criminal division, the person on trial shall at his own request, but not otherwise, be a competent witness.

"It goes on to say significantly, I think, that one's failure to make such a request shall not create any presumption against him nor even be the subject of comment by counsel.
"So no inference whatsoever may be derived from the fact that Mr. Griffin did not take the witness stand in the litigation."
(R. 890-91.)(Emphasis added.) Here, as in Towns, the trial court stated a correct proposition of law. Moreover, the trial court instructed the jury that they should not draw any inference from the fact that Griffin did not testify. Consequently, when the trial court's instruction as a whole is reviewed, it does not rise to the level of plain error. Because jurors are presumed to follow the trial court's instructions, Griffin has failed to establish the wording of the trial court's instruction adversely affected the result of his trial. See Harris v. State, 457 So.2d 465 (Ala.Cr. App.1984).
D. Griffin next claims the trial court improperly asked for exceptions to its jury instructions within the hearing of the jury. At the end of the trial court's guilt-phase jury charge and in the jury's presence, the trial court asked the following:
"THE COURT: Let's see if there are any exceptions to the charge here.
"[Prosecutor]: The state is satisfied, Your Honor.
"[Defense counsel]: The defense is satisfied, Your Honor."
(R. 894.) There is nothing in the record to indicate that Griffin raised any questions about the charge given to the jury or the trial court's courtroom procedure.
According to Griffin, Rule 21.2 (currently Rule 21.3), Ala.R.Crim.P., requires the trial court to "inquire whether there are any exceptions [to the jury charge] out of the hearing of the jury." (Griffin's brief to this Court at p. 127.) Rule 21.3, Ala. R.Crim.P., states in pertinent part:

"Opportunity shall be given to make the objection [to the jury charge] out of the hearing of the jury."
(Emphasis added.) While Rule 21.3, Ala. R.Crim.P., does state that the trial court should provide the parties with an opportunity to object outside the jury and while we believe that to be the better practice, we conclude that Griffin's rights have not been adversely affected. The court's merely asking if there were any exceptions to the jury instructions and the indication by both parties that they were satisfied with the instructions did not prejudice Griffin.
We reject Griffin's argument that because his counsel was forced to answer the question whether he was satisfied with the charge in the presence of the jury, the answer was unreliable. Such a claim is bare speculation. Our review of the record indicates that trial counsel actively advocated and advanced Griffin's right to a *336 fair trial. We find no plain error in the procedure used by the trial court.
E. Griffin next claims the trial court misstated the law to the jury regarding the credibility of witnesses. Specifically, Griffin claims "the trial court improperly denigrated and misstated the law that permits the jury to reject the testimony of a witness who the jury believe[s] to be deceitful." (Griffin's brief to this Court at p. 128.)
During the trial court's guilt-phase jury charge, the trial court stated:
"[THE COURT]: You've carefully observed the witnesses' testimony, their demeanor and carriage and comportment, all out there as criteria by which to assess one's trustworthiness.
"Anything you observe about a witness, folks, if you think that it would tend to make that witness color his or her testimony, you may consider as criteria by which to assess one's trustworthiness, a big area for common sense.
"Now, I have no way of suggesting to you how to go about being a good judge. You will be a good judge. But it's very commonsensical. Anything at all, any bias, or prejudice, or whatever, that you observe about a witness, if you think it would make that witness color his or her testimony, you may consider that as criteria by which to assess one's testimony.
"The law does say that if you think a witness intentionally misleads you about a material issue in the case, you may disregard that portion of the witness's testimony, or all of that witness's testimony, for that matter, if you think that the witness is lying to you about a material issue in the case.
"I'm not talking about a mistake. And, after all we're talking about things that happened some time ago."
(R. 889-90)(Emphasis added.) Griffin claims the above instruction "informed the jury that [it] shouldn't disregard the evidence if [it] felt a witness was merely making a mistake" and that the use of the phrase "for that matter" suggested "a total disregard of a witness' testimony would be an extreme remedy if they found a witness to be deceitful." (Griffin's brief to this Court at p. 128.)
In Slaton v. State, 680 So.2d 879, 895 (Ala.Cr.App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997), this Court held:
"From reading the jury charges as a whole, we conclude that the trial court made clear to the jury that it was free to accept or reject any part of the testimony given by any witness. `"The fact that isolated instructions are erroneous or misleading is no ground for reversal where the instructions as a whole present the case properly."` Sosa v. State, 591 So.2d 897, 899 (Ala.Cr.App.1991), quoting Williams v. State, 538 So.2d 1250, 1253 (Ala.Cr.App.1988); Harris v. State, 412 So.2d 1278, 1281 (Ala.Cr.App. 1982)."
Here, as in Slaton, we conclude the trial court's instructions sufficiently informed the jury that it was the judge of the credibility of the witnesses. Taken as a whole, the trial court's charge sufficiently covered the jury's role in judging the testimony and credibility of the witnesses.
F. Griffin next claims that "[t]he trial court discounted the severity of the lesser-included offense of intentional murder." (Griffin's brief to this Court at p. 128.)
During its guilt-phase jury charge, the trial court stated:
"THE COURT: If you're not convinced beyond a reasonable doubt that Louis Griffin is guilty of capital murder as *337 defined, then you would consider that lesser included offense of murder.
"One who commits murder, as opposed to capital murder, is less blameworthy, or less culpable, less accountable, in the criminal law than one who commits capital murder. That makes sense to call it a lesser included offense; agreed?"
(R. 882.) Griffin argues that "the jury, upon hearing the judge dismiss the seriousness of the intentional murder offense, may have been tempted to convict [him] despite doubts about his guilt of the capital conviction." (Griffin's brief to this Court at p. 129.)
Griffin's claim is speculative at best. It appears to this Court that the trial court was simply attempting to differentiate the indicted charge of capital murder from the lesser included offense of murder. We have reviewed the trial court's instruction with Griffin's contentions in mind and we do not believe that there was a reasonable likelihood or probability that the jury was or could have been misdirected by the instruction. Cf. Williams v. State, 710 So.2d 1276, 1306 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998); and Goodwin v. State, 641 So.2d 1289 (Ala.Cr.App.1994). We find Griffin's claim to be without merit.
G. Griffin claims the trial court improperly instructed the jury during the guilt phase of trial concerning sentencing for a capital conviction. Specifically, Griffin claims the trial court's instruction "skewed the jury toward a capital conviction" because, he argues, the jury was not informed of the consequences of a conviction for intentional murder. (Griffin's brief to this Court at p. 130.) Griffin failed to object to the explanation given to the jury by the trial court; therefore, our review is limited to one for plain error. Rule 45A, Ala.R.App.P.
The record indicates the jury began deliberations at 6 p.m. At 8:45 p.m., the jury asked the trial court "to clarify capital murder and the sentences it carries...." (R. 899.) The trial court informed the jury of the possible sentences for a capital-murder conviction. After the trial court explained the punishment for a capital conviction, the trial court emphasized to the jury that it did not want it to focus on the punishment. The trial court stated:
"THE COURT: I asked you not to focus on punishment but to focus exclusively on that threshold question of whether or not the defendant is guilty of capital murder, or, in alternative, murder, not guilty.
"So I really don't want you thinking about punishment at this stage in the proceedings. We're in the first stage of the proceedings, the threshold requisite stage. And only if there is a conviction of capital murder do we concern ourselves with punishment."
(R. 900-01.)
In Williams v. State, supra, the appellant claimed that the trial court and prosecutor had erred by informing the jury that a capital conviction carried a punishment of life imprisonment without parole or death. In finding that no error had occurred, this Court stated:
"[T]he comments of the trial court and the prosecutor were intended to inform the veniremembers and the jurors of the nature of the case about to be tried and the general procedures that would be followed. It is not error for the trial court to instruct the jury as to its role in the sentencing process."
Williams v. State, 710 So.2d at 1325.
We recognize that during the trial court's qualifying questions to the venire *338 at voir dire, the trial court had informed the venire that this case was a capital one and that it involved the possible sentences of life imprisonment without parole or death. (R. 111-14.) The trial court, however, instructed the jury that it was not to concern itself with the punishment aspect during the guilt phase of trial. Additionally, the prosecutor asked questions regarding the death penalty during his voir dire. (R. 180-82.) Therefore, the jury had been previously informed of the possible punishments for a conviction of capital murder and of its role in the trial process.
While we do not condone the giving of an instruction about sentencing during the guilt-phase deliberations, we do not believe in light of the previous information provided to the jury, in light of the direct question asked by the jury, in light of the trial court's instruction to the jury that it was not to focus upon the punishment, and in light of the presumption that jurors follow the court's instructions, that plain error occurred.
H. Griffin claims the trial court erred in its penalty-phase instruction to the jury because, he says, the trial court "simply referred the jury to the instructions [defining reasonable doubt] of the previous day." (Griffin's brief to this Court at p. 130.) At the beginning of the trial court's penalty-phase jury charge, the following occurred:
"THE COURT: It's my duty again to instruct you or to charge you as to the law. In charging you about the law, I do want to remind you of the instructions that we went over late yesterday concerning the basic law in defining the terms `reasonable doubt,' and, as well your duties and functions as jurors.
"If anybody thinks it's necessary, we can go back over that quantum of proof that we're talking about when we discussed the reasonable doubt standard.
"Shall I proceed?

("(No juror responded.)")
(R. 949.)
While we do not wish to be seen as approving the practice during the penalty phase of merely referring to instructions previously given during the guilt phase of a capital murder trial, we conclude that in this case the trial court's reference during the sentencing phase to its previous instruction on reasonable doubt without explicitly instructing on reasonable doubt was not plain error.
The trial court gave a detailed definition of reasonable doubt during the guilt phase at approximately 5:00 p.m. and then referenced his instruction the following morning at approximately 11:00 a.m. Only a short timeless than 24 hourslapsed between the instructions. Additionally, the trial court asked the jury if it needed to reinstruct on reasonable doubt and no one indicated that he did not remember the previous instruction. "`It is assumed that the jury will consider the previously given instructions along with those given in the supplemental charge.'" Collins v. State, 611 So.2d 498, 503 (Ala.Cr.App.1992), quoting Brannon v. State, 549 So.2d 532, 542 (Ala.Cr.App.1989), quoting Davis v. State, 440 So.2d 1191, 1195 (Ala.Cr.App.1983), cert. denied, 465 U.S. 1083, 104 S.Ct. 1452, 79 L.Ed.2d 770 (1984).
Moreover, we find it significant that the instruction on reasonable doubt during the sentencing phase was only applicable, as the trial court instructed, to the finding of the existence of the aggravating circumstances. Reasonable doubt is the state's burden of proof in establishing the aggravating circumstances. Because the jury found Griffin guilty of capital murder, the aggravating circumstance that the murder was committed for pecuniary gain was established *339 as a matter of law. The trial court repeatedly instructed the jury that if it was not convinced beyond a reasonable doubt by the evidence that an aggravating circumstance existed then it must conclude that the punishment must be life imprisonment without parole. Additionally, the trial court instructed the jury as follows:
"The defendant does not have to disprove anything about an aggravating circumstance. The burden is wholly on the State to prove such a circumstance beyond a reasonable doubt.
"A reasonable doubt about an aggravating circumstance may arise from all the evidence, from any part of the evidence, or from a lack or failure of the evidence."
(R. 955.) Viewing the trial court's instruction as a whole, we conclude that the trial court's instruction was adequate to instruct the jury on the state's burden of proof with regard to proving aggravating circumstances. The trial court's reminding the jurors of the prior instruction and inquiring to see if there were any questions regarding that instruction provided an adequate instruction on the reasonable doubt standard. Thus, we find no plain error in the court's instruction. See Boyd v. State, 715 So.2d 825 (Ala.Cr.App.1997), aff'd, Ex parte Boyd, 715 So.2d 852 (Ala. 1998), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998).

XXV.
Griffin contends that the "trial court violated [his] rights when it allowed the jury to separate without [his] consent, and thereby denied [him] a fair trial and due process under the Fourth, Fifth, Sixth, Eight, and Fourteenth Amendments to the United States Constitution, the Alabama Constitution, and Alabama law." (Issue XXVIII in Griffin's brief to this Court at p. 130-31.) We disagree.
The trial court, in allowing the jury to separate, acted pursuant to § 12-16-9, Ala.Code 1975, as amended effective June 15, 1995, which provides:
"In the prosecution of any felony case the trial court in its discretion may permit the jury hearing the case to separate during the pendency of the trial. The court may any time on its own initiative or on motion of any party, require that the jury be sequestered under the charge of a proper officer whenever they leave the jury box or the court may allow them to separate."
Griffin argues that jury separation is a procedural issue and that it is governed by Rule 19.3, not § 12-16-9, Ala.Code 1975. He claims that pursuant to Rule 19.3, separation of the jury is prohibited in capital cases without the consent of the defendant and defendant's counsel and, therefore, the trial court's separation of the jury was improper. (Griffin's brief to this Court at p. 131.)
The Alabama Supreme Court recently addressed this issue in Ex parte Stewart, 730 So.2d 1246, 1250 (Ala.1999), wherein the court held the following:
"Where two provisions directly conflict, this Court may presume that the Legislature intended to repeal the earlier provision by adopting the later one. The version of Rule 19.3 in effect at the time of Stewart's third sentencing hearing became effective on January 1, 1991. The amended version of § 12-16-9 became effective on June 15, 1995. The irreconcilable language of that later provision compels us to conclude, as the Court of Criminals Appeals did, that the Legislature intended to change the effect of Rule 19.3 insofar as it conflicted with § 12-16-9. When the Legislature, through a general act, changes the procedural rules promulgated by this Court, we are bound by the Constitution and *340 the laws of this state to give effect to the Legislature's changes. Therefore, we conclude that the Court of Criminal Appeals correctly held that § 12-16-9 overrode the conflicting portions of Rule 19.3."
See also Drinkard v. State, supra.
Likewise, we conclude that, pursuant to § 12-16-9, as amended, the trial court had complete discretion in determining whether to sequester the jury. The consent of Griffin and his counsel was not a prerequisite to separation.
"[T]he June 15, 1995, amendment to this statute [§ 12-16-9, Ala.Code 1975] eliminated the need for an agreement to separate the jury in capital cases, by vesting in the trial court the discretion to make the separation decision in such cases."
Ex parte Stewart, 730 So.2d at 1248.
Review of the record reveals that after the jury was selected, the trial court instructed the jury in pertinent part as follows:
"Here's the deal. I want you to make an agreement with me. You've already heard about the Avondale pool game room, the game room out there at the Airport Highway. You'll hear about other places perhaps depicted in the evidence. You'll hear about words that you might want a little definition of. You might want to ask somebody outside the courthouse, `What do you think such and such means?'
"Don't do that. Don't go to the scene depicted. Don't ask anybody any questions. We want a verdict that springs from this jury to be the work product of this group only, not infected with what the people at home might think.
"If I see a news reporter from the Birmingham Post-Herald or the Birmingham News, I'll ask you not to read the paper that might cover the case. Oftentimes, cases are covered in progress."
(R. 270.)
The June 15, 1995, amendment to § 12-16-9, Ala.Code 1975, vested in the trial court the discretion to make the separation decision in cases such as Griffin's. Ex Parte Stewart, supra. We find that in accordance with this decision, the trial court provided adequate instructions to the jury regarding its conduct during separation. (See Part XXIV.B. of this opinion.) Moreover, we note that no incidents regarding improper jury influence were brought to the trial court's attention through the course of Griffin's trial and none are alleged in Griffin's brief to this Court. Griffin provided this Court with only bare allegations of prejudice without any factual support. Therefore, we find that Griffin's rights to a fair trial and due process were not violated by the trial court's determination to allow the jury to separate.

XXVI.
Griffin contends that "despite the fundamental rule that capital proceedings must be transcribed, the court in this instance conducted over twenty off-the-record discussions." (Issue XXIX in Griffin's brief to this Court at p. 132.) Additionally, he argues that "because the trial court failed to ensure that [his] capital proceedings were fully recorded, [he] cannot receive adequate review of his conviction and death sentence." (Griffin's brief to this Court at p. 132.) We disagree.
In Boyd v. State, 746 So.2d 364, 382 (Ala.Cr.App.1999), this Court noted that "a court reporter has never been required to transcribe bench conferences or to record the striking of the jury unless requested to do so." See also Ex parte Harris, 632 So.2d at 545; and Ex parte Land, 678 *341 So.2d at 245. Our review of the record does not reflect that Griffin, at any time, requested that the bench conferences be recorded.
"Rule 19.4(a), Ala.R.Crim.P., states that in all capital cases, the court reporter shall record the voir dire examination of the jury and the arguments of counsel. In Ex parte Harris, 632 So.2d 543, 545 (Ala.1993), the Alabama Supreme Court noted that the phrase `arguments of counsel' does not refer to `every incidental discussion between counsel and the trial judge that occurs at the bench,' but rather, refers only to counsel's opening and closing arguments. Thus, it is clear that Rule 19.4(a) does not require the court reporter to transcribe the various bench conferences. Ex parte Land, 678 So.2d 224, 245 (Ala.1996); Roberts v. State, 735 So.2d 1244, 1260 (Ala.Cr.App. 1997)."
Willie Burgess v. State, [Ms. CR-93-2054, November 20, 1998] ___ So.2d ___, ___ (Ala.Cr.App.1998).
Pursuant to the caselaw set forth above, we conclude that it was not necessary to fully transcribe those proceedings not specifically designated by Rule 19.4(a), Ala. R.Crim.P. Further, we find that Griffin has not demonstrated how he was prejudiced by the lack of transcription of the alleged off-the-record bench conferences. Magwood v. State, 689 So.2d at 983. Accordingly, no error occurred in this regard.

XXVII.
Griffin contends that "the photographic lineup was highly prejudicial and inadmissible because the photographs were identified as mugshots." (Issue XXXI in Griffin's brief to this Court at p. 134.) Initially, we note that this contention is raised for the first time on appeal; therefore, our review is limited to plain error. Rule 45A, Ala.R.App.P.
Review of the record reveals that the "mugshots" were never mentioned during Griffin's trial, were never exhibited to the jury, and were not admitted into evidence. The photographs were shown to Shabazz, and she could not identify Griffin. Although the caption on the paper presenting the photographs reads "Mug Show-up Folder," the photographs show only the subjects' heads. There are no lines in the background, no numbers, or other signs suggesting that these men may have been arrested or imprisoned when the picture was taken. Griffin has, therefore, failed to show how he was prejudiced by the photographic line-up. Thus, no error, plain or otherwise, occurred.

XXVIII.
Griffin next claims the trial court erred by refusing "to give numerous requested jury instructions." (Issue XXXII in Griffin's brief to this Court at p. 136.) The record indicates that on December 18, 1997, Griffin filed 32 proposed jury charges in open court. (CR.156-189.) Griffin fails to cite in his brief where in the record the trial court refused any of his proposed charges. We have reviewed the entire record and we can find no indication that the trial court either granted or denied any of Griffin's requested charges. Furthermore, at the end of the trial court's guilt-phase jury charge, Griffin indicated he was satisfied with the trial court's instructions to the jury. (R. 894.) Because Griffin did not object at trial, our review is limited to plain error. Rule 45A, Ala. R.App.P.
This Court has recently held:
"`A trial court has broad discretion in formulating its jury instructions, provided those instructions accurately reflect the law and the facts of the case. Raper v. State, 584 So.2d 544 *342 (Ala.Cr.App.1991). A trial court's oral charge to the jury must be construed as a whole, and must be given a reasonablenot a strainedconstruction. King v. State, 595 So.2d 539 (Ala.Cr.App.1991); Kennedy v. State, 472 So.2d 1092 (Ala.Cr.App.1984).'
"Williams v. State, 710 So.2d 1276, 1305 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998).
"`"A trial court has broad discretion in formulating its jury instructions, providing they are an accurate reflection of the law and facts of the case. Coon v. State, 494 So.2d 184 (Ala.Cr.App.1986). When requested charges are either fairly and substantially covered by the trial judge's oral charge or are confusing, misleading, ungrammatical, not predicated on a consideration of the evidence, argumentative, abstract, or a misstatement of the law, the trial judge may properly refuse to give such charges. Ex parte Wilhite, 485 So.2d 787 (Ala. 1986)."
"`Ward v. State, 610 So.2d 1190, 1194 (Ala.Cr.App.1992).'"
Maples v. State, 758 So.2d at 64.
On appeal, Griffin offers only the conclusory assertion that his requested jury instructions should have been given because, he says, they were correct statements of law. He, however, has not shown how the trial court's instructions were deficient or that the substance of his requested instructions were not incorporated in the court's instructions. We conclude that without an objection at trial and without some slight proof on appeal that error occurred in the trial court's instructions to the jury, there was not plain error.
Moreover, we have thoroughly examined the oral charge given by the trial court and the proposed charges filed by Griffin. Griffin's proposed jury charges were substantially covered by the trial court's oral charge. We conclude no abuse of discretion occurred in this regard.

XXIX.
Griffin next claims the trial court erred when it "excused for cause five veniremembers who expressed reservations about applying the death penalty." (Issue XXXIII in Griffin's brief to this Court at p. 138.) The record indicates that the trial court individually interviewed 12 members of the venire who had expressed concerns during voir dire about imposing the death penalty. The state moved to strike 5 of the 12 for cause, indicating that those 5 had expressed an "unequivocal" opinion concerning the death penalty. The trial court granted the state's motion. Griffin did not object to the trial court's grant of the state's motion; therefore, our review is limited to one for plain error. Rule 45A, Ala.R.App.P.
Griffin now claims on appeal that by granting the state's challenges for cause the trial court not only violated his constitutional rights, but also "the equal protection rights of the excluded jurors.[16] (Griffin's brief to this Court at p. 138.)
"In Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the United States Supreme Court held that the proper standard for determining whether a veniremember should be excluded for cause because of opposition to the death penalty is whether the veniremember's views would `"prevent or substantially impair the performance of his oath."' The Supreme Court has expressly *343 stated that juror bias does not have to be proven with `unmistakable clarity.' Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)."
Pressley v. State, 770 So.2d at 127.
On appeal, Griffin makes only a conclusory statement that "veniremembers cannot be properly excluded merely because they express some reservations about the death penalty." (Griffin's brief to this Court at p. 139.) We agree. However, without an objection at trial and without at least a minimal showing that the trial court's grant of the state's challenges for cause was improper, we find no plain error.
Additionally, we have thoroughly reviewed the individual voir dire of each of the five veniremembers struck for cause. Each indicated views that would "prevent or substantially impair his or her performance of the oath." The trial court did not err in granting the state's challenges for cause and Griffin's rights were not substantially affected.

XXX.
Griffin claims his capital murder conviction and death sentence violate the principles of double jeopardy. Griffin's argument is twofold. (Issue XXXIV in Griffin's brief to this Court at p. 139.) First, he argues that "the State [improperly] used as an aggravating circumstance that [he] committed the murder for hire" which was the same "circumstance necessary to elevate intentional murder to a capital offense." (Griffin's brief to this Court at p. 139.) Second, Griffin argues he "was subjected to double jeopardy when he was prosecuted and convicted for the same crime in state and federal court." (Griffin's brief to this Court at p. 140.) We will address each claim in turn.
The Alabama Legislature specifically addressed using an aggravating circumstance(s) for both elevating an intentional murder to a capital offense and as an aggravating circumstance for sentencing determination. Section 13A-5-50, Ala. Code 1975, states:
"The fact that a particular capital offense as defined in Section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence. By way of illustration and not limitation, the aggravating circumstance specified in Section 13A-5-49(4) shall be found and considered in determining sentence in every case in which a defendant is convicted of the capital offenses defined in subdivisions (1) through (4) of subsection (a) of Section 13A-5-40."
Moreover, this Court has recently held:
"[U]nder § 13A-5-50, Ala.Code 1975, a jury may consider an element of capital murder as an aggravating circumstance if that element is specified as an aggravating circumstance in § 13A-5-49, Ala. Code 1975. Finally, this court has held that the use of an element of capital murder as an aggravating circumstance does not punish a defendant twice for the same offense. Burton v. State, 651 So.2d 641, (Ala.Cr.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995).
"`This practice, known as "double counting" or "overlapping," has been upheld. Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd. 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993); Kuenzel [v. State, 577 So.2d 474, 489 (Ala.Cr.App.1990), aff'd, 577 *344 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991) ].'"
Maples v. State, 758 So.2d at 71. In accordance with the above-cited law, we conclude that the use of pecuniary gain as an aggravating circumstance to raise the murder to a capital offense and also as an aggravating circumstance in sentencing did not violate the Double Jeopardy Clause of the United States Constitution or the Constitution of the State of Alabama.
Regarding Griffin's claim that he was prosecuted for the same offense in federal and state court, this Court in Clemons v. State, supra, stated:
"`The sole remaining question upon which we granted certiorari is whether the dual sovereignty doctrine permits successive prosecutions under the laws of different States which otherwise would be held to "subject [the defendant] for the offense to be twice put in jeopardy." U.S. Const., Amdt. 5. Although we have not previously so held, we believe the answer to this query is inescapable. The dual sovereignty doctrine, as originally articulated and consistently applied by this Court, compels the conclusion that successive prosecutions by two States for the same conduct are not barred by the Double Jeopardy Clause.
"`The dual sovereignty doctrine is founded on the common-law conception of crime as an offense against the sovereignty of the government. When a defendant in a single act violates the "peace and dignity" of two sovereigns by breaking the laws of each, he has committed two distinct "offences." United States v. Lanza, 260 U.S. 377, 382, 43 S.Ct. 141, 142, 67 L.Ed. 314 (1922). As the Court explained in Moore v. Illinois, 14 How. 13, 19, 14 L.Ed. 306 (1852), "[a]n offence, in its legal signification, means the transgression of a law." Consequently, when the same act transgresses the laws of two sovereigns, "it cannot be truly averred that the offender has been twice punished for the same offence; but only that by one act he has committed two offences, for each of which he is justly punishable." Id., at 20.
"`In applying the dual sovereignty doctrine, then, the crucial determination is whether the two [entities] that seek successively to prosecute a defendant for the same course of conduct can be termed separate sovereigns. This determination turns on whether the two entities draw their authority to punish the offender from distinct sources of power. [Citations omitted]. Thus, the Court has uniformly held that the States are separate sovereigns with respect to the Federal Government because each State's power to prosecute is derived from its own "inherent sovereignty," not from the federal government. [citations omitted].'"
720 So.2d at 966-967, quoting Heath v. Alabama, 474 U.S. 82, 88-89, 106 S.Ct. 433, 437-38, 88 L.Ed.2d 387, 392-93 (1985). Accordingly, no double jeopardy violation occurred in the prosecution in Alabama of Griffin's capital murder charge after he was convicted of RICO violations, which also involved the murder of Davis, in federal court.

XXXI.
Griffin contends that when "the trial court read the indictment to the jury, it prejudiced [him] and relieved the state of its burden of proof." (Issue XXXV in Griffin's brief to this Court at p. 142.) He further contends that "by informing the jury that the district attorney signed the indictment, the trial court bolstered the jury's perception of the prosecutor, and *345 implied that he had a special knowledge of the case that other individualnamely defense counsel and the jurylack." (Griffin's brief to this Court at p. 142.) Because Griffin did not object at trial to the reading of the indictment, our review is limited to plain error. Rule 45A, Ala. R.App.P.
Initially, we note that our review of the record indicates that although the trial court did read the indictment at the beginning of Griffin's trial, it did not inform the jury that the district attorney had signed the indictment. However, even if it had stated that the district attorney had signed the indictment, we would find no error. In Boyd v. State, supra, this Court held:
"[T]he district attorney's noting in reading the indictment to the jury, that it was signed by him, is not an injection of his personal belief or otherwise improper. Similarly, in Arthur v. State, 711 So.2d 1031 (Ala.Cr.App.1996), the appellant argued that the prosecutor improperly inserted his credibility in an attempt to bolster the possibility of conviction by stating that the indictment had been signed by him in his capacity as district attorney. This Court stated:
"`Despite the appellant's argument to the contrary, there was no implication by the prosecutor in this case that he believed the appellant to be guilty and, therefore, was prosecuting the case. The jury was amply instructed that an indictment is not an indication of guilt but rather a vehicle for bringing an individual to trial and the prosecutor's acknowledgment that he signed the indictment in his capacity as district attorney was a statement of fact rather than an opinion or insertion of credibility.'

"Arthur, 711 So.2d at 1054."
Boyd v. State, 715 So.2d at 841-42.
Clearly, no error occurs when an indictment is read to the jury, particularly when the trial court instructs the jury that the indictment is not evidence in the case. Wiggins v. State, 347 So.2d 543 (Ala.Cr. App.1977).
The record reveals that the trial court instructed the jury as follows regarding the indictment:
"The indictment, incidentallylet me remind you about the indictmentis not evidence. It doesn't even go to the jury room, because it's merely the paper vehicle that drives the case to this high level of court.
"You're the first ones that have ever been assembled together that have the power and the duty to say whether or not Louis Griffin is blameworthy for those events occurring in September of '92, and at what level do you peg his blameworthiness, if any, at either capital murder or murder, as I'll explain to you in just a little while."
(R. 806-07.) The instructions by the trial court clearly emphasized that the indictment was not evidence. More particularly, the instructions by the trial court emphasized that the jury alone had the "power and the duty to say whether or not Louis Griffin is blameworthy" for Davis's murder. Accordingly, we find no error, plain or otherwise, in the trial court's reading the indictment to the jury.

XXXII.
Griffin contends that "the trial court erroneously admitted photographs [from Davis's autopsy] and allowed a slide show for no purpose but to inflame the passions of the jury." (Issue XXXVI in Griffin's brief to this Court at p. 143.) This Court has addressed this particular issue in Smith v. State, 581 So.2d 497 *346 (Ala.Cr.App.1990), rev'd on other grounds, 581 So.2d 531 (Ala.1991). In Smith we stated:
"`It has long been the law in Alabama that "[p]hotographs which show external wounds in the body of a deceased victim, even though they are cumulative and based on undisputed matters, are admissible. The fact that they are gruesome is not grounds to exclude them so long as they shed light on the issues being tried." Burton v. State, 521 So.2d 91, 92 (Ala.Cr.App.1987). See also Kinder v. State, 515 So.2d 55 (Ala.Cr.App.1986). The fact that a photograph is gruesome and ghastly is no reason to exclude it from the evidence, so long as the photograph has some relevancy to the proceedings, even if the photograph may tend to inflame the jury. Magwood v. State, 494 So.2d 124, 141 (Ala.Cr.App. 1985). See also Hutto v. State, 465 So.2d 1211 (Ala.Cr.App.1984); Jones v. State, 439 So.2d 776, (Ala.Cr.App.1983); Godbolt v. State, 429 So.2d 1131 (Ala.Cr. App.1982).'"
581 So.2d at 526, quoting Bankhead v. State, 585 So.2d 97, 109 (Ala.Cr.App.1989). Moreover, "`This rule of law applies not only to photographs, but to photographic slides as well. Goffer v. State, 430 So.2d 896 (Ala.Cr.App.1983).'" Lee v. State, 562 So.2d 657, 663 (Ala.Cr.App.1989).
"Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Kuenzel v. State, 577 So.2d 474 [ (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991) ]."
Pilley v. State, 789 So.2d 870, 882 (Ala.Cr. App.1998).
The photographs and slides were admitted into evidence by the trial court in accordance with the caselaw set forth above; thus, we find no abuse of discretion. Further, we have reviewed the photographs and the slides and we conclude that their admission does not constitute reversible error.

XXXIII.
Griffin contends that "the manner of execution inflicted by the State of Alabama constitutes cruel and unusual punishment." (Issue XXXVII in Griffin's brief to this Court at p. 145.) However, this Court has held on numerous occasions that death by electrocution does not constitute cruel and unusual punishment.
"The United States Supreme Court addressed the death by electrocution issue in In re Kemmler, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890). In determining what constitutes cruel and unusual punishments, the Court stated: `Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel within the meaning of that word as used in the constitution. It implies that there is something inhuman and barbarious, something more than the mere extinguishment of life.' Id. at 447, 10 S.Ct. at 933. In holding that such a punishment is not cruel or unusual, the Court reasoned `that this act was passed in the effort to devise a more humane method of reaching the result.' Id. Accord Spinkellink v. Wainwright, 578 F.2d 582, 616 (5th Cir.1978). Appellant's contention is therefore without merit; death by electrocution does not amount to cruel and unusual punishment per se, but is *347 a constitutional means of imposing a sentence of death."
Jackson v. State, 516 So.2d 726, 737 (Ala. Cr.App.1985), remanded on other grounds, 516 So.2d 768 (Ala.1986). See also Boyd v. State, supra; Sullivan v. Dugger, 721 F.2d 719 (11th Cir.1983); Lindsey v. Smith, 820 F.2d 1137, 1155 (11th Cir.1987), cert. denied, 489 U.S. 1059, 109 S.Ct. 1327, 103 L.Ed.2d 595 (Ala.1989); Lowenfield v. Phelps, 817 F.2d 285 (5th Cir.1987); Stephens v. State, 580 So.2d 11, 26 (Ala.Cr. App.1990), aff'd, 580 So.2d 26 (Ala.1991), cert. denied, 502 U.S. 859, 112 S.Ct. 176, 116 L.Ed.2d 138 (1991); Thompson v. State, 542 So.2d 1286 (Ala.Cr.App.1988), aff'd, 542 So.2d 1300 (Ala.1989), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989); Owens v. State, 531 So.2d 2 (Ala.Cr.App.1986).
"There is an abundance of caselaw ... that holds that the death penalty is not per se cruel and unusual punishment. Neither is electrocution, as a means of capital punishment, cruel and unusual punishment, in violation of the Eighth Amendment. Williams v. State, 556 So.2d 737, 741 (Ala.Cr.App.1986), aff'd. in part, rev'd in part on other grounds, 556 So.2d 744 (Ala.1987); Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); Boykin v. State, 281 Ala. 659, 207 So.2d 412 (1968), reversed on other grounds, Boykin v. State, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969)."
Scott v. State, 728 So.2d 164, 171 (Ala.Cr. App.1997), aff'd, 728 So.2d 172 (Ala.1998).
Accordingly, we reject Griffin's contention that the manner of execution used by the State of Alabama constitutes cruel and unusual punishment.

XXXIV.
Griffin contends that "the Alabama statute limiting court-appointed attorney fees to one thousand dollars compensation for out-of-court work in each phase of capital cases violates state and federal constitutional law." (Issue XXXVIII in Griffin's brief to this Court at p. 146.)
Upon considering the constitutionality of the Alabama statute in question here, we reiterate our holding in Boyd v. State, supra, wherein the appellant raised an identical issue:
"This court has previously rejected similar claims and adheres to its prior decisions on this matter. Smith v. State, 581 So.2d 497, 526-29 (Ala.Cr.App.1990), rev'd on other grounds, 581 So.2d 531 (Ala.1991); May v. State, 672 So.2d 1310, 1311 (Ala.1995)."
715 So.2d at 851. See also Alonzo Burgess v. State, supra; Johnson v. State, 620 So.2d 679 (Ala.Cr.App.1992), rev'd on other grounds, 620 So.2d 709 (Ala.1993), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993). Therefore, in accordance with our previous decisions, we find Griffin's contention to be without merit.
"It should be noted that the Alabama Legislature recently passed the `Investment in Justice Act of 1999,' and, in pertinent part, that Act amended § 15-12-21[, Ala. Code 1975]. Under the new Act, the rate of compensation for attorneys representing indigent criminal defendants is increased to $50 per hour for in-court time and $30 per hour for out-of-court time, with no limit on compensation for an attorney in a case involving a capital offense. Moreover, effective October 1, 2000, the hourly rate increases to $40 per hour for out-of-court time and $60 per hour for in-court time."
*348 McWhorter v. State, 781 So.2d 257, 306 (Ala.Cr.App.1999).

XXXV.
Griffin contends that "the trial court failed to determine that [he] knowingly waived his right to testify." (Issue XXXIX in Griffin's brief to this Court at p. 147.) Griffin did not raise this objection at trial; therefore, our review is limited to plain error. Rule 45A, Ala.R.App.P.
"Alabama does not require that the court hold a discussion with the accused concerning whether he elects to testify or to waive that right. Knowles v. State, 364 So.2d 712 (Ala.Cr.App.1978). The appellant cites several Alabama cases in which this court has reversed convictions when the accused was denied the right to testify. However, in each of those cases it affirmatively appeared on the record that the appellant wanted to testify and was not allowed to do so. In this case, there is absolutely nothing in the record that even hints at the fact that the appellant wanted to testify at trial and the appellant does not argue on appeal that he was denied his right to testify once he invoked that right.
"We agree with the words of the Ninth Circuit Court of Appeals in United States v. Martinez, 883 F.2d 750, 756-57 (9th Cir.1989), vacated on other grounds, 928 F.2d 1470 (9th Cir.), cert. denied, 501 U.S. 1249, 111 S.Ct. 2886, 115 L.Ed.2d 1052 (1991):
"`The right not to testify is among the fundamental and personal rights recognized by the Constitution, see Griffin v. California, 380 U.S. 609, 614-15, 85 S.Ct. 1229, 1232-33, 14 L.Ed.2d 106 (1965). If anything, one would expect the right not to testify to be more zealously guarded than the right to testify. An uninformed defendant probably expects to testify and may be unaware how strongly the Constitution protects his right not to testify. Yet the trial court has no duty to make a sua sponte inquiry to advise the defendant of his right not to testify and to ensure that its waiver was knowing and intelligent....
"`The court has no obligation to inquire into whether the defendant knowingly and intelligently waived the right not to testify inherent in the privilege against compelled self-incrimination. [United States v. Wagner, 834 F.2d 1474 (9th Cir.1987) ]. It is primarily the responsibility of counsel, not the judge, to advise a defendant on whether or not to testify, and the tactical advantages and disadvantages or each choice. For the court to discuss the choice with the defendant would intrude into the attorney-client relationship protected by the sixth amendment. Id., citing United States v. Goodwin, 770 F.2d 631, 637 (7th Cir.1985).'"
Hutcherson v. State, 677 So.2d 1174, 1193-94 (Ala.Cr.App.1994), rev'd on other grounds, 677 So.2d 1205 (Ala.1996).
Griffin relies on two cases in support of his contention; neither of which are persuasive. First, he cites Ex parte McWilliams, 640 So.2d 1015 (Ala.1993), in which the Alabama Supreme Court conducted a review of whether McWilliams's right to testify was violated. Review of the Supreme Court's holding in McWilliams, however, does not in any way suggest that the trial court has the responsibility of inquiring at trial, on its own initiative, whether the defendant has knowingly waived the right to testify. In fact, the prosecutor in McWilliams, not the trial court, initiated the inquiry into McWilliams's waiver of his right to testify. Likewise, our review of Ephraim v. State, supra, does not indicate a conclusion by this Court that the trial court is responsible for *349 ensuring that a defendant has knowingly waived his right to testify. In Ephraim, this Court concluded that the appellant's constitutional right to testify in his own behalf was violated when the trial court refused to reopen the case after being notified that the appellant had changed his mind and wanted to testify.
Here, the record does not reveal that Griffin ever suggested to the trial court that he wanted to testify. Moreover, the issue of Griffin's not testifying was never brought before the trial court for consideration. Clearly, the caselaw cited by Griffin in support of his contention is distinguishable from this case.
No error, plain or otherwise, occurred.

XXXVI.
Griffin contends that the cumulative effect of all the errors he alleges on appeal "violated his right to due process and a fair trial in violation of state law, the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution." (Issue XL in Griffin's brief to this Court at p. 148.)
"Because no single instance of alleged error constituted reversible error, we will not consider the cumulative effect to be any greater. See Boyd v. State, 715 So.2d 825, 851 (Ala.Cr.App.1997), aff'd, 715 So.2d 852 (Ala.1998)."
Roy Burgess v. State, ___ So.2d at ___. See also Frazier v. State, 758 So.2d 577 (Ala.Cr.App.1999); Smith v. State, supra; Mack v. State, 736 So.2d 664 (Ala.Cr.App. 1998); Crymes v. State, 630 So.2d 120, 123-24 (Ala.Cr.App.1993), aff'd, 630 So.2d 125 (Ala.1993); Johnson v. State, 541 So.2d 1112 (Ala.Cr.App.1989); and McNeely v. State, 524 So.2d 375 (Ala.Cr.App.1986).
We have reviewed each allegation of error Griffin raises on appeal, and we have searched the record for plain error, and we find no reversible errors. Accordingly, we conclude that the cumulative effect of these alleged errors does not warrant a reversal. See Roy Burgess, supra.

XXXVII.
Finally, in our search of the entire record for any error that may have adversely affected Griffin's substantial rights pursuant to Rule 45A, Ala.R.App.P., we find that the trial court's written sentencing order is deficient in that the trial court failed to comply with the requirement of § 13A-5-47(d), Ala.Code 1975, that it "enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, each mitigating circumstance enumerated in § 13A-5-51, and any additional mitigating circumstances offered pursuant to § 13A-5-52." (Emphasis added.) Accordingly, we remand this cause to the trial court with directions that that court enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, each mitigating circumstance enumerated in § 13A-5-51, and any additional nonstatutory mitigating circumstances offered pursuant to § 13A-5-52. See Borden v. State, 769 So.2d 935 (Ala.Cr. App.1997); Taylor v. State, supra; Murry v. State, 562 So.2d 1348 (Ala.Cr.App.1988); Daniels v. State, 534 So.2d 628 (Ala.Cr. App.1985), aff'd, 534 So.2d 656 (Ala.1986), cert. denied, 479 U.S. 1040, 107 S.Ct. 898, 93 L.Ed.2d 850 (1987); Ex parte Cochran, 500 So.2d 1179 (Ala.1985). No evidentiary hearing is required. The rewritten sentencing order of the trial court shall be filed in this court within 35 days from the date of this opinion.
REMANDED WITH DIRECTIONS.
LONG, P.J., and McMILLAN and COBB, JJ., concur.
BASCHAB, J., concurs in result only.

*350 ON RETURN TO REMAND

FRY, Judge.
This cause was originally remanded to the trial court "with directions that that court enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, [Ala.Code 1975,] each mitigating circumstance enumerated in § 13A-5-51, and any additional nonstatutory mitigating circumstances offered pursuant to § 13A-5-52." See Griffin v. State, 790 So.2d 267, 349 (Ala.Cr.App. 1999). The trial court has complied with those directions and has submitted an amendment to its original sentencing order on return to remand that satisfies the statutory requirements.
Section 13A-5-53, Ala.Code 1975, requires that this Court address the propriety of Griffin's conviction and sentence to death. Griffin was indicted and convicted of capital murder as defined in § 13A-5-49(6), i.e., murder committed for pecuniary gain.
The record indicates that Griffin's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. § 13A-5-53(b)(1), Ala.Code 1975.
A review of the record reflects that the trial court correctly found that the aggravating circumstances outweighed the mitigating circumstances. The trial court reviewed all the evidence offered and found the following aggravating circumstances:
1. Griffin was under a sentence of imprisonment at the time he committed the capital offense, see § 13A-5-49(1);
2. Griffin had been previously convicted of felonies involving the use or threat of violence to the person, see § 13A-5-49(2); and
3. Griffin committed the capital offense for pecuniary gain, see § 13A-5-49(6).
The trial court found no statutory or nonstatutory mitigating circumstances. See §§ 13A-5-51 and 52. The trial court weighed the aggravating circumstances against the absence of any mitigating circumstances and sentenced Griffin to death. We agree with the trial court's findings in the present case.
However, pursuant to § 13A-5-53(b), Ala.Code 1975, we must independently weigh the aggravating and mitigating circumstances to determine the propriety of Griffin's sentence. After an independent weighing, we are convinced that the sentence of death is the appropriate sentence in this case.
We also conclude that Griffin's sentence was not disproportionate or excessive when compared to the penalties imposed in similar cases. See § 13A-5-53(b)(3), Ala. Code 1975. See, e.g., Ex parte Scott, 728 So.2d 172 (Ala.1998), cert. denied, 528 U.S. 831, 120 S.Ct. 87, 145 L.Ed.2d 74 (1999); Sockwell v. State, 675 So.2d 4 (Ala.Cr.App. 1993), aff'd, 675 So.2d 38 (Ala.1995); and Harris v. State, 632 So.2d 503 (Ala.Cr.App. 1992), aff'd, 632 So.2d 543 (Ala.1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995).
Finally, we have searched the entire record for any error that may have adversely affected Griffin's substantial rights and found none. Rule 45A, Ala.R.App.P.
Griffin's conviction and sentence of death are due to be, and are hereby, affirmed.
AFFIRMED.
LONG, P.J., and McMILLAN, COBB, and BASCHAB, JJ., concur.
NOTES
[1] Bimbo was also tried for capital murder involving the homicide of Christopher Davis. Bimbo was found guilty of the lesser included offence of intentional murder and was sentenced to life imprisonment.
[2] Bimbo was a witness for the defense; therefore, the state did not, as Griffin argues in his brief to this Court, rely on his testimony to establish the elements of Griffin's capital-murder charge.
[3] Griffin cites pages 318, 462-63, 464, 479, 486, 548, 549, 550, and 552 of the trial record.
[4] Within each count of the indictment, Griffin is charged with several counts of murder, including the murder for hire of Davis, attempted murder, conspiracy to commit murder, conspiracy to commit robbery, robbery, and conspiracy to distribute controlled substances. Griffin pleaded guilty to each one of these offenses when he entered his plea of guilty to the R.I.C.O. violations.
[5] Upon remand and consideration of the two additional mitigating factors, the trial court sentenced Henderson to life imprisonment without parole.
[6] The admission of Griffin's federal plea allocution is discussed in Part VI of this opinion.
[7] For example, the trial court provided funds for Griffin's witness, Smith, to travel from New York City. Her testimony was critical to present Griffin's defense that he was not in Alabama at the time of Davis's murder.
[7] See Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)(holding that the confession of a non-testifying defendant in a joint trial cannot be used to implicate a non-confessing codefendant by name).
[8] Griffin and Bimbo had been scheduled to be tried jointly, but the cases were severed prior to trial. Bimbo was tried approximately six weeks before Griffin.
[9] As the state points out, this date is obviously a clerical error.
[10] Originally, Griffin and Bimbo were to be tried together, but Griffin's first trial counsel withdrew and his case was severed from Bimbo's.
[11] Walsh was the F.B.I. agent who assisted in securing the federal government's plea agreement with Johnny Spragg.
[12] Griffin alleges that the emphasized portion is error.
[13] Griffin claims error concerning the emphasized portion of the record.
[14] Griffin also claimed that the state improperly argued that his federal plea allocution was not knowingly and voluntarily made. Griffin's plea was determined to be properly admitted in Part VI of this opinion; therefore, no error occurred in the state's argument.
[15] Griffin cites to R. 432, 564, 733, 761, and 908.
[16] Although Griffin cites J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), in support of this claim, no argument was provided. Therefore, based on the record before us and Griffin's brief, there is no indication of plain error.